

Theresa Ann Tokashiki, In Pro Per/Pro se
2169 Dalis Drive
Concord, California 94520-5419
(925) 691-4011

FILED

JUL 18 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RECEIVED

JUL 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

THERESA A. TOKASHIKI,

               Plaintiff

    vs.

KAISER FOUNDATION HOSPITALS,
AMY L'AMOREAUX, DIANE THURIN,
KRISTIN HEIMAN, DOES 1 THROUGH
10, inclusive,

               Defendants.

**Case No.  Case No.  C 08-0357 BZ**

**NOTICE OF MOTION AND MOTION FOR
LEAVE OF COURT for [PROPOSED]
SECOND (2nd) AMENDED COMPLAINT FOR
DAMAGES:**

| | |
|---|---|
| Date: | July 15, 2008 |
| Judge: | Magistrate Judge Bernard Zimmerman |
| Court location: | 450 Golden Gate Avenue |
| | San Francisco, California 94102 |
| Date of Hearing: | Wednesday, August 20, 2008 |
| Time of Hearing: | 10:00am |
| Floor: | 15th Floor |
| Courtroom No. | #G, Judge Zimmerman's Courtroom |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on Wednesday, August 20, 2008 at 10:00am or as soon thereafter as the

parties may be heard, the Plaintiff, Theresa A. Tokashiki appearing In Pro Per/Pro se, will move this

Court, at the United States District Courthouse located at 450 Golden Gate Avenue, San Francisco,

1   California, 94102, 15th Floor at Courtroom #G, the Courtroom of Magistrate Judge Bernard Zimmerman,

2   for Leave to file a SECOND (2nd) AMENDED COMPLAINT FOR DAMAGES .

3

4   Plaintiff, Theresa A. Tokashiki appearing In Pro Per/Pro se moves this Court for an order under

5   *Rule 15(a)(2) of the Federal Rules of Civil Procedure* granting her leave to file the SECOND (2nd)

6   AMENDED COMPLAINT FOR DAMAGES in the form shown in the copy of the proposed SECOND

7   (2nd) AMENDED COMPLAINT FOR DAMAGES that is attached to this motion as <u>Exhibit A</u>.

8

9   Plaintiff, Theresa A. Tokashiki In Pro Per/Pro se seeks leave to amend at this time because justice

10  requires that the Plaintiff be given an opportunity to correct the defects in the original complaint, which

11  was moved from Superior Court of California Martinez to this Court on January 18, 2008.   The Plaintiff

12  made several mistakes in her "Draft Copy", then accidentally omitted text that is vital to one cause of

13  action, of this SECOND (2nd) AMENDED COMPLAINT FOR DAMAGES sent to Defendants for

14  stipulation on June 30, 2008.  The Plaintiff would like this Court to allow the second "Draft" sent to the

15  Defendants with all changes and additions, admitted in and accepted as the [PROPOSED] SECOND (2nd)

16  AMENDED COMPLAINT FOR DAMAGES.  If that means the Plaintiff would then file a [PROPOSED]

17  THIRD (3rd) AMENDED COMPLAINT FOR DAMAGES, she would be happy to do so.  The Defendants

18  Counsel, Chris Baker indicated to Plaintiff he would not stipulate to the first one – with typos, or he also

19  wouldn't stipulate to the corrected one. The Plaintiff is filing today, the original one sent to the

20  Defendants on June 30, 2008. The only changes she made was to add an "Exhibit A" text box at the top

21  and corrected the address for the Court in the caption box.

22                                              Respectfully submitted,

23

24

25  Dated: July 15, 2008                        Theresa A. Tokashiki, In Pro Per/Pro se

26

Theresa Ann Tokashiki, In Pro Per/Pro se
2169 Dalis Drive
Concord, California 94520-5419
(925) 691-4011

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

THERESA A. TOKASHIKI,

                 Plaintiff

      vs.

KAISER FOUNDATION HOSPITALS,
AMY L'AMOREAUX, DIANE THURIN,
KRISTIN HEIMAN, DOES 1 THROUGH 10,
inclusive,

                Defendants.

**Case No.  Case No.  C 08-0357 BZ**

**DECLARATION IN SUPPORT OF
PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR  LEAVE OF COURT for
[PROPOSED] SECOND (2nd) AMENDED
COMPLAINT FOR DAMAGES [PROPOSED]
SECOND (2nd) AMENDED COMPLAINT FOR
DAMAGES:**

Date:       July 15, 2008

Court location:  450 Golden Gate Avenue
                   San Francisco. California 94102

*DECLARATION OF THERESA A. TOKASHIKI*

I, THERESA A. TOKASHIKI, declare:

1.     My name is THERESA A. TOKASHIKI. I am over 18 years of age. I reside at 2169 Dalis Drive, Concord, California. I am fully competent to make this Declaration and I have personal knowledge of the facts stated in this Declaration. To my knowledge, all of the facts stated in this Declaration are true and correct.

2.     I am the Plaintiff in this matter. I make this Declaration in support of the SECOND (2nd) AMENDED COMPLAINT, and I am stating this DECLARATION in support of my filing.

-1-
**DECLARATION IN SUPPORT OF PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR  LEAVE OF COURT for [PROPOSED] SECOND
(2nd) AMENDED COMPLAINT FOR DAMAGES [PROPOSED] SECOND (2nd) AMENDED COMPLAINT FOR DAMAGES**
TOKASHIKI vs. KAISER FOUNDATION HOSPITALS
United States District Court for the Northern District of California
**Case No.  C 08-0357 BZ**

3.      I made several mistakes in my "Draft Copy", then accidentally omitted text that is vital to one cause of action "Breach of Contract", of this SECOND (2nd) AMENDED COMPLAINT FOR DAMAGES sent to Defendants for stipulation on June 30, 2008.

4.      I would like this Court to allow the second "Draft" that I sent to the Defendants with all changes and additions, admitted in and accepted as the [PROPOSED] SECOND (2nd) AMENDED COMPLAINT FOR DAMAGES.  If that means I would then file a [PROPOSED] THIRD (3rd) AMENDED COMPLAINT FOR DAMAGES, I would be happy to do so.

5.      The Defendants Counsel, Chris Baker indicated to me he would not stipulate to the first one – with typos, and/or he also wouldn't stipulate to the corrected one.  The interesting thing is, that I don't understand this; if he won't stipulate anyway with either complaint format, I would then come to this Court for motion of leave and it would be reviewed judicially at that point.

6.      Quoting from the order of June 11, 2008 by Judge Zimmerman, "Failing that, the Plaintiff shall provide a copy of the proposed 2nd amended complaint by June 30, 2008."  I followed orders completely, but had a few problems because I'm just in so much pain with my neck and spine problem that sitting, reading, and typing just isn't fun at all.  This is from an email I sent back to Chris Baker regarding this issue as I stated to Chris, "Because I can't sit that long and read due of my spine/neck situation, some of my edits were left out then, when I checked it a few days later when I felt better, I left out a big portion of my breach of contract information which is vital to my filing."

7.      I filed a declaration supporting the enlargement of time I filed on June 2, 2008 with a copy of surgery plans for the future.

I declare under penalty of perjury under the laws of the United States that the foregoing Declaration is true and correct. I have executed this Declaration on July 15, 2008, Concord, California.

Respectfully submitted,

Dated: July 15, 2008                         Theresa A. Tokashiki, In Pro Per/Pro se

/

/

-2-

1   Theresa Ann Tokashiki, In Pro Per/Pro se
    2169 Dalis Drive
2   Concord, California 94520-5419
    (925) 691-4011
3

4

5

6

7                    UNITED STATES DISTRICT COURT

8             FOR THE NORTHERN DISTRICT OF CALIFORNIA

                           Chamber's Copy
9

10  THERESA A. TOKASHIKI,                Case No.  Case No. C 08-0357 BZ

11                    Plaintiff          [PROPOSED] ORDER for NOTICE OF MOTION
                                         AND MOTION FOR  LEAVE OF COURT for
12                                       [PROPOSED] SECOND (2nd) AMENDED
            vs.                          COMPLAINT FOR DAMAGES:
13

14  KAISER FOUNDATION HOSPITALS,         Date:           July 15, 2008
    AMY L'AMOREAUX, DIANE THURIN,        Judge:          Magistrate Judge Bernard Zimmerman
15  KRISTIN HEIMAN, DOES 1 THROUGH       Court location: 450 Golden Gate Avenue
                                                         San Francisco, California 94102
16  10, inclusive,                       Floor:          15th Floor
                                         Courtroom No.   #G, Judge Zimmerman's Courtroom
17                    Defendants.

18

19

20          This matter came on for hearing on August 20, 2008, on Plaintiff's duly noticed SECOND (2nd)

21  AMENDED COMPLAINT FOR DAMAGES.  Having read the papers submitted in support of and in

22  opposition to the motion and having considered the arguments of counsel, the Court finds that justice

23  requires that leave to amend be granted.  Accordingly,

24

25  IT IS ORDERED THAT:

26
                                              -1-
[PROPOSED] ORDER for LEAVE OF COURT FOR [PROPOSED] SECOND (2nd) AMENDED COMPLAINT FOR DAMAGES
TOKASHIKI vs. KAISER FOUNDATION HOSPITALS
United States District Court for the Northern District of California
Case No.  C 08-0357 BZ

1.     The motion is GRANTED;

2.     The Plaintiff is given leave to file the SECOND (2nd) AMENDED COMPLAINT FOR DAMAGES that was attached as <u>Exhibit A</u> to the Motion.

3.     The Plaintiff must file and serve this amended pleading no later than Friday, September 12, 2008.

4.     The Defendants may respond to this amended pleading within Thirty (30) days after service is completed.

Dated:

_____

Magistrate Judge Bernard Zimmerman,
UNITED STATES MAGISTRATE JUDGE

/

/

/

/

/

/

/

/

/

/

/

/

/

[PROPOSED] ORDER for LEAVE OF COURT FOR [PROPOSED] SECOND (2nd) AMENDED COMPLAINT FOR DAMAGES
TOKASHIKI vs. KAISER FOUNDATION HOSPITALS
United States District Court for the Northern District of California
Case No.  C 08-0357 BZ

1  Theresa Ann Tokashiki, In Pro Per/Pro se
   2169 Dalis Drive
2  Concord, California 94520-5419
   (925) 691-4011
3

4

5

6

7                    **UNITED STATES DISTRICT COURT**

8              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10  THERESA A. TOKASHIKI,                    **Case No.  Case No.  C 08-0357 BZ**

11                                           **SECOND (2ⁿᵈ) AMENDED COMPLAINT FOR DAMAGES:**
12                          Plaintiff

13                                           1.  **Breach of Contract**
                                             2.  **Breach of Contract Based on Correspondence**
         vs.                                     **Between Parties**
14                                           3.  **Contract Tort**
                                             4.  **Intentional Infliction of Emotional Distress**
15                                           5.  **Breach of the Implied Covenant of Good Faith and**
16  KAISER FOUNDATION HOSPITALS,                 **Fair Dealing**
    AMY L'AMOREAUX, DIANE                    6.  **Wrongful Discharge in Violation of Public Policy**
17  THURIN, KRISTIN HEIMAN, DOES 1               **California Fair Employment and Housing Act:**
    THROUGH 10, inclusive,                   7.  **Discrimination-Denied Physical and Mental**
18                                               **Accommodations, Mental Discrimination,**
                                                 **Continuing Violations**
19                          Defendants.       Date:             June 30, 2008
                                              Court location:   450 Golden Gate Avenue
20                                                              San Francisco, California 94102

21       The Plaintiff, THERESA A. TOKASHIKI, alleges as follows:

22       1.    Jurisdiction. This court has jurisdiction over the *U.S. Code Title 41 Chapter 10 §701* which

23  represents the Wrongful Discharge in Violation of Public Policy portion of this complaint because it arises

24  under the laws of the United States.  Jurisdiction for Breach of Contract, Breach of Contract Based on

25  Correspondence Between Parties, Contract Tort, Intentional Infliction of Emotional Distress, Breach of

26  the Implied Covenant of Good Faith and Fair Dealing, and the Discrimination causes of action are to be

27

                                          -1-

1  known as State of California actions.  Further review by this Court of jurisdiction location would be
desirable.

2      2.      Venue. Venue is appropriate in this Court, as it was removed based on Federal Question.

3      3.      Intra-district Assignment. This lawsuit has been assigned to the San Francisco Division of
4  this Court upon the Defendants Removal to United States District Court from Superior Court of
California, Martinez.
5
                    **FIRST (1st) CAUSE OF ACTION:**
6                        Breach of Contract
       4.      Kaiser Foundation Hospitals (hereinafter "Kaiser") is, and at all times herein relevant, was
7  a corporation organized under the laws of the State of California and, was operating within Contra Costa
8  County at the time of the injury to the Plaintiff.

9      5.      Defendant Amy L' Amoreaux (hereinafter "L'Amoreaux") was at all times herein relevant,
10 an employee of Kaiser Foundation Hospitals and, employed Contra Costa County.

       6.      Defendant Diane Thurin (hereinafter "Thurin") was at all times herein relevant, an
11 employee of Kaiser Foundation Hospitals and, employed in Contra Costa County.

12     7.      Defendant Kristin Heiman (hereinafter "Heiman") was at all times herein relevant, an
13 employee of Kaiser Foundation Hospitals and, employed in Alameda County.

14     8.      The true names and capacities of, the factual basis of liability for the Defendants sued
15 herein as " DOES" are unknown to Plaintiff, but Plaintiff is informed and believes that they are
responsible in someway for the acts, omission, and/or occurrences alleged herein, and that Plaintiff's
16 damages are caused by such defendants.

17     9.      On or about September 24, 2003, at Oakland, Alameda County, California, Plaintiff entered
18 into a written agreement with Kaiser titled "SETTLEMENT AGREEMENT, COMPROMISE AND
19 GENERAL RELEASE" a copy of which is attached as Exhibit 18 (A) and made a part of this pleading.
   The agreement in Exhibit 18 (A) was put together to resolve an employment dispute between the parties.
20 A copy of Exhibit 18 (A) is attached hereto this Complaint by way of a Declaration in Support of this
21 Complaint under penalty of perjury by Theresa A. Tokashiki indicating its authenticity as a true copy.

22     10.     Plaintiff has performed all conditions, covenants, and promises required on her part to be
23 performed in accordance with the terms and conditions of the contract noted as Exhibit 18 (A).

       11.     .On or about June 20, 2005 Kaiser, L'Amoreaux and Jan Austin of Kaiser Human
24 Resources breached Exhibit 18 (A) by allowing an email to be sent or a document to be copied, faxed or
25 given, noted as Exhibit 1 with information typed that breached Paragraph 7 of Exhibit 18 (A).

26
                                  -2-
27

12.    On, about, before or after June 20, 2005 Kaiser and their agents breached <u>Exhibit 18 (A)</u> by allowing a document to be created and copied, faxed, sent, or given, noted as <u>Exhibit 1a</u> with information typed that breached Paragraph 7 of <u>Exhibit 18 (A)</u>.

13.    One of several conditions, covenants, and promises of <u>Exhibit 18 (A)</u> was that Kaiser would seal the employment record of the Plaintiff and, that; said records were to be maintained for legal and regulatory matters only.  Kaiser also was supposed to only modify Plaintiffs termination of March 27, 2002 to show a "restoration of Plaintiffs job".

14.    In Paragraph 7 of <u>Exhibit 18 (A)</u> Kaiser promised to *"rescind"* the Plaintiff's *"termination"*, and Plaintiff's *"personnel file will be modified to so reflect"* this.  However, in <u>Exhibit 1a</u> Kaiser completely changed the employment history of the Plaintiff, which is against the agreement of Paragraph 7 of <u>Exhibit 18 (A)</u>.  The following paragraphs below noted of 12 through _ _ are several areas where Kaiser and their agents breached <u>Exhibit 18 (A)</u>.

15.    More specifically speaking of one breach of <u>Exhibit 18 (A)</u> exercised by Kaiser and their agents is typed in Kaiser records noted as <u>Exhibit 3a</u>.  It states in <u>Exhibit 3a</u> that Plaintiff was terminated from Kaiser Martinez in 1991 for the reason of "Unavailable for work".

However, Kaiser's stated reason on <u>Exhibit 1a</u> for termination states  "Unsatisfactory work performance".  The agreement between Plaintiff and Kaiser in Paragraph 7 of <u>Exhibit 18 (A)</u> was that Kaiser was only supposed to modify Plaintiffs March 27, 2002 termination to reflect a "Rescind" of that termination only, no more.  The Breach is Kaiser and their agents did more than totally modify Plaintiff's employment record in <u>Exhibit 1a</u> and that was not what Plaintiff and Kaiser agreed upon in Paragraph 7 of <u>Exhibit 18 (A)</u>.

16.    Kaiser and their agents modified Plaintiffs employment history and in a negative way by typing a false comment that was not made by Plaintiff.  Plaintiff never made a comment such as what is stated in <u>Exhibit 1a</u> of: "Per Terri she quit due to traumatic experience causing temporary memory loss".  Plaintiff suffers from Post Traumatic Stress Disorder (hereinafter P.T.S.D.).  This P.T.S.D. pertains to memory loss issues from a sexual assault of May 1991 that was not known prior to November of 2000.  Kaiser was only supposed to modify Plaintiffs March 27, 2002 termination to reflect a "Rescind" of that termination only, no more.  The Breach is Kaiser and their agents did more than totally modify Plaintiff's employment record in <u>Exhibit 1a</u>, and that was not what Plaintiff and Kaiser agreed upon in Paragraph 7 of <u>Exhibit 18 (A)</u>.

17.     Kaiser and their agents breached Exhibit 18 (A) by opening the seal of Plaintiffs personnel file to reveal memory issues specifically related to the March 27, 2002 termination.  Further noting paragraph 7 of Exhibit 18 (A) Kaiser would only "open the sealed envelope in Plaintiffs personnel file" for legal and regulatory purposes only and shall be accessed or used only in connection with those activities.  "Access" or "Used" only for those reasons.  Refer to subpoenaed Kaiser record noted as Exhibit 3a from time of 1991 termination as it states reason for termination was "Unavailable for work".  Plaintiffs Psychiatrist announced to Kaiser in Exhibit 5 on February 7, 2002 that she has "memory loss".  Kaiser stamped on this letter "Received Feb 19 2002".  Exhibit 3a are records from Kaiser Human Resources Department acquired by the Plaintiffs previous attorney for the sexual assault case that happened in May of 1991.  These records clearly indicate that the Plaintiff's employment ended because of "Unavailable for work" and not "Unsatisfactory work performance" as stated in Exhibit 1a at the first entry.

Date Begin: 05/01/1991, Date End: 08/24/1991, Action: Martinez Operator Services.  Terminated in the 1st 90 days due to unsatisfactory work performance, Comment: Per Terri she quit due to traumatic experience causing temporary memory loss."

2nd BREACH OF EXHIBIT 18 (A), Paragraph 7 is in breach:

Breach #D: The Plaintiff was not a "Rehire" on May 30, 2000, she was a "New Hire" that date. The section below indicating the employment "to current" also never happened as it is stated in Exhibit 1a because the Plaintiff was never a "Rehire" status at any time.

Breach #E: If Plaintiff was a "Rehire to Kaiser" as stated in Exhibit 1a, then she wouldn't have been terminated from Kaiser on March 27, 2002 to begin with.  The Breach is Kaiser and their agents did more than totally modify Plaintiff's employment record in Exhibit 1a and that was not what Plaintiff and Kaiser agreed upon in Paragraph 7 of Exhibit 18 (A).  See below:

**Exhibit 1a**

| Date Begin | Date End | Action | Comment |
|---|---|---|---|
| 05/30/2000 | To current | Rehire Walnut Creek Operator Services | |

The Plaintiff was a "New Hire" to Kaiser on May 30, 2000 and not a "Rehire".  Changing all employment or termination history was not what Kaiser and Plaintiff agreed upon in Exhibit 18 (A).  Kaiser was only supposed to "modify Plaintiff's March 27, 2002 termination" to show a "reinstatement" from the March 27, 2002 termination of Plaintiff.  In the few paragraphs below, the Plaintiff gives important information to assist with time frames.

More History prior to the 2002 termination from Kaiser:

The Plaintiff was terminated March 27, 2002 for stating "No" on the employment application when she filled it out in April of 2000.  Plaintiff as mentioned above, suffers from P.T.S.D. and the

-4-

period of time from parts of 1991 to parts of 1993 are part of this time period of Plaintiffs memory issue.

Amy Shaw knew in November of 2000 that Plaintiff was a possible past employee of Kaiser. At that time, Plaintiff was suffering from a very sick pregnancy in November of 2000. Amy Shaw and Plaintiffs union representative Marie Bates spoke with Plaintiff about her perfect attendance record. The fact that in recent week's prior, Plaintiff took off several days due to pregnancy illness that was going to go against her attendance record. Amy Shaw and Marie Bates mentioned to Plaintiff a "30-day unpaid leave" would need to be taken if she called in sick one more time. Plaintiff thought there was a "Family Medical Leave Program", but Amy stated she didn't think Plaintiff had enough "time on the books yet" and mentioned Plaintiffs hire date of May 30, 2000 to figure qualifying time for the program. Amy stated to Plaintiff and Marie Bates that she would "check on it." Exhibit 10 is the email Amy Shaw (L'Amoreaux) sent to Marie Bates and Kathy Castagnetto of Kaiser Human Resources on November 27, 2000, and Plaintiffs personal email. "Based on a conversation I had with Theresa last week, she was a previous Kaiser employee (I did not know this prior)".

Below are dates Plaintiff handled issues including pay, safety, protection for her fellow coworkers and budget issues with Amy Shaw (L'Amoreaux):

April 13, 2001 Plaintiff reports Amy Shaw (L'Amoreaux) to Administration for wanting the PBX Operators to turn off the switchboard on graveyard shift because Plaintiff felt it was unsafe.

April 13, 2001 Plaintiff asks for back-pay for all the PBX Operators pursuant to a new "Denied Lunch Break Law" in effect October 1, 2000. Kaiser Oakland Operators were paid in October of 2000 back-pay plus penalties and Plaintiff wanted answers from Amy Shaw (L'Amoreaux).

January 7, 2002 Plaintiff mentions to Senior Operator Mary Jo Smith she was turning Amy Shaw in to Kaiser corporate for her department budgeting problems and managerial problems.

January 19, 2002 Plaintiff stuck-up for fellow co-workers and involves the Nursing Supervisor.

January 24, 2002 Amy Shaw (L'Amoreaux) plans to terminate Plaintiff.

March 27, 2002 Amy Shaw (L'Amoreaux) terminates Plaintiff.

3rd BREACH OF EXHIBIT 18 (A), Paragraph 7 is in breach:

Please view Exhibit 1a for actual document. This section contains one (1) breach.

Breach #F: The Plaintiff never refused to meet with her manager regarding poor attendance. The Plaintiff was suspended because she had to go to the Emergency Room for pregnancy illness, and Amy Shaw had different plans for Plaintiff – a "Termination". It made Amy Shaw angry as her heated words and temper showed through clearly while she yelled at Plaintiff "Terri if you leave now it will be dangerous for you...". Kaiser and their agents breached Paragraph 7 of Exhibit 18 (A) by doing more of a modify a

-5-

termination to show a "rescind", they completely changed the history of Plaintiffs personnel file, that is also against the agreement.

**Exhibit 1a**

| Date Begin | Date End | Action | Comment |
|---|---|---|---|
| 01/25/2002 | 03/27/2002 | Suspension without pay <br> • Unprofessional conduct <br> • PAR shows unpaid | Investigation – Refused to meet w/ manager regarding poor attendance |

Exhibit 8 (A) Is the suspension letter from Amy Shaw regarding what happened on January 24, 2002, as she indicates the date of suspension to be "last evening". Plaintiff was suspended for allegedly being "Insubordinate" and not suspended for "Refused to meet w/Amy because of poor attendance", as stated in this section of Exhibit 1a.

More history of Plaintiffs suspension January 24, 2002 and March 27, 2002 termination:

Amy Shaw was planning on terminating Plaintiff on 1/24/2002 verified in Exhibit 8 (D) a Kaiser "Personnel Action Request Form" to "cancel termination of Plaintiff" filled out by Amy Shaw on 1-31-2002. Amy Shaw notes in Exhibit 8 (A) at paragraph four (4), "I have scheduled a meeting to address the original intention for Friday, February 1st at 4:00pm".

Witnessing everything at the grievance meetings of 2002, Greg Tegenkamp took notes at these meetings noted Exhibit 7 (E). Greg Tegenkamp was the Plaintiffs Field Representative from the union. On Page SEIU004 of Exhibit 7 (E) Greg states, "[January 25 on administrative leave w/out pay 4 mtg. to terminate]". Translating Greg's simply states Amy Shaw was terminating Plaintiff on January 24, 2002, and no suspension was planned for that date. Amy Shaw had no intention of placing Plaintiff on "Suspension" at all, she wanted the Plaintiff gone.

The Plaintiff was pregnant on January 24, 2002 and sick with morning sickness and other pregnancy related sickness. Plaintiff told Amy Shaw (now Amy L'Amoreaux) that she was sick from her pregnancy early that morning approximately 9:30am. At 11:02am that date Amy Shaw sent an email Exhibit 8 (C) to Plaintiff requesting her presence at a meeting with union representatives and Amy Shaw at 4:30pm that date. Plaintiff had not opened her email that date. Approximately 4:20pm Plaintiff returns after a department meeting. Plaintiff didn't get her last break of the day and asked Amy Shaw if she could take her break. Amy Shaw responded negatively to Plaintiff by stating she could only take a break for five (5) minutes because of "the meeting at 4:30". Knowing the Plaintiff was very sick, Amy Shaw tried to force her into the meeting but plaintiff was vomiting in the bathroom and upset. That's why the Plaintiff really needed her break to try to rest and eat a little because of her pregnancy sickness all day. Plaintiff called Administration, then the Nursing Supervisor. The Nursing Supervisor told Plaintiff if she is pregnant and sick she should leave and go to the Emergency Room immediately, and to inform Amy Shaw she has to leave to go to the Emergency Room. Plaintiff did tell Amy Shaw she had to leave because of her pregnancy illnesses. Next Amy Shaw states to Plaintiff, "Terri if you leave now it will be dangerous for you and your union representatives agree!" Then Amy Shaw suspends Plaintiff. Plaintiff starts to the Emergency Room right after Amy Shaw suspended her without pay. Delirious, heart racing, crying and sick, the Plaintiff walked to MIIC and was ready to pass out. Plaintiff went to the wrong area of the hospital. A nurse got a wheel chair and

-6-

1   wheeled Plaintiff to the Emergency Room. Emergency Room doctor diagnosed Plaintiff with "Threatened Miscarriage and Elevated Blood Pressure". All of this took place on January 24, 2002.

2

3   4th BREACH OF EXHIBIT 18 (A), Paragraph 7 is in breach:

4   Please view Exhibit 1a for actual document. This section contains two (2) breaches.

5   Breach #G: The termination of March 27, 2002 was not "reversed", it was agreed upon to be "rescinded". The Breach is Kaiser and their agents did more than totally modify Plaintiff's employment record in

6   Exhibit 1a and that was not what Plaintiff and Kaiser agreed upon in Paragraph 7 of Exhibit 18 (A).

7
    Breach #H: The Plaintiffs personnel file was supposed to be "sealed" pertaining to the termination of
8   March 27, 2002. Kaiser and their agents opened the Plaintiffs file and broke the "seal" to discuss the
    actual termination which constitutes a breach of Paragraph 7 of Exhibit 18 (A). See below:
9

10
                                                                                    **Exhibit 1a**

| Date Begin | Date End | Action | Comment | |
|---|---|---|---|---|
11 | 03/27/2002 | | Termination – involuntary | Reversed | |
| | | • Falsification of application | | |

12
    The termination of March 27, 2002 was "rescinded" on September 24, 2003. Exhibit 18 (A)
13  clearly reads in Paragraph 7 that Kaiser agreed the opposite of what they stated in the "comment"
    section above. Plaintiffs termination of March 27, 2002 was not to be discussed only for legal
14  and regulatory reasons only.

15  5th BREACH OF EXHIBIT 18 (A), Paragraph 7 is in breach:

16  Please view Exhibit 1a for actual document. This section contains two (2) breaches.

17
    Breach #I: Amy Shaw (L'Amoreaux) created a document that "reversed the Plaintiffs termination of 2-1-
18  02". This termination was to take place originally on 1-24-2002 but the date was changed to 3-27-2002.
    The document (Exhibit 8 (D)) is mentioned in Exhibit 1a. This breach translates to Kaiser and their agents
19  discussing the contents of the "sealed envelope" in Plaintiffs personnel file regarding termination of
    "March 27, 2002" insofar as to create a document memorializing that envelopes contents. That is against
20  what was agreed upon in Paragraph 7 of Exhibit 18 (A).

21  Breach #J: The Plaintiffs termination of March 27, 2002 was "rescinded" on September 24, 2003, and
    never agreed upon between Kaiser and Plaintiff to ever "reverse" the termination of March 27, 2002. The
22  agreement was that Kaiser would "rescind" Plaintiffs termination. Anything further constitutes a breach
    of Exhibit 18 (A). The Breach is Kaiser and their agents did more than totally modify Plaintiff's
23  employment record in Exhibit 1a and that was not what Plaintiff and Kaiser agreed upon in Paragraph 7 of
24  Exhibit 18 (A). See below:

25

26
                                          -7-
27

| Date Begin | Date End | Action | Comment **Exhibit 1a** |
|---|---|---|---|
| 02/01/2002 | | Termination reversal effective date | Settlement agreement signed 9/4/2003 w/ back wages |

Exhibit 8 (D) is a document that Amy Shaw filled out to reverse the termination date of "2-1-02". Keeping in mind that Plaintiff was off work on "2-1-02" as the Emergency Room doctor ordered this due to Plaintiffs pregnancy illness on January 24, 2002 just after Amy Shaw suspended Plaintiff. This was Amy Shaw's second attempt at terminating Plaintiff in 2002. Exhibit 8 (A) in the fourth paragraph states a meeting to take place "to address the original intention for Friday, February 1st, 2002".

6th BREACH OF EXHIBIT 18 (A), Paragraph 7 is in breach:

Please view Exhibit 1a for actual document. This section contains one (1) breach.

Breach #K: Anything tied to Plaintiffs March 27, 2002 termination is supposed to be sealed in an envelope in Plaintiffs personnel file per the agreement of Kaiser and Plaintiff in Exhibit 18 (A). Kaiser and their agents breached Exhibit 18 (A) by discussing in any way shape or form, details precisely connected to Plaintiffs March 27, 2002 termination. Kaiser and their agents state in the comment section an EEOC filing against "KP" that was filed by the Plaintiff. Next in the comment section below it staes that the Plaintiff was denied reasonable accommodation and it is tied to termination of the Plaintiff. As this information was supposed to be under seal, this information was released for reasons other than what was agreed upon in Exhibit 18 (A), which leads to a breach of that agreement.

| Date Begin | Date End | Action | Comment **Exhibit 1a** |
|---|---|---|---|
| 10/16/2002 | 01/08/2003 | EEOC against KP for reasonable accommodation | Denied reasonable accommodation. Case closed w/ ee receiving right to sue. Tied to termination |

The Plaintiff was denied accommodation as it states there, that is a true statement. However, discussing this openly, or accessed by Plaintiffs personnel file or used in anything other than for "legal and regulatory purposes" puts Kaiser and their agents in breach of Exhibit 18 (A).

7th BREACH OF EXHIBIT 18 (A), Paragraph 7 is in breach:

Please view Exhibit 1a for actual document. This section contains two (2) breaches.

Breach #L: On "01/25/2002" the Plaintiff was suspended from her job at Kaiser as mentioned in the '3rd BREACH' area above. Modifying the Plaintiffs termination of March 27, 2002 was what the Plaintiff and Kaiser agreed to, and not a complete rearranging of Plaintiffs employment history. The Breach is Kaiser and their agents did more than totally modify Plaintiff's employment record in Exhibit 1a and that was not what Plaintiff and Kaiser agreed upon in Paragraph 7 of Exhibit 18 (A).

Breach #M: On "01/22/2004" the Plaintiff was not on "Medical Leave", she returned to Kaiser per the "Settlement Agreement" for her March 27, 2002 termination" from Kaiser known as Exhibit 18 (A).

-8-

January 5th & 6th of 2004 the Plaintiff was in orientation, then she returned to her telephone operator position on January 21, 2004. The Breach is Kaiser and their agents did more than totally modify Plaintiff's employment record in Exhibit 1a and that was not what Plaintiff and Kaiser agreed upon in Paragraph 7 of Exhibit 18 (A). See below:

**Exhibit 1a**

| Date Begin | Date End | Action | Comment |
|------------|----------|--------|---------|
| 01/25/2002 | 01/22/2004 | Medical Leave | |

Exhibit 10a clearly mentions the Plaintiff was to return to work on January 21, 2004, as noted by Defendant Kristin Heiman of Human Resources at Kaiser.

18.     The facts mentioned above that Kaiser and their agents are in breach of regarding the agreements with the Plaintiff in Exhibit 18 (A), as Kaiser was supposed to keep all documents regarding Plaintiffs March 27, 2002 termination under seal; not to release documents pertaining to the employment dispute of "termination". For Kaiser and their agents to be discussing contents of the Plaintiffs termination grievance documents translates to the "seal being broken". Modifying the Plaintiffs employment past prior to January 24, 2002 is also not a part of the agreement of Exhibit 18 (A); Kaiser and their agents shall not modify Plaintiffs personnel file any further than "the termination of March 27, 2002 to show it was rescinded", as this is stated clearly in Paragraph 7 of Exhibit 18 (A).

19.     The Plaintiff has P.T.S.D. and never has been diagnosed with "temporary memory loss". For the Plaintiff, that is an outright sadness to see that Kaiser stated she remembered something she didn't. Yet the intention Kaiser and their agents puts notice to is a type of diagnoses that was only discussed during "Grievance Meetings"; leading up to and for the March 27, 2002 termination as the Plaintiffs facts are backed up with exhibits. "Modifying a Termination" is one thing, but completely re-doing the actual "Employment History" was not a part of the agreement of Exhibit 18 (A) at all.

Wherefore, Plaintiff prays judgment against Defendants and each of them as follows:

1. For general damages in the amount of $1,000,000.00;

2. For compensatory damages in the amount of $1,000,000.00;

3. For reasonable cost of suit herein incurred;

4. For judicial arbitration with a neutral arbitrator for this cause of action and;

5. For such other and further relief as the court may deem proper.

## SECOND (2nd) CAUSE OF ACTION:
Breach of Contract Based on Correspondence Between Parties
.Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 19 above.

-9-

20.    As a second and apart cause of action, Plaintiff re-alleges and incorporates all of the above causes of actions herein by reference.

21.    On or about September 24, 2003, at Oakland, Alameda County, California, Plaintiff entered into a written agreement with Kaiser titled "SETTLEMENT AGREEMENT, COMPROMISE AND GENERAL RELEASE" a copy of which is attached as Exhibit 18 (A) and made a part of this pleading. The agreement in Exhibit 18 (A) was put together to resolve an employment dispute between the parties. A copy of Exhibit 18 (A) is attached hereto this Complaint by way of a Declaration in Support of this Complaint under penalty of perjury by Theresa A. Tokashiki indicating its authenticity as a true copy.

22.    Plaintiff has performed all conditions, covenants, and promises required on her part to be performed in accordance with the terms and conditions of the contract noted as Exhibit 18 (A).

23.    On or about June 20, 2005 Kaiser, L'Amoreaux and Jan Austin of Kaiser Human Resources breached a covenant of 'good faith and fair dealing' in Exhibit 18 (A) by allowing an email to be sent or a document to be copied, faxed or given, noted as Exhibit 1 with information typed that breached Paragraph 7 of Exhibit 18 (A).

24.    On or about June 20, 2005 Kaiser, L'Amoreaux and Jan Austin of Kaiser Human Resources breached a covenant of 'good faith and fair dealing' in Exhibit 18 (A) by allowing an email to be sent or a document to be copied, faxed or given, noted as Exhibit 1a with information typed that breached Paragraph 7 of Exhibit 18 (A).

25.    On or about June 20, 2005 Kaiser, L'Amoreaux and Jan Austin breached Paragraph 4 of Exhibit 18 (A) where it states, "In exchange for Employer's performance of the acts described in Paragraphs 7 and 8, Grievant…release the Employer…(collectively "the releases") from any and all claims…This includes…any covenant of good faith and fair dealing…".   The agreement between Plaintiff and Kaiser noted as "the releases" was to abide by the   …by allowing an email to be sent, copied, faxed or given, noted as Exhibit 1 with information typed that breached Paragraph 7 of Exhibit 18 (A).

26.    On, about, before or after June 20, 2005 Kaiser and their agents breached Exhibit 18 (A) by allowing a document to be created and copied, faxed, sent, or given, noted as Exhibit 1a with information typed that breached Paragraph 7 of Exhibit 18 (A).

27.    One of several conditions, covenants, and promises of Exhibit 18 (A) was that Kaiser would seal the employment record of the Plaintiff and, that; said records were to be maintained for legal

and regulatory matters only. Kaiser also was supposed to only modify Plaintiffs termination of March 27, 2002 to show a "restoration of Plaintiffs job".

28.    In Paragraph 7 of <u>Exhibit 18 (A)</u> Kaiser promised to rescind the Plaintiff's termination, and Plaintiff's personnel file would be modified to reflect this. However, in <u>Exhibit 1a</u> Kaiser completely changed the employment history of the Plaintiff, which is against the agreement of Paragraph 7 of <u>Exhibit 18 (A)</u>

29.    On or about June 20, 2005, Amy L' Amoreaux caused confidential information contained in the <u>Exhibit 18 (A)</u> to utter publicly to the detriment of the Plaintiff in violation of the terms of the <u>Exhibit 18 (A)</u>.

30.    On or about June 20, 2005 to July 7, 2005, Jan Austin of Kaiser also breached <u>Exhibit 18 (A)</u> sending or emailing or copying or handing to someone or by way of facsimile <u>Exhibit 1</u>, <u>Exhibit 1a</u>.

31.    As a proximate result of the acts of the Defendants and each of them, Plaintiff has been damaged consisting of having personal medical information being revealed publicly, embarrassment, sadness to the point of tears and the question she reviews in her mind have no answers as to why <u>Exhibit 1</u> and <u>Exhibit 1a</u> were ever published, ever. The Plaintiff is suffering from those comments and that is not very nice of Kaiser, L'Amoreaux, Heiman, Thurin, and Jan Austin to allow any communication like that to go against their past employee, and is against all the rules, period.

Wherefore, Plaintiff prays judgment against Defendants and each of them as follows:

1. For general damages in the amount of $500,000.00;

2. For compensatory damages in the amount of $500,000.00;

3. For the cost of suit herein incurred.

### THIRD (3rd) CAUSE OF ACTION:
Contract Tort

32.    As a third and apart cause of action, Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 31, and all of the above causes of actions herein by reference.

33.    The above Cause of Action clearly depicts a Contractual Tort Action, and the hurtful comments made by Amy L'Amoreaux towards Plaintiff's memory loss disability in <u>Exhibit 1</u>, as this exhibit also breaches <u>Exhibit 18 (A)</u>, L'Amoreaux's comments on June 20, 2005 were not only unwarranted, uncalled for, against the law, the comment made against Plaintiffs mental disability reaches back into the termination from Kaiser on March 27, 2002, which is against the agreement in <u>Exhibit 18(A)</u>. The Plaintiff feels deeply hurt and has suffered mental anguish, embarrassment of mental status stated by

L'Amoreaux The audacity of L'Amoreaux typing and printing and distributing hurtful words noted as "I am surprised she would state this as she has significant memory loss on everything else… (that is me being sarcastic)".

34.    Kaiser's rendition of Plaintiffs Employment History in Exhibit 1a, I just don't understand why they would allow this to happen, especially when Exhibit 18 (A) states grievance is placed "Under Seal". So we can flutter our mouth like a butterfly in flight with whatever flies out of it? I think not. This is clear "Contract Tort" because of the contents of the "Breached Information" in Exhibit 1 and Exhibit 1a, Plaintiff already suffers from emotional and mental disabilities as ALL Defendants are aware of this. Kaiser wants to hammer the nail a little harder and harder with Plaintiff with all of the Breaches of Contract mentioned in this Complaint, and they should be held accountable for all their actions, and moreover ALL Defendants should be held accountable for the damage of those actions.

35.    The damage is done. The damages need to be heard. Settlement was on September 24, 2003 but that contract is in breach as indicated in this Complaint. Plaintiff feels the pain all over again of what she went through before, then is handed more pain with comments as L'Amoreaux made in Exhibit 1; it's not fun at all to go through unnecessary pain by Kaiser and their agents all over again.

Wherefore, Plaintiff prays judgment against Defendants and each of them as follows:

1. For general damages in the amount of $1,000,000.00;

2. For compensatory damages in the amount of $1,000,000.00;

3. For reasonable cost of suit herein incurred and;

4. For such other and further relief as the court may deem proper.

## FOURTH (4th ) CAUSE OF ACTION:
Intentional Infliction of Emotional Distress

36.    As a fourth and apart cause of action, Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 35, and incorporates all of the above causes of actions herein by reference.

37.    At all times herein relevant, Kaiser is, was a corporation organized under the laws of the State of California and, was operating within this judicial district at the time of the injury to the Plaintiff.

38.    Defendant Amy L' Amoreaux was at all times herein relevant, an employee of Kaiser Foundation Hospitals and, employed within this judicial district.

39.    At all times herein relevant, DOE Defendant 1-10 were agents, servants and employees of Kaiser Foundation Hospitals and in doing the things herein alleged were acting with the scope and course

of said employment, and were acting with the scope of their authority as such agents, servants and with the consent and permission of primary Kaiser.

40.    On or about June 20, 2005, Defendant Amy L' Amoreaux, acting within the scope and course as an agent, employee, and servant of Kaiser, did cause confidential information contained in the Plaintiff's personnel file regarding a mental conditions to be uttered publicly to the detriment of the Plaintiff in violation of the terms of Exhibit 18 (A) entered into between Kaiser and Plaintiff.

41.    As a proximate result of the negligence and carelessness of Defendant Amy L' Amoreaux, acting within the full knowledge and accent of Kaiser, and Defendants Doe 1-10 each of them, Plaintiff suffered profound shock to her nervous system resulting in emotional injuries to her person because of her personal medical information being revealed publicly.

42.    As a further proximate result of the negligence and carelessness of L' Amoreaux, acting within the full knowledge and accent of Kaiser, and Defendants Doe 1-10 each of them, Plaintiff suffered serious mental anguish and emotional distress resulting in extreme depression, because of her personal medical information being revealed publicly in violation of the agreement in Exhibit 18 (A) entered into between Plaintiff and Kaiser.

Wherefore, Plaintiff prays judgment against Defendants and each of them as follows:

1. For general damages in the amount of $1,000,000.00;

2. For compensatory damages in the amount of $1,000,000.00;

3. For reasonable cost of suit herein incurred and;

4. For such other and further relief as the court may deem proper.

## FIFTH (5th ) CAUSE OF ACTION
Breach of the Implied Covenant of Good Faith and Fair Dealing

43.    As a fifth and apart cause of action, Plaintiff re-alleges and incorporates herein paragraphs 1 through 42, and all of the above causes of action herein by reference.

44.    At all times herein relevant, Kaiser promised to seal the employment record of the Plaintiff and to maintain same for legal and regulatory matters. Implied in that Agreement/contract was a covenant that Kaiser would act in good faith and deal fairly with Plaintiff and to do nothing to deprive Plaintiff of the benefit of that Agreement/contract, Plaintiff justifiably relied of the terms of the agreement in expectation that Kaiser and their agents would honor same.

45.    Plaintiff and Defendant had a special relationship in that Plaintiff had been an employee of the Defendant and Defendant had access to very sensitive medical information re the Plaintiff and, had an

-13-

obligation to protect that information, especially being a medical provider. Defendant was aware of Plaintiff's vulnerability if the information was released to the public but, acted in reckless disregard of same.

46.     Defendant breached its obligation to Plaintiff by failing to adequately protect the Plaintiff's medical file and allowed same to be publicly released.

47.     As a proximate result bad faith breach of the Defendants, and each of them, Plaintiff has been damaged and has embarrassed and hurt consisting of having her personal medical information being revealed publicly without the permission of the Plaintiff. And Kaiser allowed L'Amoreaux to state these horrible words not only to Jan Austin, but to Plaintiffs Union Representative, as noted in Exhibit 1.

48.     Again in Exhibit 1a, one of Kaiser's agents typed an employment history with not only sensitive information on it relating to a sexual assault, but utterly lying about something that never happened.

Wherefore, prays judgment against Defendants and each of them as follows:

1. For general damages in the amount of $150,000.00;

2. For punitive damages in the amount of $300,000.00;

3. For the cost of suit herein incurred.

4. For such other and further relief as the court may deem proper.

## SIXTH (6th) CAUSE OF ACTION

**Wrongful Discharge in Violation of Public Policy**-*U.S. Code Title 41 Chapter 10 §701*
**The Federal Drug-Free Workplace Act of 1988**-*based on*
**Kaiser's Alcohol and Drugs Policy #KP 3.02 NC**-*Administrative Regulation/Company Policy*

49.     As a sixth and separate cause of action, Plaintiff re-alleges and incorporates herein paragraphs 1 through 48, and incorporates all of the above causes of actions herein by reference.

50.     At all times herein relevant, Kaiser was the employer of the Plaintiff. During the entire course of that employment, there existed an express and implied in fact employment contract between these parties noted as *U.S. Code Title 41 Chapter 10 §701*, wherein as a condition of this contract, Plaintiff would maintain said employment with Defendants indefinitely so long as she did her job efficiently and followed the *U.S. Code Title 41 Chapter 10 §701* requirements after she received a copy of Kaisers policy based on noted law indicated in *U.S. Code Title 41 Chapter 10 §701.* That by following such policy, then carried out her duties in a proper and competent manner, Plaintiff would not be demoted, discharged or otherwise disciplined nor would Plaintiff's job functions be reassigned for other

-14-

than good cause with notice thereof; Defendants would not evaluate Plaintiff's job performance in an arbitrary, untrue or capricious manner.

51.    Plaintiff never had complaints of her not doing her job, ever.  Thurin suspended Plaintiff on April 3, 2005 for Kaiser's KP 3.02 NC Policy on Alcohol and Drugs.  Noted policy as Exhibit 6, which is states in this policy it is, "codified current practice and is consistent with the requirements of the federal Drug-Free Workplace Act of 1988".  Plaintiff never received a copy of this policy.

52.    Placed on a paid suspension from April 3, 2005 through to June 20, 2005, Plaintiff was then unjustly terminated on June 20, 2005 for allegedly violating Exhibit 6 Kaiser's KP 3.02 NC Policy on Alcohol and Drugs.

53.    Keep in mind Plaintiff alerted supervisory and management of her use of vicodin and soma as prescription drugs first on January 22, 2004 with her manager L'Amoreaux, based on seeing a small paragraph in Kaisers Orientation Binder on January 6, 2004 on alcohol and drugs.  L'Amoreaux got mad at Plaintiff and requested her to never tell anyone what pain medications she was taking again.  Well, violating L'Amoreaux's request, Plaintiff knew she had to give notice of another doctor recommended treatment of pain medication called Cannabis, so she drove to Kaiser in July or August of 2004 while on approved medical leave, to show her Doctor Recommendation for Cannabis.  The appointed supervisor didn't take a copy of such Recommendation for Cannabis.

54.    Keeping in mind Plaintiff could not be demoted, discharged or otherwise disciplined nor would Plaintiff's job functions be reassigned for other than good cause with notice thereof; Defendant would not evaluate Plaintiff's job performance in an arbitrary, untrue or capricious manner.

55.    Despite the terms of this contract generated by Defendant, Defendant undertook to systematically harass, harangued Plaintiff, generating false reports against Plaintiff and, ultimately, wrongful terminating Plaintiff's employment without good cause.

56.    Defendants further breached the agreement by engaging in a code of conduct with the intent and effect of making plaintiff's work environment unreasonably burdensome oppressive, before wrongful terminating Plaintiff's employment without good cause.

57.    Kaiser was to notice Plaintiff pursuant to *U.S. Code Title 41 Chapter 10 §701* their Federal Contractor Law, of a policy that could end her employment if she didn't follow it.  Kaiser noticed Plaintiff on such policy five (5) days after suspending her for that policy.  Kaiser then terminated Plaintiff for allegedly violating such policy Exhibit 6.  Quoting "*U.S. Code Title 41 Chapter 10 §701(a)(1)(A),(B) establishing a drug-free awareness program to inform employees about—(i) the dangers of drug abuse in*

-15-

the workplace; *(ii)* the person's policy of maintaining a drug-free workplace; *(iii)* any available drug counseling, rehabilitation, and employee assistance programs; and *(iv)* the penalties that may be imposed upon employees for drug abuse violations; **(C) making it a requirement that each employee to be engaged in the performance of such contract be given a copy of the statement required by subparagraph (A);, (D) notifying the employee in the statement required by subparagraph (A), that as a condition of employment on such contract, the employee will— (i)abide by the terms of the statement;**...*(G)* making a good faith effort to continue to maintain a drug-free workplace through implementation of subparagraphs (A), (B), (C), (D), (E), and (F)". Plaintiff knows of at least three (3) Kaiser employees that were terminated for this policy that never received a copy.

58.     During a grievance meeting on April 8, 2005 with Plaintiffs Union Representatives there, Kaiser indicated to them that "Kaiser is a Federal Facility and we have laws to abide by".

59.     During a second step termination grievance meeting in July of 2005 between Plaintiff and Kaiser, Plaintiffs Union Representative handed her a copy of a letter noted here as Exhibit 8. This letter was written by Jan Austin of Kaiser Human Resources Department specifically to deny Plaintiffs second step grievance request. Attached to this letter was a copy of *U.S. Code Title 41 Chapter 10 §701* printed out. The letter indicated a copy of this was attached and noted as "Federal Drug Free workplace requirements".

60.     Plaintiff attended her arbitration pursuant to the Collective Bargaining Agreement on February 22, 2006. The decision was in Kaisers favor.

61.     If Plaintiff would have seen this policy, she would have noticed under "Illegal Drugs" that "Cannabis (e.g., marijuana)" as it states in this policy, was listed in a manner that would lead Plaintiff to question management at Kaiser or supervisory. If it was shown to Plaintiff prior to her suspension, then if Plaintiff violated that policy, I could understand Kaiser's direction. But that didn't happen and Plaintiff was terminated allegedly violating that policy.

Wherefore, Plaintiff prays judgment against Defendants and each of them as follows:

1. For general damages in the amount of $150,000.00;

2. For compensatory damages in the amount of $500,000.00;

3. For this Court to order Kaiser to provide a copy of all proceedings of this case to their Federal Granting Agency and provide receipt to this Court of such copy to their Federal Granting Agency

-16-

4. For this Court to order Kaiser to implement the ongoing drug free awareness program as directed in *U.S. Code Title 41 Chapter 10 §701* to ensure full compliance with their Federal Contract, and to further educate Kaiser employees pursuant to this law;

5. For this Court to order any proceedings for investigative measures into the law breaking activity of Kaiser not following *U.S. Code Title 41 Chapter 10 §701* not only as punishment for breaking such important laws, but for further insurance Kaiser employees will always have full notice of the KP 3.02 NC Policy on Alcohol and Drugs.

6. For this Court to allow such investigation to trail through Plaintiff's complaint and utilize subpoenas for as many Kaiser employees to come forward with penalty of perjury statements indicating they also did not receive such policy and that full report goes to Kaisers Federal Granting Agency;

6. For reasonable cost of suit herein incurred and;

7. For such other and further relief as the court may deem proper.

## SEVENTH 7th CAUSE OF ACTION
Discrimination
Denied Physical and Mental Accommodations, Mental Discrimination, Continuing Violations
FAIR EMPLOYMENT AND HOUSING ACT (Government Code Section 12940) and Right to Sue
Letter dated May 2, 2006 (from E.E.O.C. for D.F.E.H.) is noted here and attached hereto this complaint

62.    As a seventh and separate cause of action, Plaintiff re-alleges and incorporates herein paragraphs 1 through 61, and incorporates all of the above causes of actions herein by reference.

63.    At all times herein relevant, Plaintiff was an employee covered by California Government Code Section 12940 which states in relevant part that, it shall be an unlawful employment practice for an employer, because of physical disability, mental disability, medical condition, to discriminate against any person.

64.    At all times herein relevant, Kaiser was the employer within the meaning of California Government Code Section 12940 and, as such, was barred from discriminating in employment decisions on the basis of physical disability, mental disability, and medical condition and certain health conditions that required accommodation.

65.    On January 5th and 6th of 2004, the Plaintiff was scheduled by Kaiser and their agents to attend an Orientation Meeting prior to her returning to her job for re-training. In this Orientation Meeting the Plaintiff glanced through the Orientation Binder given to her by Kaiser and their agents and noticed a

-17-

small paragraph on drugs and alcohol. Wanting to do everything right with what she read there, so the Plaintiff alerted L'Amoreaux. During a meeting between L'Amoreaux and Plaintiff on January 22, 2004, the Plaintiff told L'Amoreaux of her prescribed medications of Vicodin and Soma she was taking for her spine condition. L'Amoreaux was upset at Plaintiff for telling L'Amoreaux of Plaintiffs new medications. L'Amoreaux stated to Plaintiff that is private medical information and to never bring it up again.

66.     On March 1, 2004 Plaintiff received a phone call from L'Amoreaux indicating she was on paid suspension for her "Memory Loss Issue". L'Amoreaux indicated she was fearing for the safety of Kaiser patients and the hospital, and could not have me work until she got a letter from Plaintiffs doctor. L'Amoreaux stated she was directed by Heiman and Kaiser's Legal Department to suspend Plaintiff. Although Plaintiff had no problems doing her job, no notification of any kind that there were complaints, L'Amoreaux pulled Plaintiff from her regular duties on March 3, 2004. Suspended for March 2, 2004, Plaintiff returns to her duties, not knowing L'Amoreaux pulled her from those duties, and was approached by Senior Operator Mary Jo Smith. Smith indicated to Plaintiff that she couldn't work the "Alarm Station" which was "Full Duty" because of the letter Plaintiff slipped under L'Amoreaux's office door on January 24, 2004. For nearly one (1) month, Plaintiff could not return to full duty, and with no further explanation from L'Amoreaux or Heimann.

67.     From March 26, 2004 to March 14, 2005, the Plaintiff was on approved medical leave pending accommodation. When Plaintiff returned to work on March 15, 2005 she was supposed to be accommodated for her spine condition by Kaiser and their agents. On March 19, 2005 the Plaintiff and Thurin met briefly to discuss Plaintiff's accommodation. That date, Thurin denied Plaintiffs physical accommodation by going against Plaintiffs physician's accommodation request that required Kaiser and their agents to accommodate Plaintiff longer than thirty (30) days.

68.     March 15, 2005 Plaintiff returned to "Full Duty" as she was just coming back from being on an approved medical leave. Plaintiff was being trained, well if training someone means sitting 10 feet away, then I guess the Plaintiff received a "so-so" training from Cyndi Munoz-Romo the Senior Operator. Plaintiff didn't get very good training, but without proper training that was no problem for Plaintiff. She could do her job with her eyes closed, and she survived returning to "Full Duty" with only minimal training-one and a half days. Again, Munoz-Romo was doing her job at her desk, and not sitting with Plaintiff as all trainers are supposed to do. But Plaintiff did the best job she could with the training they provided.

-18-
SECOND (2ⁿᵈ) AMENDED COMPLAINT FOR DAMAGES
TOKASHIKI vs. KAISER FOUNDATION HOSPITALS
United States District Court for the Northern District of California
Case No. C 08-0357 BZ

69.     Why is it that Plaintiff was told by L'Amoreaux that because of her "Memory Loss" she was pulled from "Full Duty" in 2004, yet returned with no problems to "Full Duty" in 2005? This baffles me.

70.     Plaintiff informed Kaiser by and through its agents L'Amoreaux, Thurin, and Heiman, Cliff Gates, Jan Austin and Does 1-10 that she had mental health conditions and provided medical documentation of same, Kaiser by and through its agents L'Amoreaux, Thurin, Heiman, Cliff Gates, and Jan Austin and Does 1-10, did actively discriminate against Plaintiff by ignoring and disregarding the medical information provided to substantiate same.

71.     Furthermore, Plaintiff did in fact inform Kaiser by and through it agents L'Amoreaux, Thurin, and Heiman, Jan Austin and Does 1-10 that she was taking medication for her health conditions including, the fact that she had a CANNABIS RECOMMENDATION from her treating physician.

72.     Despite the recommendation from Plaintiff's physician regarding the accommodation, Defendants and each of them acting in concert did in fact disregard Plaintiff's physician accommodation request, which constitute an act of discrimination against Plaintiff for her physical disability and her health condition.

73.     Furthermore, Defendant and each of them, acting in concert discriminated against Plaintiff's disabilities by filing charges against her alleging Marijuana possession in the work place and, ultimately terminating her employment in opposition to public policy in California.

74.     Jan Austin of Kaiser Human Resources insisted that the Plaintiff received a copy of Kaiser's Drug and Alcohol Policy prior to April 3, 2005, the date Plaintiff was suspended for allegedly having an "Illegal Drug" on Kaiser's premises. The Plaintiff indicated she never received a copy of this policy Exhibit 6 from Kaiser or their agents, but indicated to Jan Austin on April 8, 2005 during a grievance meeting, that she showed her cannabis recommendation to an appointed supervisor in July or August of 2004. It was on April 8, 2005 that the Plaintiff received her first copy of said policy from Jan Austin noted here as Exhibit 6. Exhibit 30.1 is a part of Heiman's Investigation over the cannabis issue regarding the Plaintiff, clearly indicates there was witness to the Plaintiff showing her cannabis card to "co-workers", his name is David Lankiet. But the only time the Plaintiff ever showed her card was while she was on medical leave and shortly thereafter receiving her cannabis recommendation in July of 2004. On April 5, 2006, a co-worker of the Plaintiffs came forward with a signed declaration under penalty of perjury, noting witness to the Plaintiff showing appointed supervisor Alicia Blinks of Kaiser. Noted as

-19-

Exhibit 5.1, Miranda L. Gutierrez was witness just as David Lankiet noted in Exhibit 30.1 was witness to the Plaintiff showing her cannabis recommendation to Kaiser and their agents.

75. On June 20, 2005 at 8:33am, L'Amoreaux created and email now known to this complaint as Exhibit 1 with discriminative comments regarding Plaintiffs mental condition. L'Amoreaux had notice in 2002, January 22, 2004, and another hard copy of letter from Plaintiffs Psychiatrist noted as Exhibit 5 on Janauary 24, 2004. L'Amoreaux, with the understanding Plaintiff has "Mental diagnoses", L'Amoreaux sarcastically laughed at Plaintiffs mental status in this email of Exhibit 1.

76. Event of April 3, 2005 of Plaintiff being suspended by Thurin is to be explained in this paragraph. Plaintiff came back from lunch on that date and was told she had a call holding, it was Thurin. Thurin asked Plaintiff if she had anything on premises that contained cannabis. Plaintiff was a little shocked because she remembered bringing in her cannabis recommendation specifically to show to management or supervisory, as mentioned above the year prior. After a few times Thurin asked this question, the Plaintiff stated "Yes". Plaintiff was suspended by Thurin. Plaintiff showed the Security Officer standing next to her-while Thurin is on the phone and said, "see this is my cannabis card I have a legal right to have it". Thurin suspended Plaintiff for having chocolate chip cookies on her desk with recycled plastic wrap that the Plaintiff wrapped non-cannabis chocolate chip cookies in it. The wrap had a previous label on it indicating the contents was cannabis, but Thurin never asked about the cookies, she just assumed. Plaintiff and Thurin hung the phone up and Plaintiff started gathering her things to leave. Plaintiff told the Security Officer she had to get her cannabis medication out of the refrigerator, he asked to take a look at it and Plaintiff said sure and handed it to him. He did not confiscate it. He did not confiscate the cookies. Plaintiff was not sent to a laboratory to verify anything of what Kaiser is claiming today. Thurin was the manager in charge, and did not order confiscation or testing of Plaintiff at all. Plaintiff never got a copy of the KP 3.02 NC Policy pertaining to the Drug Free Workplace Act of 1988 until after she was suspended, if so, Plaintiff would have thought to question management or supervisory prior to bringing her cannabis medication to Kaiser. Thurin never stated where the cannabis was found, but Plaintiff only placed a small piece of cannabis candy labeled with her name on it in a protective zip-lock baggie and put it behind some condiments in the refrigerator.

77. On June 20, 2005 Kaiser and their agents terminated Plaintiffs employment for having her cannabis medication on their premises. Then at ends meet, Kaiser and their agents added that the Plaintiff consumed her medication. Kaiser and their agents never tested or offered any type of testing, asked for Plaintiffs cannabis documentation for proof it was, then terminated her.

-20-

78. The Defendants held the After acquired evidence doctrine against the Plaintiff in her State Action, hoping the termination would hold, but EEOC case law proves different. The After acquired evidence doctrine is not valid when discrimination is exercised, and especially if it is exercised the same date the Plaintiff was terminated-earlier in the day at 8:33am, the Plaintiff was terminated after 2:00pm on June 20, 2005 the same date Exhibit 1 was created by L'Amoreaux. The After acquired evidence doctrine will fail this Court or any other Court, by law.

79. Defendants and each of them committed these acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiff's rights.

80. During the entire course of that employment, there existed an express and implied in fact employment contract between these parties, wherein Plaintiff would maintain said employment with Defendants indefinitely so long as she carried out her duties in a proper and competent manner.

81. Three (3) other employees at Kaiser that the Plaintiff knows were terminated for allegedly violating Kaiser's drug and alcohol policy. Each of them were given an offering of settlement. One of them was offered a drug rehabilitation program and a $5,000.00 payment to a job agency to find her a new job, but she took the money instead. These three (3) employees were allegedly selling illegal prescription narcotics on premises. Plaintiff was offered the door outside of Kaiser, with boot and nothing more. Disparate treatment has been exercised by Kaiser and their agents against the Plaintiff.

82. Continuing Violations apply if the discriminatory acts never stopped. March 27, 2002 Plaintiff was terminated because of issues of her memory, and she was pregnant when that termination happened. The torture of bringing up mental issues is something that L'Amoreaux never stopped doing to Plaintiff and it shows in Exhibit 1. Plaintiff returned back from reinstatement to work on January 21, 2004. Placed a letter under L'Amoreauxs' office door regarding Plaintiffs mental disabilities January 24, 2004. Plaintiff stated to L'Amoreaux on February 10, 2004 (approximate date) that she feared L'Amoreaux was going to terminate Plaintiff again. March 1, 2004 Plaintiff receives the phone call from L'Amoreaux suspending Plaintiff on March 2, 2004. March 3, 2004 Plaintiff was removed from "Full Duty" by L'Amoreaux. Plaintiff goes on approved medical leave on March 26, 2004. Plaintiff returned from leave on March 15, 2005. L'Amoreaux knowing Jan Austin was going to terminate Plaintiff, has her last chance to get Plaintiff where it counts-L'Amoreaux knew it would hurt Plaintiff and knew that the Collective Bargaining Agreement allowed the Union access to Plaintiffs file and that L'Amoreaux's comment in Exhibit 1 would somehow make it into the hands of the Plaintiff. L'Amoreaux hurt Plaintiff

SECOND (2ⁿᵈ) AMENDED COMPLAINT FOR DAMAGES
TOKASHIKI vs. KAISER FOUNDATION HOSPITALS
United States District Court for the Northern District of California
Case No. C 08-0357 BZ

and Jan Austin allowed that email along with <u>Exhibit 1a</u> with further discriminatory statements and lies into the hands of Plaintiffs union. There was no break in service and approved medical leave constitutes continued excused employment, but each short time Plaintiff was at work, L'Amoreaux had to get her words in to hurt Plaintiff. Plaintiff deserves justice.

Wherefore, prays judgment against Defendants and each of them as follows:

1. For general damages in the amount of $2,500,000.00;

2. For compensatory damages in the amount of $500,000.00

3. For punitive damages pursuant to California Civil Code 3294 (a), (b), (c)(1)(2)(3) in the amount of $1,000,000.00;

4. For this Court to order Kaiser to implement an anti-discrimination program to train managers, supervisors, and all employees about discrimination.  If they have one in place it isn't working.

5. For the cost of suit herein incurred

6. For such other and further relief as the court may deem proper.


Dated:  June 30, 2008                                       Theresa A. Tokashiki
                                                                       In Pro Per/Pro se

-22-

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

(SEE ADDRESS CHECKED BELOW)

■ (800) 700-2320

☐ 1001 Tower Way, Suite 250
H  Bakersfield, CA 93309
   (661) 395-2729

☐ 1320 E. Shaw Avenue, Suite 150
C  Fresno, CA 93710
   (559) 244-4760

☐ 611 West Sixth Street, Suite 1500
S/T Los Angeles, CA 90017
   (213) 439-6799

☒ 1515 Clay Street, Suite 701
M  Oakland, CA 94612
   (510) 622-2941

☐ 2000 "O" Street, Suite 120
E  Sacramento, CA 95814
   (916) 445-5523

☐ 1350 Front Street, Suite 3005
   San Diego, CA 92101
   (619) 645-2681

☐ San Francisco District Office
A  1515 Clay Street, Suite 701
   Oakland, CA 94612
   (510) 622-2973

☐ 111 North Market Street, Suite 810
G  San Jose, CA 95113
   (408) 277-1277

☐ 2101 East Fourth Street, Suite 255-B
K  Santa Ana, CA 92705
   (714) 558-4266

Original filed copy
with court

Date:      May 2, 2006

Case Name:   THERESA TOKASHIKI vs.
             KAISER FOUNDATION HOSPITALS

EEOC No:    370-2005-02096

## NOTICE TO COMPLAINANT AND RESPONDENT

This is to advise you that the above-referenced complaint is being referred to the California Department of Fair Employment and Housing (DFEH) by the U.S. Equal Employment Opportunity Commission (EEOC). The complaint will be filed in accordance with California Government Code section 12960. This notice constitutes service pursuant to Government Code section 12962.

**No response to the DFEH is required by the respondent.**

The EEOC will be responsible for the processing of this complaint. DFEH will not be conducting an investigation into this matter. EEOC should be contacted directly for any discussion of the charge. DFEH is closing its case on the basis of "processing waived to another agency."

## NOTICE TO COMPLAINANT OF RIGHT-TO-SUE

Since DFEH will not be issuing an accusation, this letter is also your right-to-sue notice. According to Government Code section 12965, subdivision (b), you may bring a civil action under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The lawsuit may be filed in a State of California Superior or Justice Court. Government Code section 12965, subdivision (b), provides that such a civil action must be brought within one year from the date of this notice. Pursuant to Government Code section 12965, subdivision (d)(1), this one-year period will be tolled during the pendency of the EEOC's investigation of your complaint. You should consult an attorney to determine with accuracy the date by which a civil action must be filed. This right to file a civil action may be waived in the event a settlement agreement is signed. Questions about the right to file under federal law should be referred to the EEOC.

The DFEH does not retain case records beyond three years after a complaint is filed.

**Remember: This Right-To-Sue Notice allows you to file a private lawsuit in State court.**

Sincerely,

WANDA J. KIRBY
Chief Deputy Director

1  Theresa Ann Tokashiki, In Pro Per/Pro se
   2169 Dalis Drive
2  Concord, California 94520-5419
   (925) 691-4011
3

4

5

6
                        UNITED STATES DISTRICT COURT
7
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
8

9

10  THERESA A. TOKASHIKI,                    **Case No. Case No. C 08-0357 BZ**

11                      Plaintiff            **DECLARATION IN SUPPORT OF**
                                             **PLAINTIFF'S SECOND (2nd) AMENDED**
12        vs.                                **COMPLAINT FOR DAMAGES:**

13                                           Date:           July 15, 2008
14  KAISER FOUNDATION HOSPITALS,
    AMY L'AMOREAUX, DIANE THURIN,            Court location:  450 Golden Gate Avenue
15  KRISTIN HEIMAN, DOES 1 THROUGH 10,                        San Francisco, California 94102
    inclusive,
16
17                      Defendants.

18

19  *DECLARATION OF THERESA A. TOKASHIKI*

20  I, THERESA A. TOKASHIKI, declare:

21  1.     My name is THERESA A. TOKASHIKI. I am over 18 years of age. I reside at 2169 Dalis Drive,

22  Concord, California. I am fully competent to make this Declaration and I have personal knowledge of the

23  facts stated in this Declaration. To my knowledge, all of the facts stated in this Declaration are true and

24  correct.

25

26
                                         -1-

2.    I am the Plaintiff in this matter.  I make this Declaration in support of the SECOND $(2^{nd})$ AMENDED COMPLAINT, and I am stating this DECLARATION regarding a SETTLEMENT AGREEMENT, COMPROMISE AND GENERAL RELEASE, that was signed on September 24, 2003 with Kaiser Foundation Hospitals and SEIU Local 250 Health Care Workers Union and Theresa A. Tokashiki noted as Exhibit 18 (A) is a true copy, and certify this under penalty of perjury. The other documents Exhibit 1, Exhibit 1a, and Exhibit 65 attached to this Declaration are also true copies of facsimile pages from Greg Tegenkamp of United Health Care Workers Union-West that was faxed to me on July 7, 2005 and July 11, 2005 pertaining to my Unjust Suspension of April 3, 2005 to June 20, 2005 through to my Unjust Termination of June 20, 2005 see Exhibit 1, Exhibit 1a, and Exhibit 65, as these documents are also being declared under penalty of perjury.  My address is:  2169 Dalis Drive, Concord, CA 94520-5419, (925) 691-4011.

**List of Exhibits for this Declaration:**

**Exhibit 18 (A)**

1.    SETLEMENT AGREEMENT, COMPROMISE AND GENERAL RELEASE signed on September 24, 2003 with Kaiser Foundation Hospitals and SEIU Local 250 Health Care Workers Union and Theresa A. Tokashiki (A true and correct copy is attached hereto as "Exhibit 18 (A)").

**Exhibit 1**

1.    Email from Amy L'Amoreaux to Jan Austin of Kaiser Human Resources on June 20, 2005 (A true and correct copy is attached hereto as "Exhibit 1").

2.    Cover page from Greg Tegenkamp to Theresa Tokashiki on July 7, 2005 (A true and correct copy is attached hereto as "Exhibit 1").

**Exhibit 1a**

1.     "Theresa Tokashiki Employment History" obtained from Greg Tegenkamp on July 7, 2005

(A true and correct copy is attached hereto as "Exhibit 1a").

**Exhibit 65**

1.     Email from Amy L'Amoreaux to Jan Austin of Kaiser Human Resources on June 20, 2005

(A true and correct copy is attached hereto as "Exhibit 65").

2.     Cover page from Greg Tegenkamp to Theresa Tokashiki on July 11, 2005 (A true and

correct copy is attached hereto as "Exhibit 65").

3.     "Theresa Tokashiki Employment History" obtained from Greg Tegenkamp on July 11,

2005 (A true and correct copy is attached hereto as "Exhibit 65").

I declare under penalty of perjury under the laws of the United States that the foregoing Declaration is true

and correct. I have executed this Declaration on July 15, 2008, Concord, California.

Dated:  July 15, 2008                                    Theresa A. Tokashiki, In Pro Per/Pro se

/

/

/

/

/

/

/

/

/

-3-

# SETTLEMENT AGREEMENT, COMPROMISE AND GENERAL RELEASE

1.  This Settlement Agreement, Compromise and General Release (hereinafter "Settlement Agreement") is made and entered into between Theresa Tokashiki (hereinafter "Grievant"), Hospital & Health Care Workers' Union, Local 250, SEIU, AFL-CIO (hereinafter "Local 250"), and Kaiser Foundation Hospitals (hereinafter "Employer") for the consideration and mutual promises set forth in the following paragraphs.

2.  Grievant was employed by Employer as a Communications Operator from May 30, 2000 until March 27, 2002 when her employment was involuntarily terminated. At the time of termination, the Grievant was employed in a 32-hour per week regular position at the Employer's Walnut Creek Medical Center. Pursuant to the Collective Bargaining Agreement between Employer and Local 250, a grievance was filed protesting the termination of Grievant's employment. The matter was set for hearing before an arbitration panel chaired by Arbitrator Gerald R. McKay on September 24, 2003.

3.  Grievant, Local 250, and Employer desire to completely and finally resolve and settle any and all claims, rights and actions, of any kind or nature, which Grievant has or may have against Employer arising out of her employment relationship with it, including but not limited to those arising from, or relating to, the Grievant's involuntary termination.

4.  It is understood and agreed that in exchange for Employer's performance of the acts described in Paragraphs 7 and 8, Grievant and Local 250 release Employer and any affiliated or related companies, including the component entities which comprise the Kaiser Permanente Medical Care Program (Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals and The Permanente Medical Group, Inc.) and their respective officers, directors, agents, and employees, (collectively, "the releasees") from any and all claims of any kind, known or unknown, which Grievant now has or has ever had against the releasees which arise from or are in connection with, Grievant's employment relationship with Employer or any of the releasees. This includes, but is not limited to, any and all claims arising out of or in connection with any alleged violations of the Collective Bargaining Agreement between Employer and Local 250, tort, express or implied contract, any covenant of good faith and fair dealing, any personal injury, wage claim, or any federal, state or municipal statute, regulation or ordinance, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Fair Employment and Housing Act, except as specifically enumerated in this Settlement Agreement. At no time subsequent to the execution of this Settlement Agreement will Grievant file any claim or action of any kind against the releasees which is based in whole or in part on any matter referred to in this paragraph relating to or arising from events which occurred prior to the execution of this Settlement Agreement.

///

1

5. It is understood and agreed that this is a full and final Settlement Agreement, which also covers all unknown, undisclosed and unanticipated grievances, losses, wrongs, injuries, debts, claims or damages which may have arisen, or may arise from any act or omission prior to the date of execution of this Settlement Agreement, as well as those alleged losses, wrongs, injuries, debts, claims or damages now known. Grievant hereby expressly waives any right or benefit available to him in any capacity under the provisions of Section 1542 of the California Civil Code, which provides as follows:

> **A general release does not extend to all claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

Grievant understands this waiver and expressly agrees that this Settlement Agreement extends to all claims of whatever nature and kind, known or unknown, suspected or unsuspected, vested or contingent, past, present or future, arising from or attributable to any incident or event, occurring, in whole or in part, on or before the date of Grievant's execution of this Settlement Agreement, and that any and all rights granted herein under any state or federal law or regulation limiting the effect of this Release are hereby waived.

6. Local 250 agrees to immediately withdraw all outstanding grievances filed on behalf of Grievant, including, but not necessarily limited to, the grievance styled "Theresa Tokashiki Termination." ~in the amount of $50,000/~ WHO

7. In exchange for Grievant's and Local 250's agreements and releases herein, Employer shall pay to Grievant back wages ~calculated from March 27, 2002 through the date of this Agreement~, less legally required and customary deductions for the Federal Income Contribution Act and federal and state income taxes. Employer will rescind Grievant's termination, and the accessible documents in Grievant's personnel file will be modified to so reflect. Employer shall place all documents regarding the Grievant's March 27, 2002 discharge in a sealed envelope in the Grievant's personnel file. Such documents shall be retained for legal and regulatory purposes only, and shall be accessed or used only in connection with such activities.

8. Employer agrees that ~within ____ days of execution of this Settlement Agreement,~ immediately it shall reinstate Grievant to a Regular position as a Communications Operator ~at the Martinez Medical Center, or~ at another facility as mutually agreed to by Employer, Union and Grievant. Grievant shall be reinstated without loss of seniority or tenure credit for benefit calculation purposes.

/2~ WHO WHK

/2~ WAS other than Martinez and/or Walnut Creek

/// 

2~ WAS Grievant shall be placed on a personal leave of absence ~not to be~ until Jan 4, 2004, and during said leave, may apply for other positions. If she secures no other position, she shall return to work as described above on January 4, 2004.

9.    Grievant acknowledges that she: (a) has read this Settlement Agreement, is fully aware of its contents and legal effect, and is freely and voluntarily executing it; and (b) has been given the opportunity to consult with an attorney and has exercised that right.

10.   This Settlement Agreement (a) shall not be construed as an admission of fault or wrongdoing by either party; (b) shall not be used or referred to by either party to support a claim of such fault or wrongdoing; and, (c) has no effect on any vested rights to any moneys in any employee benefit plans in which Grievant has participated or any claim which he may have in the future because of events which may occur after the effective date.

11.   It is understood and agreed by both parties that this is the entire settlement of this dispute and no other grievance shall arise out of or in the course of the settlement of this dispute. The settlement of this grievance shall not constitute precedent for any party nor shall any party use any portion of this grievance or settlement in any pending or future case of a similar or dissimilar nature.

12.   This Settlement Agreement shall become effective on the last date of signature by Grievant or Local 250. Upon receipt of the signed Settlement Agreement, Grievant and Union shall promptly submit to Employer's designated representative documentation requested by Employer necessary to determine Grievant's interim earnings from March 27, 2002 through the date of execution of this Settlement Agreement. Upon receipt of such information Employer shall calculate the amount of back pay due Grievant pursuant to Paragraph 7 of this Settlement Agreement, and shall notify Union of this amount. If Union and Grievant agree with Employer's calculations, Employer shall prepare and transmit a check to Grievant in the agreed-upon amount. If Union, Grievant and Employer fail to agree to the amount of back pay due Grievant, Union may submit the dispute to binding arbitration pursuant to Paragraph 17, below.

13.   This Settlement Agreement shall be construed and governed by the laws of the State of California. Should any provision of this Settlement Agreement be determined by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remainder of this Settlement Agreement shall remain fully valid and enforceable. The usual presumptions against the drafter of the document shall not apply to any dispute regarding interpretation of this Agreement.

14.   This is the complete agreement between the parties regarding Grievant's employment, the release of any claims against Employer, and the payment by Employer for that release. Any modifications must be in writing and signed by the parties.

/ / /

/ / /

/ / /

3

15.   Any disputes concerning the implementation, interpretation or application of this Settlement Agreement shall be subject to binding arbitration pursuant to the terms and conditions of the Collective Bargaining Agreement between the Employer and Local 250.


Dated: _September 24_, 2003          By: _____
                                          Theresa Tokashiki


Dated: _September 24_, 2003          By: _William Sokol_____
                                          For Hospital & Health Care Workers'
                                          Union, Local 250, SEIU, AFL-CIO


Dated: _September 24_, 2003          By: _____
                                          For Kaiser Foundation Hospitals


4



**Amy L'Amoreaux**                    To: Jan E Austin/CA/KAIPERM@Kaiperm
06/20/2005 08:33 AM                   cc:
                                      Subject: Re: Theresa Tokashiki

I did NOT have any such conversation with Theresa Tokashiki..

I am surprised she would state this as she has significant memory loss on everything else... (that is me being sarcastic)

There was no conversation with Theresa Tokashiki regarding medication.

Amy
Jan E Austin

>           **Jan E Austin**                     To: Amy L'Amoreaux/CA/KAIPERM@KAIPERM
>           06/16/2005 12:09 PM                   cc: Raymond Koniaczek/CA/KAIPERM@Kaiperm
>                                                 Subject: Theresa Tokashiki

Today, I received a phone call from Theresa Tokashiki confirming our Monday meeting, asking about picking up her check on Friday, and wanting to discuss the conversation she had with you on January 22, 2004. She said the conversation was about 45 minutes in length, she was coming back from reinstatement and she was informing you the meds she was on - soma and vicodin etc.

Do you recall this conversation? Can you please re-cap this conversation for me?

Please let me know if there is anything else I can do for you.

Jan Austin SPHR, MAOM
Employee/Labor Relations Consultant - Diablo KFH/HP
Internal phone: 8-470-5977
External phone: 925-295-5977
Emergencies Cell: 925-408-1143
Fax: 925-295-5935

This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not the intended recipient, you must not read, copy, use, or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

**Exhibit 1**



**SEIU**
## UHW **Fax Cover Sheet**
United Healthcare Workers
**WEST**

United for Quality Care    www.SEIU-UHW.org         Date: 7-7-05

## To:

Name: THONO-3A TOKASHIKI

Office:

Fax Number: (925) 691-4011

Telephone Number: 691-4011

## From:

Name: GLOL TOZONKAMP

Office: 15850

Fax Number:

Telephone Number:

**Number of Pages (Including Cover Sheet):** 2 /ot - 29

**Remarks:**

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

**Exhibit 1**

## Theresa Tokashiki – Employment History

Employee # 000110383

| Date Begin | Date End | Action | Comment |
|---|---|---|---|
| 05/01/1991 | 08/24/1991 | Martinez Operator Services. Terminated in 1st 90 days due to unsatisfactory work performance | Per Terri she quit due to traumatic experience causing temporary memory loss |
| 05/30/2000 | to current | Rehire Walnut Creek Operator Services | |
| 02/19/2001 | 04/7/2001 | Medical leave | |
| 01/25/2002 | 03/27/2002 | Suspension without pay<br>• Unprofessional conduct<br>• PAR shows unpaid | investigation – Refused to meet w/ manager regarding poor attendance |
| 03/27/2002 | | Termination - involuntary<br>• falsification of application | Reversed |
| 02/01/2002 | | Termination reversal effective date | settlement agreement signed 9/4/2003 w/ back wages |
| 10/16/2002 | 01/08/2003 | EEOC against KP for reasonable accommodation | Denied reasonable accommodation. Case closed w/ ee receiving right to sue. Tied to termination |
| 01/25/2002 | 01/22/2004 | Medical Leave | |
| 03/26/2004 | 03/14/2005 | Medical Leave | Returned to work 3/15/2005 w/ 3 mo. work restriction of a break every 5→10 minutes to leave work area and walk. |
| 04/04/2005 | 6/20/05 | Investigatory suspension<br>• Violation of Federal Drug-Free workplace Act 1988<br>• KPs Alcohol and Drug Policy 3.02NC<br>• Possession and consumption of marijuana while performing job duties in the workplace | |
| 6/20/05 | 6/20/05 | Terminated for violation of KP Alcohol and Drug policy and Federal Drug-Free policy | Grievance filed same date |

**Exhibit 1a**



**Amy L'Amoreaux**
06/20/2005 08:33 AM

To: Jan E Austin/CA/KAIPERM@Kaiperm
cc:
Subject: Re: Theresa Tokashiki

I did NOT have any such conversation with Theresa Tokashiki..

I am surprised she would state this as she has significant memory loss on everything else... (that is me being sarcastic)

There was no conversation with Theresa Tokashiki regarding medication.

Amy
Jan E Austin

         **Jan E Austin**
         06/18/2005 12:09 PM

To: Amy L'Amoreaux/CA/KAIPERM@KAIPERM
cc: Raymond Konieczek/CA/KAIPERM@Kaiperm
Subject: Theresa Tokashiki

Today, I received a phone call from Theresa Tokashiki confirming our Monday meeting, asking about picking up her check on Friday, and wanting to discuss the conversation she had with you on January 22, 2004. She said the conversation was about 45 minutes in length, she was coming back from reinstatement and she was informing you the meds she was on - soma and vicodin etc.

Do you recall this conversation? Can you please re-cap this conversation for me?

Please let me know if there is anything else I can do for you.

Jan Austin SPHR, MAOM
Employee/Labor Relations Consultant - Diablo KFH/HP
Internal phone: 8-470-5977
External phone: 925-295-5977
Emergencies Cell: 925-408-1143
Fax: 925-295-5935

This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not the intended recipient, you must not read, copy, use, or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

**Exhibit 65**

## Theresa Tokashiki – Employment History

Employee # 000110383

| Date | Date | Action | Comment |
|---|---|---|---|
| 05/01/1991 | 08/24/1991 | Martinez Operator Services. Terminated in 1st 90 days due to unsatisfactory work performance | Per Terri she quit due to traumatic experience causing temporary memory loss |
| 05/30/2000 | to current | Rehire Walnut Creek Operator Services | |
| 02/19/2001 | 04/7/2001 | Medical leave | |
| 01/25/2002 | 03/27/2002 | Suspension without pay<br>• Unprofessional conduct<br>• PAR shows unpaid | investigation – Refused to meet w/ manager regarding poor attendance |
| 03/27/2002 | | Termination - involuntary<br>• falsification of application | Reversed |
| 02/01/2002 | | Termination reversal effective date | settlement agreement signed 9/4/2003 w/ back wages |
| 10/16/2002 | 01/08/2003 | EEOC against KP for reasonable accommodation | Denied reasonable accommodation. Case closed w/ ee receiving right to sue. Tied to termination |
| 01/25/2002 | 01/22/2004 | Medical Leave | |
| 03/26/2004 | 03/14/2005 | Medical Leave | Returned to work 3/15/2005 w/ 3 mo. work restriction of a break every 5→10 minutes to leave work area and walk. |
| 04/04/2005 | 6/20/05 | Investigatory suspension<br>• Violation of Federal Drug-Free workplace Act 1988<br>• KPs Alcohol and Drug Policy 3.02NC<br>• Possession and consumption of marijuana while performing job duties in the workplace | |
| 6/20/05 | 6/20/05 | Terminated for violation of KP Alcohol and Drug policy and Federal Drug-Free policy | Grievance filed same date |

Exhibit 65



**SEIU**
**UHW Fax Cover Sheet**
United Healthcare Workers
WEST

**United for Quality Care**     www.SEIU-UHW.org          Date: 7-11-05

## To:

Name: THERESA  TOKASHIKI

Office: _____ HUME

Fax Number: (-925) 691-4011

Telephone Number: _____ SAME

## From:

Name: _____ GREG TEGENKAMP

Office: _____

Fax Number: _____

Telephone Number: _____

**Number of Pages (Including Cover Sheet):** _____ @ 50

**Remarks:** _____ EMPLOYER'S INFORMATION

_____ +

_____ COPY OF GRIEVANCE

_____

_____

_____

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

**Exhibit 65**

   **Amy L'Amoreaux**     To: Jan E Austin/CA/KAIPERM@Kaiperm
                        06/20/2005 08:33 AM   cc:
                                              Subject: Re: Theresa Tokashiki

I did NOT have any such conversation with Theresa Tokashiki..

I am surprised she would state this as she has significant memory loss on everything else... (that is me being sarcastic)

There was no conversation with Theresa Tokashiki regarding medication.

Amy

Jan E Austin

  **Jan E Austin**        To: Amy L'Amoreaux/CA/KAIPERM@KAIPERM
  05/18/2005 12:09 PM     cc: Raymond Konieczek/CA/KAIPERM@Kaiperm
                          Subject: Theresa Tokashiki

Today, I received a phone call from Theresa Tokashiki confirming our Monday meeting, asking about picking up her check on Friday, and wanting to discuss the conversation she had with you on January 22, 2004. She said the conversation was about 45 minutes in length, she was coming back from reinstatement and she was informing you the meds she was on - soma and vicodin etc.

Do you recall this conversation? Can you please re-cap this conversation for me?

Please let me know if there is anything else I can do for you.

Jan Austin SPHR, MAOM
Employee/Labor Relations Consultant - Diablo KFH/HP
Internal phone: 8-470-5977
External phone: 925-295-5977
Emergencies Cell: 925-408-1143
Fax: 925-295-5935

This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not the intended recipient, you must not read, copy, use, or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

**Exhibit 1**



**SEIU**
**UHW Fax Cover Sheet**
United Healthcare Workers
WEST

United for Quality Care    www.SEIU-UHW.org    Date: 7-7-05

## To:

Name: THONOZA TOKASHIKI

Office: _____

Fax Number: (925) 691-4011

Telephone Number: 691-4011

## From:

Name: GROF TOBONKAMP

Office: 1580

Fax Number: _____

Telephone Number: _____

**Number of Pages (Including Cover Sheet):** a lot - 29

**Remarks:** _____

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

**Exhibit 1**

## Theresa Tokashiki – Employment History

Employee # 000110383

| Date Start | Date End | Action | Comment |
|---|---|---|---|
| 05/01/1991 | 08/24/1991 | Martinez Operator Services. Terminated in 1st 90 days due to unsatisfactory work performance | Per Terri she quit due to traumatic experience causing temporary memory loss |
| 05/30/2000 | to current | Rehire Walnut Creek Operator Services | |
| 02/19/2001 | 04/7/2001 | Medical leave | |
| 01/25/2002 | 03/27/2002 | Suspension without pay • Unprofessional conduct • PAR shows unpaid | investigation – Refused to meet w/ manager regarding poor attendance |
| 03/27/2002 | | Termination - involuntary • falsification of application | Reversed |
| 02/01/2002 | | Termination reversal effective date | settlement agreement signed 9/4/2003 w/ back wages |
| 10/16/2002 | 01/08/2003 | EEOC against KP for reasonable accommodation | Denied reasonable accommodation. Case closed w/ ee receiving right to sue. Tied to termination |
| 01/25/2002 | 01/22/2004 | Medical Leave | |
| 03/26/2004 | 03/14/2005 | Medical Leave | Returned to work 3/15/2005 w/ 3 mo. work restriction of a break every 5→10 minutes to leave work area and walk. |
| 04/04/2005 | 6/20/05 | Investigatory suspension • Violation of Federal Drug-Free workplace Act 1988 • KPs Alcohol and Drug Policy 3.02NC • Possession and consumption of marijuana while performing job duties in the workplace | |
| 6/20/05 | 6/20/05 | Terminated for violation of KP Alcohol and Drug policy and Federal Drug-Free policy | Grievance filed same date |

Exhibit 1a



**Amy L'Amoreaux**
06/20/2005 08:33 AM

To: Jan E Austin/CA/KAIPERM@Kalperm
cc:
Subject: Re: Theresa Tokashiki

I did NOT have any such conversation with Theresa Tokashiki..

I am surprised she would state this as she has significant memory loss on everything else... (that is me being sarcastic)

There was no conversation with Theresa Tokashiki regarding medication.

Amy
Jan E Austin

**Jan E Austin**
05/16/2005 12:09 PM

To: Amy L'Amoreaux/CA/KAIPERM@KAIPERM
cc: Raymond Konieczek/CA/KAIPERM@Kalperm
Subject: Theresa Tokashiki

Today, I received a phone call from Theresa Tokashiki confirming our Monday meeting, asking about picking up her check on Friday, and wanting to discuss the conversation she had with you on January 22, 2004. She said the conversation was about 45 minutes in length, she was coming back from reinstatement and she was informing you the meds she was on - soma and vicodin etc.

Do you recall this conversation? Can you please re-cap this conversation for me?

Please let me know if there is anything else I can do for you.

Jan Austin SPHR, MAOM
Employee/Labor Relations Consultant - Diablo KFH/HP
Internal phone: 8-470-5977
External phone: 925-295-5977
Emergencies Cell: 925-408-1143
Fax: 925-295-5935

This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not the intended recipient, you must not read, copy, use, or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

**Exhibit 65**

**Theresa Tokashiki – Employment History**

Employee # 000110383

| Date Begin | Date End | Action | Comment |
|---|---|---|---|
| 05/01/1991 | 08/24/1991 | Martinez Operator Services. Terminated in 1ˢᵗ 90 days due to unsatisfactory work performance | Per Terri she quit due to traumatic experience causing temporary memory loss |
| 05/30/2000 | to current | Rehire Walnut Creek Operator Services | |
| 02/19/2001 | 04/7/2001 | Medical leave | |
| 01/25/2002 | 03/27/2002 | Suspension without pay<br>• Unprofessional conduct<br>• PAR shows unpaid | investigation – Refused to meet w/ manager regarding poor attendance |
| 03/27/2002 | | Termination - involuntary<br>• falsification of application | Reversed |
| 02/01/2002 | | Termination reversal effective date | settlement agreement signed 9/4/2003 w/ back wages |
| 10/16/2002 | 01/08/2003 | EEOC against KP for reasonable accommodation | Denied reasonable accommodation. Case closed w/ ee receiving right to sue. Tied to termination |
| 01/25/2002 | 01/22/2004 | Medical Leave | |
| 03/26/2004 | 03/14/2005 | Medical Leave | Returned to work 3/15/2005 w/ 3 mo. work restriction of a break every 5→10 minutes to leave work area and walk. |
| 04/04/2005 | 6/20/05 | Investigatory suspension<br>• Violation of Federal Drug-Free workplace Act 1988<br>• KPs Alcohol and Drug Policy 3.02NC<br>• Possession and consumption of marijuana while performing job duties in the workplace | |
| 6/20/05 | 6/20/05 | Terminated for violation of KP Alcohol and Drug policy and Federal Drug-Free policy | Grievance filed same date |

**Exhibit 65**



**United for Quality Care** www.SEIU-UHW.org Date: 7-11-05

## To:

Name: THERESA TOKASHIKI

Office: HUME

Fax Number: (925) 691-4011

Telephone Number: SAME

## From:

Name: GABE TEGENKAMP

Office: _____

Fax Number: _____

Telephone Number: _____

**Number of Pages (Including Cover Sheet):** ~50

**Remarks:** EMPLOYER'S INFORMATION
+
COPY OF GRIEVANCE

560 Thomas L. Berkley Way • Oakland, CA 94612 • 510-251-1250 • Fax 510-763-2680
5480 Ferguson Drive • Los Angeles, CA 90022 • 323-734-8399 • Fax 323-721-3538

Service Employees International Union, AFL-CIO
Union/public/Forms/FaxCoverSheet.pdf                    UHW:GC

**Exhibit 65**

Theresa Ann Tokashiki, In Pro Per/Pro se
2169 Dalis Drive
Concord, California 94520-5419
(925) 691-4011

# SUPERIOR COURT OF CALIFORNIA
## CONTRA COSTA COUNTY
Unlimited Civil Case

THERESA A. TOKASHIKI,

              Plaintiff

    vs.

KAISER FOUNDATION HOSPITALS,
AMY L'AMOREAUX, DIANE THURIN,
KRISTIN HEIMAN, DOES 1 THROUGH
10, inclusive,
              Defendants.

**Case No. C07-00682**

**INDEX TO EXHIBITS IN SUPPORT OF
PLAINTIFF'S FIRST AMENDED COMPLAINT
FIRST AMENDED COMPLAINT FOR
DAMAGES: Breach of Contract, Breach of
Contract Based on Correspondence Between
Parties, Contract Tort, Intentional Infliction of
Emotional Distress, Breach of the Implied
Covenant of Good Faith and Fair Dealing,
Wrongful Termination, California Fair
Employment and Housing Act Denied Physical
and Mental Accommodations, Mental
Discrimination**

## INDEX TO EXHIBITS:

**Exhibit 1**    Email from Amy L'Amoreaux to Jan Austin on 6-20-2005 at 8:33am

**Exhibit 1a**    Theresa Tokashiki Employment History

**Exhibit 1.0**    Termination Letter of June 20, 2005

**Exhibit 2**    Dennis Roberts Letter of 5-31-2005.

**Exhibit 3a**    Copied employment records from Sexual Assault Case

**Exhibit 5**    Letter from Psychiatrist Dr. Michael Levy to Mike McClure 2-7-2002

**Exhibit 5.1**    Declaration of Miranda L. Gutierez 6-18-2005

**Exhibit 6**    Kaiser's Drug & Alcohol Policy 3.02NC

-1-

INDEX TO EXHIBITS IN SUPPORT OF PLAINTIFFS FIRST AMENDED COMPLAINT FOR DAMAGES: Breach of Contract, Breach of
Contract Based on Correspondence Between Parties, Contract Tort, Intentional Infliction of Emotional Distress, Breach of the Implied Covenant of
Good Faith and Fair Dealing, Wrongful Termination, California Fair Employment and Housing Act Denied Physical and Mental Accommodations,
Mental Discrimination
TOKASHIKI vs. KAISER FOUNDATION HOSPITALS

| | | |
|---|---|---|
| 1 | **Exhibit 7** | Theresa McCauley's (Tokashiki) Cannabis Recommendation of 7-6-2004 |
| 2 | **Exhibit 7 (E)** | Greg Tegenkamp's hand written notes & typed out version 2002 |
| 3 | **Exhibit 8** | Jan Austin's letter to Greg Tegenkamp "Deny 2nd Step Greivance" 7-13-2005 |
| 4 | **Exhibit 8 (A)** | Suspension letter from Amy Shaw regarding suspension on January 24, 2002. |
| 5 | **Exhibit 8 (B)** | Western Union Mailgram from Amy Shaw to Terry Tokashiki 1-25-2002 |
| 6 | **Exhibit 8 (C)** | E-mail from Amy Shaw to Theresa Tokashiki on 1-24-2002 at 11:02am |
| 7 | **Exhibit 8 (D)** | Personnel Action Request Form: Reverse Termination "02-01-02" |
| 8 | **Exhibit 10** | Email from Amy Shaw to Marie Bates, Kathy Castagnetto, Theresa Tokashiki 11-27-2000 |
| 9 | **Exhibit 10a** | Email from Kristin Heiman to Teresa Tokashiki 1-6-2004 |
| 10 | **Exhibit 13 (C)** | "Threatened Miscarriage" notes from Kaiser Emergency Room Doctor 1-24-2002 |
| 11 | **Exhibit 13(d)** | Dr. Jordan-GYN note stating "pregnant, stress-multiple etiologies" on 1-28-2002 |
| 12 | **Exhibit 18 (A)** | Settlement Agreement between Kaiser and Theresa Tokashiki 9/24/2003 |
| 13 | **Exhibit 30** | Letter from Cindy Munoz-Romo to Kaiser Permanente Executive Management on 5-3-2005 |
| 14 | **Exhibit 30.1** | Investigation Statements from Kristin Heiman Human Resources not dated |
| 15 | **Exhibit 36** | Employment Development Department notes on 6-28-2005 |
| 16 | **Exhibit 41** | Email from Greg Tegenkamp to Terri Tokashiki on 5-3-2005 |
| 17 | **Exhibit 69** | E-mail from Amy Shaw discussing Exhibit 18 (A) on October 22, 2003 at 9:29am |

-2-

INDEX TO EXHIBITS IN SUPPORT OF PLAINTIFFS FIRST AMENDED COMPLAINT FOR DAMAGES: Breach of Contract, Breach of Contract Based on Correspondence Between Parties, Contract Tort, Intentional Infliction of Emotional Distress, Breach of the Implied Covenant of Good Faith and Fair Dealing, Wrongful Termination, California Fair Employment and Housing Act Denied Physical and Mental Accommodations, Mental Discrimination
TOKASHIKI ... KAISER FOUNDATION HOSPITALS

**KAISER PERMANENTE®**

Kaiser Permanente Medical Center

TO:        Theresa Tokashiki

FROM:    Diane Thurin, Executive Consultant

CC:         Jan Austin, HR Consultant
              Christine Robisch, Chief Operating Officer
              Ray Konieczek, HR Business Partner
              SEIU-HCW Union Representative
              Sonya Campilongo, Manager Operator Services

DATE:    June 20, 2005

On April 03, 2005, it was alleged that you were in possession of, and consumed marijuana while working in the Operator Services Department at Kaiser Permanente Walnut Creek. You were immediately placed on paid investigatory suspension while we conducted a thorough investigation into this matter. The investigation confirmed that you have possessed and consumed marijuana at work without notice to or permission from the Employer.

This conduct is unacceptable. It is in direct violation of Kaiser Permanente's Alcohol and Drug policy and the Federal Drug-Free Workplace Act of 1988. It also placed our patients' safety and the organization at risk. Therefore, your employment with Kaiser Permanente is terminated effective June 20, 2005.

Your final check is enclosed. Your COBRA benefit information will be sent to your home address.

_____            _____
Employee Signature                                          Date

_____            06·20-2005
Manager Signature                                           Date

_____            _____
SEIU-HCW Union Representative                       Date

1425 South Main Street
Walnut Creek, California 94596-5300
(925) 295-4000

08915-39 (REV. 5-00)

# DENNIS ROBERTS • ATTORNEY

370 GRAND AVENUE • OAKLAND, CA 94610 • PHONE (510) 465-6363 • FAX (510) 465-7375

www.dennisrobertslaw.com • *A Professional Corporation* • roberts_dennis@sbcglobal.net

**Exhibit 2**

May 31, 2005

Ms. Terri Tokashiki
2169 Dalis Dr.
Concord, CA 94520

Dear Ms. Tokashiki:

You have consulted me regarding whether anyone can question a physician's
recommendation regarding the Compassionate Use Act (H & S Code Secs. 11362.5, 11362.7,
et seq.). I have been representing defendants in medical marijuana cases since the inception
of this Act, and I am associated with William Panzer, Esq. in numerous cases. Mr. Panzer
was one of the drafters of this statute then known as Prop. 215. You fit entirely under said
Act and the statutes which codify same.

I have sent you two cases, *People v. Wright* and *People v. Spark* which are based on the
California Supreme Court decision in *People v. Mower.* The reading of these cases makes it
clear that once you obtain a medical recommendation by a licensed California physician no
one can go behind that recommendation. You do not need to prove you were "seriously ill"
or what medical condition was that gave rise to the medical recommendation. Because of
this no one can ask you for what condition you obtained said recommendation, nor ask you to
release confidential medical records.

It does not matter what your employment contract says about the use of marijuana. They can
no more ban medical marijuana for a valid patient (by showing a medical recommendation )
than they could ban the use of darvon, tylenol, or any other prescription drug which your
physician has recommended that you use. In other words, it is not only **not** against the law to
ingest marijuana if you are a bona fide patient with a recommendation by a licensed
California physician, but in fact you are protected by the statutes cited above in the Health
and Safety Code and by the body of California case law that has grown up around those
statutes.

I have read over the Kaiser Policy on "Alcohol and Drugs". There is nothing in this KP
Policy which would govern your conduct as being wrong. There is nothing which you did
which would interfere with KP's obligation to provide safe, reliable and timely health care
services and a safe work environment.

Under the definitions section, they define "illegal drug" as 1) not legally obtainable; 2)
legally obtainable drug which has not been legally obtained; or 3) a prescribed drug which is
not being used for prescribed or manufactured purposes...". You do not fit in any of these
categories as your medicine was legally obtained and is legally (under the Compassionate
Use Act) obtainable. You did not nor did you intend to use your medicine at Kaiser, nor were
you "under the influence."

1

Let me give you a few examples: H & S Sec 11362.5(d) says in pertinent part:

"Section 11357, relating to the possession of marijuana and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient...who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."

Section 11362.765 Specified individuals not subject to criminal liability:
"...The individuals specified in subdivision (b) shall not be subject, on that sole basis, to criminal liability under sections 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570...

Section 11362.77 Quantity of marijuana which qualified patient or primary caregiver may possess; Local guidelines; Recommendations by Attorney General.
(a) A qualified patient...may possess not more than eight ounces of dried marijuana per qualified patient. [You are also entitled to possess up to six mature or 12 immature marijuana plants.]
...
( c) Counties and cities may retain or enact medical marijuana guidelines allowing qualified patients ... to exceed the state limits set forth in subdivision (a).
(d) Only the dried mature processed flowers of female cannabis plant or the plant conversion shall be considered when determining allowable quantities of marijuana under this section.

Sec. 11362.785(d) "Nothing in this article shall require a governmental, private, or any other health insurance provider or health care service plan to be liable for any claim for reimbursement for the medical use of marijuana." [Please do not ask Kaiser to pay for your medical marijuana as they have a legal right to refuse.]

Under the section entitled Prohibitions: you did not consume or use legal medicine on the KP premises. You did temporarily store your legal medicine at Kaiser as it was necessary to keep it in usable condition prior to your ingesting it at home. This is no different than keeping legally prescribed insulin in their refrigerator for later use off premises.

Since your medicine is legal you did not violate any of the sections of B. Prohibitions, sub-sections (1) through (6). Finally, you were not "under the influence" of any drug, legal or illegal.

I have also sent you some photographs memorializing my victory in People v. Wolf, et al in the Alameda County Superior Court. There we were not only granted a dismissal of the charges because of the medical marijuana statutes, but had returned to us $3,500.00 seized from the defendants as well as an assortment of pipes and bongs used for ingestion of the marijuana. Under the law you have a right to obtain a return of the medicine which they seized from you and, should they have destroyed it or kept it under improper conditions which rendered it unusable, you are entitled to be compensated for the cost.

2

In conclusion: If you are not prohibited from storing any legitimate medicine obtained through the recommendation of a licensed physician, they cannot prohibit you from storing this particular medicine. In other words, if you were a diabetic who took her insulin after work but needed to keep it cold while at work, and they did not prohibit this, they cannot prohibit you from doing what you did. If they do they will be facing an employment discrimination case.

Very truly yours,

Dennis Roberts

3

 KAISER PERMANENTE

## PERSONNEL ACTION REQUEST

| DATE ACTION REQUESTED | EFFECTIVE DATE OF ACTION |
|---|---|
| 8/20/91 | 8/24/91 |

| EMPLOYEE | EMPLOYEE NUMBER |
|---|---|
| THERESA McCAULEY | 55063 2479 |

### TYPE OF CHANGE REQUESTED

| | | EMPLOYMENT CATEGORY | |
|---|---|---|---|
| ☐ New Hire | ☐ Initial LOA | **FROM** | **TO** |
| ☐ Re-Hire | (minimum = 30 days) | ☐ Full Time | ☐ Full Time |
| ☐ Transfer | ☐ Extension of LOA | ☐ Part Time | ☐ Part Time |
| ☐ Promotion | ☐ Return from LOA | ☐ Short Hour | ☐ Short Hour |
| ☐ Reclassification | ☒ Termination | ☐ Casual | ☐ Casual |
| ☐ Tenure Increase | ☐ Other | ☐ Regular | ☐ Regular |
| | | ☐ Temporary | ☐ Temporary |

| CHANGE | FROM | TO | CHANGE | FROM | TO |
|---|---|---|---|---|---|
| ☐ Job Title | | | ☐ Loc./Ent. | | |
| ☐ Scheduled Hours | | | ☐ Cost Center | | |
| ☐ Shift | | | ☐ Salary | | |
| ☐ Grade/Step | | | ☐ Union | | |
| ☐ Job Code No. | | | ☐ EEO Code | | |
| ☐ Reports To | | | ☐ Replacement for | | |
| ☐ Position Number | | | ☐ Other | | |

REMARKS / REASONS

Did not successfully complete
probation 53

### AUTHORIZATION FOR CHANGE

SUPERVISOR / DEPARTMENT HEAD SIGNATURE
*Lisa Kendrich*

ADMINISTRATOR / MANAGER SIGNATURE
*Maria Klein*

COMPENSATION SIGNATURE

**FOR TRANSFER:**    Please key
_____ Bargaining Unit Seniority  attached teneeord

20.0 Reg Day
8.0 Reg Eve
4.5 Reg Day of 8-10-91 PPE

**FOR TERMINATION:**
_____ Last Day Worked
_____ Earned Vacation Hours
_____ Accrued Vacation Hours
_____ Float Holidays
_____ Sick Leave

C0004

| ENTERED BY: | DATE ENTERED: |
|---|---|
| | 8-22-91 |

91603 (REV 3-90)    DISTRIBUTION: WHITE / ORIGINAL = PERSONNEL • CANARY = PAYROLL • PINK = RETAINED BY SUPERVISOR • GOLDENROD = COMPENSATION

**Exhibit 3a**


KAISER PERMANENTE

## UNEMPLOYMENT INSURANCE TERMINATION REPORT — Northern California

1. ☐ PMG
   ☒ KFH - Code 74
   ☐ KFHP - Code 80   MARTINEZ _LOCATION NAME_   1 54 5345 _LOCATION CODE #_

2. THERESA _FIRST NAME_  ANN _MIDDLE_  McCAULEY _LAST_  Social Security 550 63 2479

3. 2169 DALIS DR _LAST ADDRESS NUMBER & STREET_  CONCORD _CITY_  CA _STATE_  94520 _ZIP_

4. C13X OFFICER _LAST POSITION_  5/1/91 _HIRE DATE_  8/19/91 _LAST DAY WORKED_  8/24/91 _TERMINATION DATE_

5. Upon termination employee received wages in lieu of notice   ☒ No   ☐ Yes   $_____ AMOUNT

6. Was this termination requested or suggested by the Company   ☐ No   ☒ Yes

7. REASON FOR TERMINATION:

| VOLUNTARY QUIT | MISCONDUCT CONNECTED WITH WORK | OTHER |
|---|---|---|
| ☐ To Look for Other Employment | ☐ Refused to Follow Instructions | ☐ Layoff |
| ☐ Self Employment | ☐ Breach of Company Rules | ☐ Disability |
| ☐ Dissatisfaction with Job | ☐ Intoxication – under apparent influence | ☐ Pregnancy |
| ☐ Change in Residence | ☐ Unexcused Absenteeism | ☐ Required by Company Policy |
| ☐ To Attend School | ☐ Failure to Report for Work Without | ☒ Unavailable for work |
| ☐ Personal Reasons (Specify) | Notification | ☐ Retirement |
| ☐ To be Married | ☐ Dishonesty (Specify) | ☐ Military Service |
| ☐ Marital or Domestic Duties | ☐ Excessive Tardiness | ☐ Unsatisfactory Performance |
| ☐ Early Retirement | ☐ Refused Work Assignment | ☐ Other (see below) |
| ☐ To Accept Other Work | ☐ Insubordination | |
| ☐ Other Voluntary Leaving | | |
| ☐ Relocation of Spouse | | |

8. STATE COMPLETE DETAILS REGARDING TERMINATION: SICK TIME AND OTHER UNAVAILABLE TIME TOTALED 174 HOURS BEFORE HER 200 HRS PROBATION WAS COMPLETED

_(USE REVERSE SIDE IF NECESSARY)_

9. Was a Leave of Absence offered to employee? No   Did the employee request a Leave of Absence? No
   Was a Leave granted? N/A   Period of Leave? _____

Compiled by LISA KENDRICK   Supervisor _____   8/21/91 _DATE_

Reviewed by: _____ PERSONNEL DIRECTOR / REPRESENTATIVE

G0008

**Exhibit 5**



**KAISER PERMANENTE**
Mental Health Services
391 Taylor Boulevard
Suite 250
Pleasant Hill, California 94523

**RECEIVED**

FEB 1 9 2002

Human Resources
NE Bay CSA

7 February 02

Mike McClure
Human Resources
Kaiser Martinez

Dear Mike,

I have seen Theresa Tokashiki as a client since 7/23/80. She has periods of depression since then that have been accompanied by agitation, memory loss, and decreased concentration.

If you have further questions, please contact me at 8-488-8910.

Sincerely,

Mike Levy, M.D.
Associate Chief of Mental Health/Chemical Dependency Services
Diablo Service Area for The Permanente Medical Group
(925) 688-8910

Kaiser Permanente Medical Center
200 Muir Road
Martinez, California 94553-4696

M Levy MD

**KAISER PERMANENTE.**

D/S AUTH 68
SAN FRANCISCO CA
PRE-SORTED FIRST CLASS

xx 02/12/

≡ 0.32

Mike McClure
Human Resources
Kaiser Martinez

00013-610 (11-00)

# *DECLARATION OF MIRANDA L. GUTIERREZ*

*Pursuant to Code of Civil Procedure, State of California: CCP § 2015.5 Certification "Under Penalty of Perjury." And Federal Rules of Evidence: Rule 803(5), 901(a),(b),(b)10,and 1001(1), (3), and (4), this is a valid declaration and will be used as evidence.*

———————————————————————

Miranda L. Gutierrez is offering this information specifically to let out the truth about questions that Theresa A. Tokashiki, myself, was a co-worker that she worked with at Kaiser Hospital in Walnut Creek, California. I asked her to answer the questions leading to this formal Declaration, of her own free will and on June 18, 2005. She has not been paid for this testimony and information by myself, Theresa A. Tokashiki. She understands that this Declaration she is about to give is considered a legal document for or not for court reasons, and with this understanding, that in court, it would be held as a "penalty of perjury" if she lied, which she is not doing nor intends to do while providing information and answering these questions.

———————————————————————

"'I Miranda L. Gutierrez swear to tell the truth and declare my statement to be the whole truth in the information as stated in my answers and in this Declaration under Penalty of Perjury.'"

QUESTION ONE (1): A combination question. Do you remember the day I first returned back to work in 2004, and on that day Amy L'Amoreaux *(formerly 'Amy Shaw')* had a meeting together in her office for approximately forty-five (45) minutes? Do you remember I told you what Amy and I were talking about and the fact that I requested Amy to never terminate a pregnant woman ever again and that Amy and I had a discussion that included several different topics, issues and concerns including the fact that I was taking 'heavy medications' for my pain and how Amy got very upset that I even confronted her with what medications I was taking and to never mention that to her or anyone else in the department ever again?

"'Yes I do remember part of that Terri. That day the operators that were there working, were very upset that you were not at your switchboard answering calls. And they were wondering

1  when you were going to return to your seat so you could answer some calls. I remember you
2  telling me that you asked Amy never to fire a pregnant woman again, oh yes. I remember that
3  part only but I know you told me you two talked about a lot of stuff, but I don't remember
4  everything you told me, sorry.'"

5  QUESTION ONE (1a): Where were you sitting Miranda when I came into the office the day I
6  showed Alicia my Cannabis Card?

7
8  '"I was sitting at Operator Station/Position #4, and Alicia was in Operator Station/Position #5.'"

9  QUESTION TWO (2): What time of year was it?
10

11  '"I remember you had thongs on and no socks so it had to be between July and August…it was
12  hot last year around that time, and you know I get freezing cold in that office, so it's not easy for
    me to remember what I was wearing because I always wear a sweat-shirt.'"
13

14  QUESTION THREE (3): A combination question. Where was my purse located and what
15  happened after I showed Alicia Blinks my Cannabis Card/Recommendation, and how long did I
16  stay at her desk?

17  '"Well Terri, your purse was on my desk.. Alicia was praising you for getting it. 'How'd you get
18  this…it's cool you got it'…just the fact that you did show it to her and she was impressed. She
19  just acted like she needed to get one too. And you were at her desk about 10 or 15 minutes. I was
20  answering calls at the time but I do remember Alicia and you were back there talking about it, I
    don't remember exactly what you two were saying though. I do remember you taking out your
21  wallet and walking back to Alicia's desk to show her something out of your purse or your wallet
22  or both possibly, I was on the phone. Your purse was on my desk, and you pulled some candy
23  you just bought at the gift shop for all the operators. You took it out of your purse and gave it to
24  everyone I think you had a Reecee's and Hershey's…I had the Hershey's and Alicia didn't want
25  any candy…I remember you offered her some and she didn't want it. I remember you showed
    me your card before…your card is laminated and has your picture on it, but what you showed
26  Alicia has a smaller print of your drivers license on it…'"

---

DECLARATION OF MIRANDA L. GUTIERREZ - 2

QUESTION FOUR (4): A combination question. Do you remember why I came in that day and approximately what time it was?

'"When you walked in you asked, "Where's Amy...is she here today?"-But you came in to talk to Amy not Alicia, I knew that. And I know it was after 2:30pm and Jo is gone at that time. That's the time frame when you showed up that day, and Alicia leaves at 3:30pm so it had to be between that time frame, I know it was."'

QUESTION FIVE (5): Do you remember who was placed in charge by Amy to run the department in her absence?

'"Yes, it was always Alicia...'cause there was no one else to put in charge. And Amy was concerned with the Partnership with the Union...and...the "LMP" Labor Partnership Management" She put her in charge and she was the Union Steward and part of the LMP..."'

QUESTION SIX (6): Did Alicia ever state she had any formal training to be a Manager or a Supervisor or that Amy was going to send her to any training program?

'"No."' '"Alicia never should have been put in a supervisory position because she was just another operator. Jo Smith was different...she was senior operator...she should have been able to tell us what to do when Amy wasn't in the office, which was a lot of time when Amy was not in the office."'

QUESTION SEVEN (7): Do you feel that Amy had Alicia supervise because of her steward experience or her operator experience?

'"There are two factors involved with my answer. The union side of Alicia knew the rules of the union...which was what the employees were and were not allowed to do, and that Alicia had more seniority and could be considered a senior worker, but she was never a senior operator. The only one in the department that had more seniority than Alicia is Felicia and she works graveyard and wouldn't be available to supervise us. Once the LMP was in effect, it made Alicia more busy and unavailable to take calls...but Amy would always tell us that Alicia can't answer calls right now...she's doing a project for me."'

DECLARATION OF MIRANDA L. GUTIERREZ - 3

1  QUESTION EIGHT (8): A combination question. Do you remember anyone in the department

2  named David Lankiet and do you remember me telling you about my suspension the day my

3  Cannabis Candy (Reecee's) was found in the refrigerator and do you remember that you came

4  out with the following words, '"Terri, David Lankiet is addicted to Reecee's Candy! Liz and

5  Dean don't eat sweets…David was probably looking for some candy to eat and found your

6  candy. He's always in the refrigerator looking for sweets…that belong to someone else in the

7  department. I hate that, it's very dishonest."', ?

8

9  '"Yes Terri, I do remember stating that to you."'

10

11  Miranda L. Gutierrez, former PBX Operator at Kaiser Hospital in Walnut Creek, California. My

12  address is: 503 Texas Street, Antioch, California 94509

13

14

15  Dated this 18th day of June, 2005

16                                                        Miranda L. Gutierrez

17

18

19

20

21

22

23

24

25

26

DECLARATION OF MIRANDA L. GUTIERREZ - 4

**KAISER PERMANENTE** Human Resources

Print po

Home
Northern California Policy Index
Southern California Policy Index

| Northern California Human Resources Policies | |
|---|---|
| Number: 3.02 NC | Supersedes: N/A |
| Issued: 3/89 | Revised: 9/91 |

To print this polic
to use this buttor
can be inherent,
related results in
long html pages.

**Related Informa**
N/A

# Alcohol and Drugs

### I. POLICY STATEMENT

The Kaiser Permanente Medical Care Program of Northern California (KP) prohibits the use and/or abuse of drugs, including alcohol, in the workplace. As a provider of health care, KP recognizes that alcohol and drug abuse or dependency is a major health problem that can have tragic consequences for individuals, families and the workplace. While KP endeavors to avoid unnecessary intrusion into employees' personal lives, KP is committed to providing a workplace safe from the adverse effects of alcohol and drugs.

### II. PURPOSE

This policy codifies current practice and is consistent with the requirements of the federal Drug-Free Workplace Act of 1988 and with KP's obligation to provide safe, reliable and timely health care services and a safe work environment.

### III. COVERAGE

All employees are covered under this policy. (Physicians are covered under policies issued by The Permanente Medical Group, Inc.) In addition, all organizations that supply temporary or registry personnel, students or trainees to KP are held accountable for providing individuals who comply with this policy. Temporary personnel and independent contractors who fail to comply with this policy are removed from KP premises and may be barred from any future service with KP.

### IV. DEFINITIONS

**Illegal Drug** - For the purpose of this policy, any drug which is:

1. not legally obtainable;

2. a legally obtainable drug which has not been legally obtained; or

3. a prescribed drug which is not being used for prescribed or manufactured purposes or in accordance with the prescribing professional's and/or manufacturer's instructions.
   Examples of illegal drugs include, but are not limited to, the following: stimulants (e.g., cocaine and amphetamines), cannabis (e.g., marijuana), narcotics, depressants and hallucinogens.

**Legal Drug** - When used as directed, a prescribed drug which has been legally obtained or an over-the-counter drug.

**Being Under the Influence** An individual is affected by a drug or alcohol or the combination of drugs and alcohol in any detectable manner. The symptoms of influence are not confined to those consistent with misbehavior, nor to obvious impairment of physical or mental ability, such as slurred speech or difficulty in maintaining balance, but may include symptoms such as the odor of alcohol. A determination of "under the influence" can be established by a professional opinion, a medically accepted drug or alcohol screening test, or a lay person's opinion based upon observation of conduct and/or events.

V.  **PROVISIONS**

    A.  Self-Acknowledged Drug and Alcohol Problems

        1.  Treatment is available for persons with problems related to alcohol and/or drug abuse or dependency, and KP strongly encourages employees with such problems to seek treatment. The responsibility for seeking, obtaining and cooperating in such treatment is the individual's.

        2.  Any individual experiencing drug and/or alcohol dependency is encouraged to use available Employee Assistance Programs and/or any disability plans, treatment, and health plan coverage that may be appropriate. Employees may check with the Personnel Department regarding available resources. Participation in such programs does not relieve the employee of the responsibility to meet job performance expectations. However, participation may help preserve employment when sought before serious absenteeism, performance problems or misconduct occurs.

        3.  Information regarding an employee's efforts to obtain help, as well as statements regarding substance use or abuse, are treated confidentially (see section "D" on Confidentiality, below).

    B.  **Prohibitions**

    The following acts and/or conditions related to the use of alcohol and/or drugs are prohibited. Under no circumstances is patient care provided by an individual who is under the influence.

        1.  Consumption, use, possession, transfer, manufacture, solicitation, attempted or actual sale, purchase, distribution or dispensation of illegal drugs on KP premises.

        2.  Consumption or use of alcohol or possession or transfer of open containers of alcohol on KP premises, except at KP sanctioned events, or when performing authorized job duties (e.g. laboratory work).

        3.  Being under the influence, or giving the appearance of being under the influence, of illegal drugs or of alcohol, while on KP premises or conducting KP business.

        4.  Being under the influence of any legal drug while performing KP business or on KP premises to the extent that such use affects or gives the appearance of affecting the safety of co-workers, members, patients, or the general public; the individual's job performance; or the safe or efficient operation of KP's facilities or business.

        5.  Theft, diversion, or unauthorized removal of drugs maintained or dispensed on KP premises.

        6.  Participation or acquiescence in any of the actions mentioned above.

    Further, conduct leading to off-duty arrests and/or convictions related to illegal drugs or alcohol dependency may render an individual unfit for



continued employment. Action is not taken solely because the arrest and/or conviction, but is taken following an investigation and based on the nature of the employee's conduct, how this conduct affects the individual's fitness to perform the job, the safety and morale of other employees and members, and KP's business interests and reputation.

C. Investigation

1. Individuals suspected of being in violation of this policy may be suspended pending investigation. Any illegal drugs which are confiscated are turned over to local law enforcement agencies.

2. In addition to other investigatory methods, when there is reason to suspect that an individual is under the influence, the situation is discussed privately with the individual. Reasonable suspicion may exist by virtue of a change in behavior, unexplained accident or error, change in physical characteristics or other objective facts and/or rational conclusions based upon documented observations. The individual may be asked to provide, on KP time and at KP expense, blood and/or urine specimens which are then tested for the presence of alcohol, drugs or drug metabolites. Provision of a specimen is voluntary and the testing of the specimen is done or confirmed by an independent laboratory.

3. Employees are responsible for informing their supervisors if their use of prescribed or over-the-counter drugs may affect their job performance or pose safety problems. If the adverse effects cannot be reversed or controlled, the employee may have to be removed from the workplace and placed on sick leave or a leave of absence.

4. Disciplinary action is determined based upon the information available (including medical tests, when available, confirming or disproving the presence of drugs and/or alcohol) and consistent with avoiding unreasonable risks or harm to KP, its members, patients or employees.

D. Confidentiality

1. KP recognizes the importance of maintaining confidentiality when individuals are suspected of prohibited alcohol or drug-related activities or are involved in rehabilitation. Consistent with law and KP policy, all reasonable efforts are made so that only the following persons are informed of the individual's circumstances:

   a. those who have a need to know in order to meet operational or safety needs of KP;

   b. those who must be notified by law and/or licensure requirements; or

   c. those authorized in writing by the affected individual.

2. As in any other situation involving confidential information, any person divulging information regarding an individual's actual or suspected prohibited alcohol or drug-related activities or involvement in rehabilitation, other than in the circumstances described above, is subject to discipline up to and including discharge.

E. Penalties

1. Violations of the prohibitions against theft, distribution, solicitation, sale or purchase of illegal drugs result in automatic discharge and may lead to criminal prosecution.*(When the sole purpose of a theft is diversion of drugs for personal use, penalties are handled in accordance with "2." below.)

2. Violations of other prohibitions related to alcohol and/ legal drugs, including diversion of drugs, subject an individual to disciplinary action, up to and including discharge, and to possible criminal prosecution.

F.  Additional Employee Obligations and Responsibilities

1.  Employees who abuse drugs and/or alcohol often affect the performance of other employees. KP cannot provide quality health care without the cooperation and assistance of all employees. As discussed in the "Principles of Responsibility" (see Guidelines tab in this manual), employees who observe activities prohibited by this policy are responsible for alerting their supervisors or whatever management is necessary to resolve the issues. Failure to report violations may result in disciplinary action.

2.  Any employee who is convicted of, or who pleads no contest to, a criminal offense for a drug violation that occurred in the workplace must, as a condition of employment, notify the Personnel Department within five days of the conviction. Personnel immediately contacts the Regional Director of Human Resource Services, who notifies the appropriate parties as required by law. Any employee who fails to report this information is subject to discharge.

© Copyright Kaiser Permanente, 2004
Please read our Disclaimer and Privacy Statement

# Hany Assad, M.D.
**1740 Telegraph Avenue**
**Oakland, California 94612**

## Therapeutic Cannabis Recommendation

Name: _Theresa Ann McCauley_
(Your legal name as it appears on your California Drivers License)

Address: _2164 Dalis Drive_

City: _Concord_ , California    Zip: _94520_

Date of Birth: _3/10/03_

This document serves to certify that the specified patient above met with the healthcare professional indicted below for a review of medical conditions which justify the patient to be approved for the use of therapeutic cannabis by the clinic's physician Hany Assad, M.D.

JUL 0 6 2004

☐ Hany Assad, M.D.    ☑ John Bass, N.P.    ☐ Christine Smith, N.P.    ☐ Felicia Black, P.A.

After review of the patient's medical history, pertinent records, and appropriate physical examination, the patient's use of cannabis is for the relief of symptoms associated with a medical disorder which has been approved, by me, the Physician.  It is in my opinion that the patient named above has sought this recommendation for therapeutic cannabis for relief of symptoms associated with a medical disorder.  In addition, it is in my opinion that the patient's use of the drug is not for a euphoric effect nor to satisfy a craving.

_(Eval - in records)_

I concur that such use is reasonable and falls within the purview of the Compassionate Use Act of 1996, California Health and Safety Code SSI 11362.5.

This recommendation is good for: _One year_

Hany Assad, M.D.
California License A54309

JUL 0 6 2004

Date of Issuance _____

To verify this recommendation,
please call: (510) 839-0723



**CALIFORNIA**
DRIVER LICENSE
C2254132    CLASS: C
EXPIRES 03-10-08
THERESA ANN MCCAULEY
2164 DALIS DR
CONCORD CA 94520
SEX: F    HAIR: BRN
HT: 5-02    WT: 200    DOB: 03-10-63

2002-007          THeresa Tokashihi, Step 3, 7-17-02

                    Cliff Gates                    Greg Tyunkanf
                                                   Theresa Tokashihi

5/1/91
5/8/91

6/30/2000 ✓          1) time delay between JAHCO and actions
11/07/2000 ✓            ( Cliff has E-mail 12/6/2000 requesting meeting
5/2001 ✓                  for investigation)
1/27/2002 ✓
3/13/2002 ✓          2) Intent - heys
7/2002
3/27/2002 ✓                      32hr/week
5/14/02 ✓
7/02

Step 2 Grievance Meeting re Terri-Tokuda
= May 24, 2002

CAROL TELLERKAMP                    AMY SHAW
TERESA TOKASHIKI                    SAMILLE CLARK

---

Terminated March 27
        falsification of employment application

    Have you ever been employed
            checked NO, when YES.

    [ had worked for Kaiser MTE
      in 1991 - Lisa Kerluchs    ]
    was manager

    traumatic experience that occurred
    in 1991 - at time of Kaiser employed

    periods of memory loss, etc →
    to M. deMolten on 3/7/02

was this taken into consideration
        ↓
        Terry's resume had employment from
        1992 to present

SEIU003

Employment - Started she had been
1 hour Employee

Resume [was original] application -
No → They gave to me

May 30, 2000

March 27, 2002

[did interview based on her resume

[recruitment services]
↓ did not have Terry's application
↓
rejected → 
         September 2001

[Terry was not at work after] ↔

needed guidance

[ January 25 on administrative leave ]
[ w/out pay
       4 months terminated

[rhetorical questions → intent is an element

SEIU004

*[handwritten notes, largely illegible]*

Terri was employ & leave
70 days →
       was there documentation as to
       what

[ what reason did we not Kari
       Gretta leave, performance —
                  not being available ]

evaluations
       Terry is not comfortable being — greater
       higher goals, unless more a-
       ment
              tend to take things upon herself

? I chose to have greater coworkers

attendance was awful → could not
       get time to meet for discipline

34 hr employee

attendance — ~~———~~ — last child - pregnancy

3 pregnancies in a year + half

   → men

**SEIU005**

→ thorough conversations w/ people scheduler + H.R.

need Eth's policy on falsification of records (application)

↓

Get back in 2 weeks.

MARCH 18, 2002 re Thursa Tokashiki WCK

AS        investigatory meeting
          set for Jan 24
          ✳         unable to meet because
                    of his ship

AS        To discuss application for
          Employee

AS        employee since May 30th, 2000

AS        why check 'no' → were you
          ever an employee.

CT        What is possible outcome of meet

AS        of no tolerance for fraudulent applicati

Why: administrative leave without pay

AS        Insubordination
          not addressing that issue today.

How long did you know she worked.
Joint commission            **SEIU007**

[application]

- Why she checked the
  box "no" when she
  had been employed before ↓

Didn't remember I worked at Kaiser
before.  1991 - 1993 a break
called people solutions

[ Operator May 1 1991 to August. ]

[ 1991 → Pandora's Box ]

[ Children's Hosp Oakland May 5, 1991
  sexually assaulted at Hospital ? ] ↓

[ I think I worked at Kaiser at some point
  in my life ]

[ didn't know ] →                    **SEIU008**

did you recall working for his K → (no)

did you recall being an operator → (no)

did you recall be, nervously terminated → (no)

INVESTIGATORY SUSPENSION as of 3-13-02

→ ADMINISTRATIVE LEAVE running concurrently
↳           alleged insubordination
    ↓ [over effective today]

when will you let us know results
    of investigation
        by end of week

    ← [ Samille Clark involved w/ this ] →

[ Joint commission in September ]

SEIU009

March 27, Erica Polinski    Termination

Taupine Longmire
Amy Shaw

accrued vacation
earned vacation
This last meet
. This today

SEIU010

Documents re Theresa Tohahi
provided 7/3/03 by Sandell Clark

1) Evaluation signed 9-14-01

2) Theresa Tohahi resume

3) Application for Employment — (5-16-2000)

4) Orientation handbook - professional
Conduct - Revised January 2001

per
sample previous employment records were
purged, destroyed

Relying on testimony of
previous manager Lisa Kenston

May 1, 1991 , 8/24/91

SEIU0 11

**Exhibit 7(E)**–typed out & with my personal notes

*GREG TEGENKAMPS GRIEVANCE NOTES-FIELD REP. FOR UNION –*
*GREG WAS THERE TO WITNESS ALL GRIEVANCE MEETINGS FOR*
*THIS TIME-PERIOD OF January 2002 to March 2002. THIS*
*TERMINATION WAS SETTLED ON: September 24, 2003 in favor of Theresa*
*A. Tokashiki. (See Exhibit 18 (A) for Settlement Agreement 9/24/2003)*

## These are the typed notes I did from Greg's original hand-written notes listed as Exhibit 7(E):

(A)    No Date, Greg Tegenkamp's hand-written notes regarding Plaintiff
Tokashiki's Grievance Representation for her March 27, 2002 termination
(labeled as SEIU002, SEIU003, SEIU004, SEIU005, SEIU006, SEIU007,
SEIU008, SEIU009, SEIU010 and SEIU011). The notes are not completely
legible.

Page SEIU011 – States the following: '"Documents re Theresa Tokashiki
provide 7/3/03 by Samille Clark 1) Evaluation signed 9-14-01, 2) Theresa
Tokashiki resume, 3) Orientation handbook – Professional Conduct – Revised
January 2001…Per Samille ⟶ previous employment records were purged,
destroyed. Relying on testimony of previous manager Lisa Kendrick May 1,
1991, 8/24/91.'"

### *March 27, 2002 – TERMINATION DATE*
Page SEIU010 – States the following: March 27 Teresa Tokashiki
TERMINATED, = Tarynne Longmire, Amy Shaw, accrued vacation, earned
vacation, 2hrs last meeting, 2hrs today.'"

***END OF Meeting of 3/18/2002 here…first page "SEIU009"**
Page SEIU009 - States the following: INVESTIGATORY SUSPENSION as
of 3-18-01= (the number "2" is scratched over with a "1")

ᴅ   /

ADMINISTRATIVE LEAVE running concurrently, ⟶ alleged insubordination [over effective today], when will you let us know results of investigation – by end of week ⟶[Samille Clark involved w/this] , ⟵⟶ [Joint Commission in September].'"

Page SEIU008 - States the following: '"[September] [Application] = Why she checked the box "no" when she had been employed before ⟶ Didn't remember I worked at Kaiser before. 1991 – 1993 a blank. Called people solutions, [operator May 1 1991 to August.] [1991⟶ Pandora's Box] [Children's Hosp Oakland May 5, 1991 sexually assaulted at Hospital] ⟶ [I think I worked at Kaiser at some point in my life] [didn't know]⟶ did you recall working for Lisa K⟶ (no), did you recall being an operator ⟶ (no), did you recall being previously terminated ⟶ (no)'"

### *March 18, 2002 - GRIEVANCE MEETING/CONTINUED...*

Page SEIU007 - States the following: '"March 18, 2002 re Theresa Tokashiki WCR, = A.S. investigatory meeting set for Jan 24 * unable to meet because of Dr's slip, AS to discuss application for Employment, AS employee since May 30th, 2000, AS why check "no" ⟶ were you ever an employee., GT what is possible outcome of meeting, AS no tolerance for fraudulent application why: administrative leave without pay, AS Insubordination not addressing that issue today. How long did you know (illegible writing) worked. Joint commission.'"

Page SEIU006 - States the following: '"(illegible writing) conversations = w/people solutions & H.R. ⟶ get back in 2 weeks, need ER's policy for falcification of records <application>'"

Page SEIU005 - States the following: '"previous employment records, evaluating current discipline] resume. Teresa was employed less than  =90 days ⟵ was there documentation as to what…what reason – did Lisa

Kendrick [(illegible writing), performance not being available], evaluations

Terry is not comfortable being an operator higher goals, values, visions in

mind, **1.**tends to take things upon herself, I had to have positive conversation.

attendance was awful       could not get time to meet for discipline <u>32 hr</u>

employee attendance –→ lost child-pregnancy. 3      prior pregnancy's in a

year & half. Nov 2000 thru Dec 6 (illegible writing)→ 1st pregnancy (illegible

writing), January 2001 (illegible writing) Dec 22, 2001, in January 2002

(illegible writing-possibly "'last time preg.'")

←————————————————————→
Zero tolerance for falcification of application'"


Page SEIU004 - States the following: '"Employment – stated she had been =
Kaiser Employee, Resume [accompanied], application- No→ Terry gave to
me, May 30, 2000 March 27, 2002, did interview based on her resume
[recruitment services]→ did not have Terry's application  —→ September
2001 [Terry wasn't at work often]←→ needed guidance, [January 25 on
administrative leave w/out pay 4 mtg. to terminate] [theoretical question intent
is an element to falcification]'"


Page SEIU003 - States the following: '"Step 2 Grievance Meeting re Teresa
Tokashiki = May 24, 2002, Greg Tegenkamp, Teresa Tokashiki, Amy Shaw,
Samille Clark, Terminated March 27 falsification of employment application,
Have you ever been employed (illegible writing) NO, when YES. [had
worked for Kaiser MTZ in 1991 – Lisa Kendricks was manager.] traumatic
experience that occurred in 1991 – at time of Kaiser Employment**, periods of
memory loss, etc. to Mike McClure on 2/7/02**, was this taken into
consideration  Terry's resume had employment from 1982 to present,
(illegible writing)'"

## *July 17, 2002 "THIRD STEP MEETING/Cliff Gates*

Page SEIU002 - States the following: '"(illegible writing) Theresa Tokashiki,

Step 3, 7-17-02 = Cliff Gates, Greg Tegenkamp, Theresa

Tokashiki____5/1/91, 5/5/91, 5/30/2000, 11/27/2000, 9/2001, 1/25/2002,

3/18/2002, 3/27/2002, 5/24/02, 7/1/02, 1) time delay between JAHCO and

action <Cliff has E-mail (scribbled out or erased, and written over as

12/6/2001) requesting meeting for investigation> 2) Intent – (illegible

writing)"'

**JUST A PERSONAL & PRIVATE NOTE FROM MY HEART:**
*(This is not a part of Greg's notes, just my own typing of how I feel and more heart break).*
**GREG TEGENKAMP'S NOTES SHOWS NOTICE OF A MENTAL CONDITION, MENTIONS THE PSYCHIATRIST'S LETTER RECEIVED BY KAISER ON 2/19/2002 AND VERBALLY DURING A "STEP MEETING" ON MARCH 18, 2002, NOTICE OF VARIOUS MENTAL CONDITIONS IS NOTICED. GREGS NOTES ALSO INDICATED AMY SHAW'S WORDS REGARDING "3 PRIOR PREGNANCIES" LISTED IN "SEIU005" AMY, TALKS ABOUT A PREGNANCY I HAD COMPLICATIONS WITH, AS NOTED, WHERE AMY SHAW IS "COUNTING OUT VERBALLY" THE PREVIOUS PREGNANCIES I HAD. YET AFTER THE NOTICE FROM DR. LEVY OF MY MEMORY LOSS DISABILITY AND OTHER MENTAL DISABILITIES ON 2/19/2002 & 3/18/2002, WHY DIDN'T KAISER HUMAN RESOURCES STOP AMY SHAW BEFORE SHE TERMINATED ME ON 3/27/2002?- AND ON 3/18/2002 I GET SUSPENDED AGAIN-JANUARY 24, 2002 WAS THE FIRST SUSPENSION –ALL OF THIS PUT MORE STRESS ON ME AND MY UNBORN BABY GIRL – WHY DIDN'T KAISER STOP HER? AND ANOTHER QUESTION FOR KAISER IS WHAT DOES "PREGNANCY" HAVE TO DO WITH "SUSPENSION"? THERE IS NO REASON THOSE TWO WORDS SHOULD EVER BE ON A PAGE TOGETHER. NO REASON. NO PREGNANCY OR PRIOR PREGNANCY INFORMATION SHOULD BE ON A PAGE WITH "DISCIPLINARY ISSUES BEING DISCUSSED THAT HAVE NOTHING TO DO WITH THE FACT OF THE PREGNANT WOMAN'S PREGNANCY", AS NOTICED ON PAGE "SEIU005" '"...employee attendance – lost child-pregnancy. 3      prior pregnancy's in a year & half. Nov 2000 thru Dec 6 (illegible writing) 1st pregnancy (illegible writing), January 2001 (illegible writing) Dec 22, 2002..."' "ATTENDANCE" AND "PREGNANCY", ESPCIALLY WHEN THE WOMAN QUALIFIES FOR THE "FAMILY MEDICAL LEAVE ACT (1,250 HOURS OF WORK, AND 12 MONTHS AT THE**

JOB) (F.M.L.A.), ATTENDANCE AT THAT POINT WOULD HAVE
NO BEARING ON AN ISSUE OF "ATTENDANCE WHILE BEING
PREGNANT". END OF STORY. AT ANY POINT THAT IS
WRITTEN TOGETHER, THE CONSTITUTION'S DO NOT ALLOW
TREATMENT LIKE THAT, WHICH THEREFORE IS CONSIDERED
STRONGLY THAT DISCRIMINATION SITS RIGHT BETWEEN
THOSE WORDS "ATTENDANCE" AND "PREGNANCY".
EXHIBIT 1 YOU WILL SEE IS FROM THE PREVIOUS BOSS THAT
HAD THE NOTICE OF A MENTAL CONDITION – AND LAUGHS AND
JOKES ABOUT IT IN FRONT OF HUMAN RESOURCES IN AN E-MAIL
DATED: 6/20/2005 (Exhibit 1), THE SAME DATE OF MY TERMINATION.
THE E-MAIL WAS RECEIVED AT 8:33AM, AND I WAS TERMINATED IN
THE AFTERNOON OF 6/20/2005. WHY DID AMY DO THIS?

## *HERE BELOW ARE JUST A FEW EXHIBIT EXAMPLES:*

### *Exhibit 13* – with the inner-exhibits /example:

#### Exhibit 13 (O) reads:

"(O)     May 29, 2002, '"AMBULATORY CARE CONSULATATION FOLLOW-
UP for the GYN CLINIC, FINDINGS: Wt-299#, B/P 137/70, #S/P D&E
FOR fetal demise, N50...? S/P D&E 18-22 wks fetal demise.  Reports on and
off bleeding ever since, some cramping No fever, no engorgement.  Has been
sexually active, withdrawl (method of birth control)  Periods were always
regular. HCG neg.  5 wks ago @ CHC (HCG means 'the Pregnancy
Hormone').  Not re-examined.  Reviewed fetal demise labs: WNL:  sustained
an ovulation post D&E, ....fetal demise.  Advised contraception until at least
first period happens. ***Then to consult with Perinatology prior to
Conception***."' Signed by Dr. Berletti.

#### then Exhibit 13 (B) reads:

(B)     January 24, 2002, Emergency Room Visit Documentation from Kaiser
Hospital Walnut Creek after the Suspension of January 24, 2002, Diagnosis
"Threatened Miscarriage."

#### then Exhibit 13 (D) reads:

(D)     "Kaiser Gynecological visits were on March 6, 2002, and the one on March
11, 2002 states, '"Lots & Lots of Stress"', then on March 26, 2002 I saw Dr.
Lyons, a Perinatologist my regular Gynecologist referred me to that states,
'"No Thrombophlebitis, + Varicose Veins, - Thrombophlebitis, Follow-up
with Dr. Jordan on 4/9/02"'. Dr. Michael Jordan is my Gynecologist there."

#### then Exhibit 13 (E) reads:

(E)     "April 18, 2002, I was having an Asthma Attack and also was feeling some
"weird" feelings in my abdomen.  Because I didn't have any medical coverage, I
had no choice but to go to our County Hospital for help. *(I already had a second
'Prenatal Exam' scheduled and that was just a few days-I think it was April 23, 2002, well I*

Ex. 5

*looked in my old calendar that a sales woman at the Music Exchange in Walnut Creek gave to me after she heard one of my original songs and let me play their $80,000.00 Concert Yamaha with recording studio hooked-up-I still have the print of my music-I was there in Nov. of 2001-back to my notes here-...so in this calendar for 2002, it states exactly what I wrote for that date, "Tuesday, April 23, 2002 at 10:00am – Healthy Start 1-800-495-8885. My first Pre-Natal was done at Kaiser Shadelands in March 2002.)* I drove to the Emergency Room at the Contra Costa County Hospital and was sent to Labor & Delivery because I was more than twenty-two 22-weeks pregnant. I went to Labor & Delivery and was seen by Dr. Berletti – Director of the Gynecology Department at Contra Costa Regional Medical Center (CCRMC) Dr. Berletti began a "Fetal Monitoring History". This is a type of EKG "Electrocardiograph" Machine that reports on "Heartbeat Levels" to monitor the "Baby's" heartbeat in the Mother's Womb. Dr. Berletti noted at "1504" which translates the time was 3:04pm, the "Monitor Serial#" was noted as "Exam" and the "Beginning Paper #" was '15685' and the "Ending Paper #" was '15687'. The paper stopped because the machine didn't detect a heartbeat from little Angelina's heart, and then the machine was turned off by Dr. Berletti."

**then Exhibit 13 (H) reads:**

(G)     April 18, 2002, My Obstetrical Evaluation Record at C.C.R.M.C.– Continued. It notes "'Bedside Sono (Sonogram) ⟶ no fetal activity, Sono in DI (Diagnostic Imaging) ⟶ no fetal activity ⟶no cardio activity ⟶ no fluid (confirmed by Dr. Won, Head of Radiology). (a) fetal demise at 18-20 wks – pt. in denial (pt. means 'Patient'), (b) pt. demands EVUS (EVUS means 'Entravaginal Ultrasound') to confirm – agree to do same later this evening.'" I demanded to have the best Doctors for my care and my unborn baby girl's care. I demanded the "Doctor Director for each specialty" and I would not accept anything less. No heartbeat for my baby girl, Angelina Josephina Rose meant that I would die right along with her, but I am still living. The pain of loosing my child is one thing, but I didn't feel any pain or have any symptoms that little Angelina was dead. Angelina Josephina Rose had died at 18weeks and 3 days. Dr. Berletti said, "'Your baby has been dead for at least three (3) weeks, Ms. Tokashiki. I don't think she was older than 18 weeks, maybe even less than that.'" Dr. Berletti ordered extensive laboratory tests for Plaintiff Tokashiki, in preparation for surgery the following day, April 19, 2002. (See Exhibits 13 (E), 13 (I)- (D) Kaiser Gynecological visits were on March 6, 2002, and the one on March 11, 2002 states(Exhibit 13 (E), "'Lots & Lots of Stress'", then on March 26, 2002- next day 3/27/2002 Plaintiff gets fired from Kaiser Walnut Creek. 3/26/2002 Dr. Lyons stated, "baby and mama are doing just fine and there is a strong heart beat coming from your baby." Plaintiff Tokashiki saw a Dr. Lyons, a Perinatalogist her regular Gynecologist referred her to that states, "'No Thrombophlebitis, + Varicose Veins, - Thrombophlebitis, Follow-up with Dr. Jordan on 4/9/02'". Dr. Michael Jordan is Plaintiff Tokashiki's Gynecologist. Exhibit 13 (I) states Plaintiff's baby is dead and has been for several weeks "deformities" and on other medical reports clearly stating Angelina Josephina Rose-my beautiful baby girl laid dead inside me for 21 days, how could you Amy? Why?

2/22    Terri called at 4:47 a.m. and reported sick to work.
2/22    Terri called at 9:47 p.m. and reported sick to work for 2/23/02-2/25/02
3/1     Terri called in the middle of the night and reported off work for 3/1/02-3/4/02

M^c C|urn called ther 2/28 tall she
                                          nang
                                          call
                                          Amy
                                      for mtg




KAISER PERMANENTE

Kaiser Permanente
Diablo Area Human Resources
1425 South Main St
Walnut Creek, CA 94596
Phone: (925) 295-5977
Fax: (925) 295-5935

July 13, 2005

Mr. Greg Tegenkamp
Field Representative
United Healthcare Workers
560 20th Street
Oakland, Ca 94612

          Re:  Teresa Tokashiki

Dear Mr. Tegenkamp:

During our Step 2 Meeting on July 7, 2005, you had several questions.

 Below are my responses:

The two individuals Pete Longmire discussed with Teresa Tokashiki were contracted
individuals working in a sub-contracted department and not covered under our Alcohol
and Drug Policy.  Because of confidentiality and HIPPAA, I have not been given their
names or any information and accordingly cannot provide that information to you. My
understanding is these contracted individuals have not brought cannabis to work or
consumed cannabis on KP premises, and are not driving or working within 6 after using
cannabis.

Teresa was terminated because she was in possession at work and consumed an item
that had a label " contains cannabis" We have an employee who witnesses that she
was consuming  this cookie and Teresa admitted that she was consuming cannabis
when she was called by Diane Thurin, Manager of Operator Services.

Teresa was informed and given the Personnel Policies during her Orientation on May
30, 2000.  She signed a document which states: " I have received a copy of the New
Employee Orientation Handbook and take full responsibility for the information covered
in the handbook and during the orientation."  After reviewing the actual 2000 Employee
Orientation Handbook, we found the Drug and Alcohol policy # 3.02 within this binder.

Kaiser's Drug and Alcohol Policy is consistent with the requirements of the Federal
Drug-Free Workplace Act of l988.



Kaiser Permanente
Diablo Area Human Resources
1425 South Main St
Walnut Creek, CA 94596
Phone: (925) 295-5977
Fax: (925) 295-5935

KAISER PERMANENTE

Page 2

Based on the above, and our discussion on July 7, 2005, we believe her Step 2 grievance should be denied.

Sincerely,

Jan Austin
Employee & Labor Relations Consultant

Cc:    file
Cc;    Federal Drug Free workplace requirements

Exhibit 8



# LII

**legal information institute**

collection home

## US CODE COLLECTION

search

donate

Prev | Next

**TITLE 41 > CHAPTER 10 > § 701**

# § 701. Drug-free workplace requirements for Federal contractors

*Release date: 2005-02-25*

**(a) Drug-free workplace requirement**

**(1) Requirement for persons other than individuals**

No person, other than an individual, shall be considered a responsible source, under the meaning of such term as defined in section 403 (8) of this title, for the purposes of being awarded a contract for the procurement of any property or services of a value greater than the simplified acquisition threshold (as defined in section 403 (11) of this title) by any Federal agency, other than a contract for the procurement of commercial items (as defined in section 403 (12) of this title), unless such person agrees to provide a drug-free workplace by—

**(A)** publishing a statement notifying employees that the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance is prohibited in the person's workplace and specifying the actions that will be taken against employees for violations of such prohibition;

**(B)** establishing a drug-free awareness program to inform employees about—

**(i)** the dangers of drug abuse in the workplace;

**(ii)** the person's policy of maintaining a drug-free workplace;

**(iii)** any available drug counseling, rehabilitation, and employee assistance programs; and

**(iv)** the penalties that may be imposed upon employees for drug abuse violations;

**(C)** making it a requirement that each employee to be engaged in the performance of such contract be given a copy of the statement required by subparagraph (A);

**(D)** notifying the employee in the statement required by subparagraph (A), that as a condition of employment on such contract, the employee will—

**(i)** abide by the terms of the statement; and

**Search this title:**

**Notes
Updates
Parallel authorities
(CFR)
Your comments**

(ii)  notify the employer of any criminal drug statute conviction for a violation occurring in the workplace no later than 5 days after such conviction;

(E)  notifying the contracting agency within 10 days after receiving notice under subparagraph (D)(ii) from an employee or otherwise receiving actual notice of such conviction;

(F)  imposing a sanction on, or requiring the satisfactory participation in a drug abuse assistance or rehabilitation program by, any employee who is so convicted, as required by section 703 of this title; and

(G)  making a good faith effort to continue to maintain a drug-free workplace through implementation of subparagraphs (A), (B), (C), (D), (E), and (F).

## (2) Requirement for individuals

No Federal agency shall enter into a contract with an individual unless such individual agrees that the individual will not engage in the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance in the performance of the contract.

## (b) Suspension, termination, or debarment of contractor

### (1) Grounds for suspension, termination, or debarment

Each contract awarded by a Federal agency shall be subject to suspension of payments under the contract or termination of the contract, or both, and the contractor thereunder or the individual who entered the contract with the Federal agency, as applicable, shall be subject to suspension or debarment in accordance with the requirements of this section if the head of the agency determines that—

(A)  the contractor violates the requirements of subparagraph (A), (B), (C), (D), (E), or (F) of subsection (a)(1) of this section; or

(B)  such a number of employees of such contractor have been convicted of violations of criminal drug statutes for violations occurring in the workplace as to indicate that the contractor has failed to make a good faith effort to provide a drug-free workplace as required by subsection (a) of this section.

### (2) Conduct of suspension, termination, and debarment proceedings

(A)  If a contracting officer determines, in writing, that cause for suspension of payments, termination, or suspension or debarment exists, an appropriate action shall be initiated by a contracting officer of the agency, to be conducted by the agency concerned in accordance with the Federal Acquisition Regulation and applicable agency

procedures.

**(B)** The Federal Acquisition Regulation shall be revised to include rules for conducting suspension and debarment proceedings under this subsection, including rules providing notice, opportunity to respond in writing or in person, and such other procedures as may be necessary to provide a full and fair proceeding to a contractor or individual in such proceeding.

## (3) Effect of debarment

Upon issuance of any final decision under this subsection requiring debarment of a contractor or individual, such contractor or individual shall be ineligible for award of any contract by any Federal agency, and for participation in any future procurement by any Federal agency, for a period specified in the decision, not to exceed 5 years.

Prev | Next

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**credits**                    **about us**                    **send email**

Kaiser Permanente Medical Center
1425 South Main Street
Walnut Creek, California 94596-5300
(925) 295-4000


KAISER PERMANENTE

January 25, 2002

Terri Tokashiki
2169 Dalis Drive
Concord, CA 94520

Terri,

You have been placed on Administrative Leave without pay effective, January 25, 2002, until
further notice. Immediate action was taken due to your unprofessional, inappropriate, and
disruptive conduct last evening at the Walnut Creek facility. During this leave you are not to
report to work in Communications. You may only come to the facility if you are a patient, are
visiting a patient in the hospital, or are called by me to attend a meeting.

Your refusal to meet with me during your scheduled working hours was insubordinate
behavior. Your refusal to meet was witnessed by your Local 250 representatives. Your
conduct caused disruption in the Operator Services department and Administration by calling
there and stating you were being "Held hostage". You also inappropriately contacted the
House Supervisor and used the Overhead page system for unauthorized personal reasons.

This particular meeting has been rescheduled more than once. The most recent scheduling
was this past Friday, January 18, 2002, which you stated you were too sick to attend. When
we spoke on the phone January 17, 2002, I stated we would meet the next week when you
were at work. On Thursday morning, January 24, 2002 I sent you an e-mail confirming the
time of our meeting. Your refusal to meet with me caused me to have to follow you out the
door stating your were suspended.

I have scheduled a meeting to address the original intention for Friday, February 1st, 2002 at
4:00 p.m. If you should need your payroll check prior to the meeting, you must contact me to
make arrangements to pick it. If no arrangements are made, your check will be available for
you at 4:00 p.m. on February 1, 2002.

If you have any questions you may contact me at 925-295-6255.

Amy Shaw
Operator Services Supervisor

Cc: Michael Day, Local 250 Chief Shop Steward



Data Telegrams
PO Box 34593
Phoenix AZ 85067

UNION ● MAILGRAM®
Messaging Services

UNITED STATES
POSTAL SERVICE

098811000306 01/25/02          OKA2 - OKAB
EM36029

**Exhibit 8 (B)**

IIıIııIıIıIIııIıIIIıııIıIııIııIIIıIıııIIıIıIııIIıI
► TERRY TOKASHIKI
2169 DALIS DR
CONCORD CA  94520-5419

25 January, 2002

YOU HAVE BEEN PLACED ON ADMINISTRATIVE LEAVE EFFECTIVE
25 JANUARY 2002 UNTIL FURTHER NOTICE.

YOU ARE TO REFRAIN FROM ENTERING THE PREMISES UNLESS YOU ARE A
PATIENT, VISITING A PATIENT IN THE HOSPITAL, OR CALLED IN BY ME TO
ATTEND A MEETING.

I HAVE SET UP A MEETING FOR 01 FEBRUARY 2002 AT 0400PM.  YOU WILL
RECEIVE A LETTER IN THE MAIL.

AMY SHAW, SUPERVISOR
KAISER PERMANENTE
1425 S MAIN OPERATING SERVICES
WALNUT CREEK CA 94596
(925) 295-6255

MGMCOMP  20:41  EST



**Amy Shaw**                           01/24/2002 11:02 AM

To:      Theresa A Tokashiki/CA/KAIPERM@KAIPERM
cc:
Subject:  Meeting

FYI... We will meet today at 4:30 with Michael Day, Chief Shop Steward, L250 present.  It is up to you to obtain another L250 shop steward if you choose.  However, Michael Day will be in attendance.

Amy

Received at NH Fax



**KAISER PERMANENTE**

Exhibit 8 (D)

JAN 3 1 2002

WI # 74600674

## PERSONNEL ACTION REQUEST

| DATE ACTION REQUESTED | EFFECTIVE DATE OF ACTION |
|---|---|
| 1-31-02 | 2-1-02 |

| EMPLOYEE | EMPLOYEE NUMBER (SOCIAL SECURITY #) |
|---|---|
| Tokashiki, Theresa | 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 |

### TYPE OF CHANGE REQUESTED

| | | EMPLOYMENT CATEGORY | |
|---|---|---|---|
| ☐ New Hire (Fill out To Authorization for Change Only). | ☐ Initial LOA (more than 30 days ) | **FROM** | **TO** |
| ☐ Rehire | ☐ Extension of LOA | ☐ Full Time | ☐ Full Time |
| ☐ Transfer | ☐ Return from LOA | ☐ Part Time | ☐ Part Time |
| ☐ Promotion | ☐ Termination | ☐ Regular | ☐ Regular |
| ☐ Reclassification | ☑ Other | ☐ Short Hour | ☐ Short Hour |
| ☐ Tenure Increase | | ☐ Temporary | ☐ Temporary |
| | | ☐ Casual/On Call | ☐ Casual/On Call |

| CHANGE | FROM | TO | CHANGE | FROM | TO |
|---|---|---|---|---|---|
| ☐ Job Title | | | ☐ Loc./Ent. | | |
| ☐ Scheduled Hours | | | ☐ Cost Center | | |
| ☐ Shift | | | ☐ Salary | | |
| ☐ Grade/Step | | | ☐ Union | | |
| ☐ Job Code No. | | | ☐ Replacement for | | |
| ☐ Reports To | | | ☐ Other | | |
| ☐ Position Number | | | | | |

REC'D IN DMC
FEB 0 4 2002
PEOPLE SOLUTIONS

**REMARKS / REASONS**

Revise termination effective 2-1-02
employee could not meet on 2/1/02.

### AUTHORIZATION FOR CHANGE

| SUPERVISOR / DEPARTMENT HEAD SIGNATURE | ADMINISTRATOR / MANAGER SIGNATURE |
|---|---|
| Amy Shaw | |
| ADDITIONAL APPROVAL IF REQUIRED | |

### FOR TERMINATION OR TRANSFER:

_____ Last Day Worked
_____ Earned Vacation Hours
_____ Accrued Vacation Hours
_____ Float Holidays
_____ Sick Leave
_____ Bargaining Unit Seniority (For Transfer Only)

| ENTERED BY: | DATE ENTERED: |
|---|---|
| | |

 **KAISER PERMANENTE**®

Kaiser Permanente Medical Center

March 8, 2002

Theresa Tokashiki
2169 Dalis Drive
Concord, CA 94520

Terri,

You have 48 hours from receipt of this letter to contact me to set up a meeting. If I do not hear from you by Friday, March 15, 2002, I will assume you are no longer interested in employment.

Please contact me at 295-6255 or via the Operator staff at 295-4000.

Amy Shaw

Amy Shaw
Operator Services Supervisor

Cc:  Michael Day, Local 250 Chief Shop Steward

 **KAISER PERMANENTE.**

Kaiser Permanente Medical Center

March 27, 2002

Terri Tokashiki,

Effective today, March 27, 2002, your employment with Kaiser Permanente is being
terminated.  You are being terminated for falsification of employment application.

You will be sent a letter in the mail from People Solutions regarding your benefits.

Amy Shaw
Amy Shaw
Supervisor
Operator Services

Cc: Local 250

Exhibit 10

**From:** Amy Shaw <Amy.Shaw@____.org>

**To:** Marie Bates <Marie.Bates@kp.org>; Kathy Castagnetto <Kathy.Castagnetto@kp.org> <Kathy.Castagnetto@kp.org>

**:** Totstoteenspianoinstruction <Totstoteenspianoinstruction@email.msn.com>

**Date:** Monday, November 27, 2000 1:50 PM

**Subject:** Contract Interpretation/Clarification

Kathy,

I have an employee who was benefited on 7-30-00. She is currently off of work due to pregnancy. Unfortunately she was having some complications.

She has posed the question and would like clarification of Local 250 contract language on page 38 paragraph 203. The paragraph states "An employee shall not be entitled to sick leave with pay unless he/she has acquired three (3) months' continuous service credit" etc... The question and need for clarification is the word continuous.. Based on a conversation I had with Theresa last week, she was a previous Kaiser employee (I did not know this prior). Would the time she was employed with Kaiser (prior to my hiring her) count towards the "continuous service credit"... I told Theresa no it would not because there was a break in service, but that I would pose the question to you and Marie.

As you see, I have cc'd Theresa's home e-mail as she is not currently working.

Thank you in advance.

Amy

Greg —
Please see arrow "" (I did not know this prior)"" — this is the second pages of E-mails.

3/1/02

KAISER PERMANENTE

Kaiser Permanente
Northeast Bay Human Resources
200 Muir Road, Tiburon Building
Martinez, California 94553-4696
(925) 229-7434

## LETTER OF EXPECTATION

**TO:** Teresa Tokashiki

**DATE:** January 6, 2004
**FROM:** Kristin Heiman
Human Resources Generalist

**CC:** Amy Shaw
Operator Services Supervisor

On December 12, 2003 it was determined that your return to work date was scheduled for January 4, 2004 and that you would attend New Employee Orientation on January 5, and January 6, 2004.

On January 2, 2004 you requested a leave of absence due to your mother's illness. On January 5, 2004 your leave of absence was granted and below is your expected return to work schedule.

You are expected to return to work on Wednesday, January 21, 2004 for a two day training session. You will be trained from January 21-22, 2004 from 8:00 am - 4:30 pm. If you or Amy feel you need additional training that will be decided by Thursday, January 22, 2004.

You will begin your regular schedule shift of 32 hours Friday, Saturday, Sunday and Mondays from 7:30 am – 4:00pm on Friday, January 23, 2004.

If you are unable to return back to work as expected on January 21, 2004 advance notice must be given to Amy Shaw in writing and must be approved by management.

If you have any questions, please feel free to call me at (925) 295-7452.

ROOM

The undersigned consents to examination and common laboratory and radiologic tests necessary to evaluate and initiate treatment of the current medical problem in the emergency department. Further tests and procedures, if indicated, will be explained.

| SIGNATURE | RELATION IF NOT PATIENT |
|---|---|
| X | |
| | WITNESS |

**Exhibit 13 (C)**

**FOLLOW-UP INSTRUCTIONS:** Please contact your regular doctor, the department indicated below, or this department at 295-4070 if unexpected problems develop, you are getting worse or you are not improving as anticipated.

Unless a specific appointment is noted below, it will be your responsibility to make arrangements for any additional care. If X-rays were taken, your treatment was based on a preliminary evaluation of those films by the Emergency physician. All X-rays are reviewed by a radiologist. After this review, you will be notified if there are any significant findings that would alter your diagnosis or treatment. You will also be notified of any abnormal laboratory results received by the Emergency Department after you have gone home.

**THE PERMANENTE GROUP, INC.**
**Emergency Department**
1425 S. Main Street, Walnut Creek, CA 94596
(925)-295-4820

**SCHOOL / WORK RELEASE**

Time off authorized from  ☑ Work   ☐ School   ☐ P.E.

Due to:  ☑ ILLNESS   ☐ INJURY

From: 1/24/02  Return Date: 1/30/02

**RESTRICTIONS**
From: _____  To: _____

SIGNED  Henmmm M.D.   DATE 1/24/02

**The following instruction sheets have been given to you:**  ☐ Back care  ☐ Cast care  ☐ Diet instructions  ☐ Eye injury
☐ Head injury  ☐ Kidney stone  ☐ Lacerations and abrasions  ☐ Neck care  ☐ Sprain or soft tissue injury
☐ Exit writer: _____ Threatened Miscarriage Areal

**ADDITIONAL INSTRUCTIONS:**
☐ Elevate above the level of your heart.   ☑ Drink plenty of fluids.   ☑ Avoid doing anything that aggravates the problem.

☐ Take _____ aspirin, ibuprofen (Advil®, Nuprin®) or acetaminophen, _____ mgs. total, every _____ hours, as needed for pain/fever.

☐ Apply an ice bag for _____ minutes _____ times per day while awake for _____ (days).

☐ Apply heat (hot soaks or warm compresses) _____ minutes _____ times per day while awake for _____ (days).

☐ Please return to:  ☐ ED  ☐ Injury Clinic  in _____ days. Bring this slip with you. You are to see:

Dr. _____ at _____ o'clock

☑ Other Instructions: Followup with your Obstetrician tomorrow

Return if you feel worse or develop persistent vomiting, vaginal bleeding (1 pad per hour for 3 consecutive hours) lightheadedness, problems breathing, worsening cramping, chest pain, unusual headache.

No sex

**Please Stop At Reception**

**Following Your Discharge**

☐ An appointment has been requested for you in the _____ clinic. Call them in 5 days if they have not called you.

☑ Call today or the next weekday to make an appointment in the clinic checked below. Tell the receptionist you were seen in the Emergency Department and advised to be seen in about _____ days or _____ weeks.

| | | |
|---|---|---|
| ☐ Allergy . . . . . . . . . . . . . . . . . . 906-2015 | ☐ Internal Medicine . . . . . . . . . 295-4070 | ☐ Pediatrics . . . . . . . . . . . . . . . . . 295-4200 |
| ☐ Antioch Medical Office . . . . . . . . . 779-5090 | ☐ Martinez Medical Office . . . . . . . . 372-1000 | ☐ Pleasanton Appointments . . . . . . . 847-5050 |
| ☐ Call Center . . . . . . . . . . . . . . . . 295-4070 | ☐ Mental Health . . . . . . . . . . . . . . 295-4145 | ☐ Shadelands Medical Office . . . . . . . 906-2040 |
| ☐ Dermatology . . . . . . . . . . . . . . . 295-6950 | ☐ Neurology . . . . . . . . . . . . . . . . 295-6953 | ☐ Surgery Department . . . . . . . . . . 295-4110 |
| ☐ Eye . . . . . . . . . . . . . . . . . . . . 906-2010 | ☐ Occupational Med. Shadelands . . . 906-2060 | ☐ Urology . . . . . . . . . . . . . . . . . . 295-4060 |
| ☐ Head & Neck Surgery . . . . . . . . . . 295-4100 | ☐ Orthopedics . . . . . . . . . . . . . . . 295-4130 | ☑ Women's Health Center . . . . . . . . 295-4040 |
| ☐ Health Education . . . . . . . . . . . . . 295-4410 | ☐ Other _____ | |

**Your treating M.D. today has been** _Herb Smith_

I hereby acknowledge that I have reviewed these instructions and have had my questions answered regarding my treatment, medication, and any further follow-up plans. I understand that I may call the Emergency Department at any time if I have further questions.

X _____
PATIENT OR RESPONSIBLE PARTY

03784143   03 63   F

**PHYSICAL EXAMINATION/INSTRUCTIONS FOR PE:** ☐ Normal exam finding, ⬭ = Area for description of abnormal or relevant finding

**PE CODING:** ☐ HCFA req. elements ☐ **Level 1:** 1-5 elements in 1+ sys ☐ **Level 2-3:** 6 elements in 1+ sys
☐ **Level 4:** 2+ elements from 6 sys or 12+ elements from 2+ sys ☐ **Level 5:** 2+ elements from 9 sys

Exhibit 13(C)

**CONST:** ☐ Vitals (See MSE) ☐ WDWN ☐ Well hydrated ☐ No resp. distress ☐ Appears well  *Looks S'NAME*

**Eyes:** ☐ PERRL, Irises nl ☐ Lids, Conjunctiva / Cornea / Ant. chamber nl ☐ Discs & fundi nl ☐ EOMI
☐ Hearing grossly intact ☐ Ext. Ears, Nose nl ☐ Nasal mucosa nl ☐ TMs, Canal nl ☐ Lips, Teeth, Gums nl ☐ Oropharynx nl

**Neck:** ☐ Supple/No masses / No C-spine tenderness / FROM w/o pain ☐ Thyroid nl

**Resp:** ☐ Resp effort nl ☐ Palpation nl ☐ Percussion nl
☐ Clear to auscultation ☐ B/S equal ☐ No pleural rub

**Chest:** <Breasts> ☐ Inspection ☐ Palpation nl

**CV:** ☐ Regular rhythm ☐ No murmur, rub or gallop ☐ No carotid bruits ☐ No abdominal bruits ☐ Palpation nl ☐ No JVD ☐ Capillary refill nl
<Pulses> ☐ Femoral nl ☐ Dorsalis pedis nl ☐ No peripheral edema ☐ Post tibial nl ☐ All equal bilaterally

**GI:** <ABD> ☐ Nondistended/BS nl / Soft/No masses or tenderness / No guarding or rebound / No palpable pulsatile mass ☐ Liver, Spleen nl ☐ No hernia
<Rectal> ☐ Tone nl/No masses or tenderness ☐ Stool hemocult neg. ☐ Quality control done  *⊘BS, ⊘masses. ⊘HSM*

**GU:** <Male GU> ☐ Prostate nl ☐ Penis nl ☐ Scrotal contents nl/Testicular position and size nl/No tenderness or masses
<Female GU> ☐ Ext. genitalia nl ☐ Cervix nl/Os closed/No CMT ☐ Urethra nl ☐ Uterus nl ☐ No vaginal discharge
☐ No adnexal tenderness or mass ☐ Rectovaginal confirmatory
<Urinary> ☐ No bladder distension or tenderness ☐ No CVAT  *Tender suprapubic area.*

**MS:** <Back> ☐ No vertebral tenderness ☐ FROM w/o pain <Pelvis> ☐ Stable, nontender
<Ext.> ☐ RUE nl ☐ LUE nl ☐ RLE nl ☐ LLE nl ☐ Inspection/Palpation: No Cyanosis/No Edema/No calf swelling/tenderness
☐ Gait & station nl ☐ Digits, Nails nl ☐ Neg. straight leg raise

**Neuro:** ☐ CN II-XII intact ☐ Sensation nl ☐ DTRs / Babinski nl ☐ Motor ☐ Speech nl ☐ Follows commands

**Psych:** ☐ A&Ox3 ☐ Judgement/insight nl ☐ Mood/affect nl ☐ Memory nl ☐ No suicidal ideation

**Skin:** ☐ No rash/No lesions ☐ Palpation nl

**Lymph Nodes:** Adenopathy: ☐ No cervical ☐ No axillary ☐ No inguinal ☐ Other: _____

*Pelvic No gross ulcerns or adenopathy, tenderness on mm. Diff pelvic exam
2° to obesity. No umbl bleed and l/c
see U/S view on sheet ⊘FUPE heartbeat*

*Requestrant probmt SOB. Pt denies SOB. States she only occasional
has to sigh. No chest pain. No DOE. No recent weight ☐ or
surgery. Has had vaginal spotting ☐ umm able cramps × intermittent × 2-3 wks.
Stop last wk to return today. Vomits 3 blood 1-3 ×/day. Occasional diarrhea
☐ bld or mucus. No recent travel hx or antibx use. Fever to 99.5°F max.*

*⊘UA ⊘Rh: Told to come here if
crampy returned ☐ bleed.*

*☐H₂₀ MD*
G. Hashimoto, M.D.

**CONSULTANT**                          Time Called: _____

1. _____
2. _____

**DISCHARGE DIAGNOSIS:**
*Threaten Ab*

---

**COMPLETE FOR INDUSTRIAL PATIENTS ONLY**

1. Date of injury: ___/___/___  2. Date last worked: ___/___/___
3. Are your findings and diagnosis consistent with history of injury or onset of illness?
☐ Yes ☐ No  If "No," explain: _____

4. Is there any other current condition that will impede or delay patient's recovery?
☐ Yes ☐ No  If "Yes," explain: _____

5. If occupational illness, specify etiologic agent and duration of exposure: _____

6. Were chemical or toxic compounds involved? ☐ Yes ☐ No
7. ☐ Return to work without restriction on ___/___/___ (date)
☐ Remain off work until ___/___/___ (date)
☐ Modified duty as of ___/___/___ until ___/___/___ (dates)

---

☐ Copy / V-mail / Fax sent to Dr. _____
☐ Referral / Follow-up request to _____
☐ Discharge medications _____

---

**DISPOSITION:** ☑ Home ☐ Admit: Rm.# _____ ☐ Transfer to _____
☐ Deceased ☐ LWBS ☐ AMA ☐ Notified CMR/ _____

**CONDITION UPON LEAVING E.D.:**
☑ Improved ☐ Stable ☐ Guarded ☐ Critical

☐ Chart was dictated / computerized
☐ CHART COMPLETE:

**Exhibit 13(d)**

KAISER PERMANENTE

**VISIT VERIFICATION/FAMILY LEAVE** Health Care Provider Certification

(This section must be completed and determined by **treating provider** only)
**THE ABOVE NAMED PERSON:**
☐ **NO**, does not have a "Serious Health Condition" (see reverse for further information) **OR**
☐ **YES**, has a "Serious Health Condition", as defined below *(check one)*:
  **1.** ☐ Hospital care    **4.** ☐ Chronic condition requiring treatment
  **2.** ☐ Absence plus treatment    ☐ **Is** currently incapacitated
  **3.** ☐ Pregnancy    ☐ **Is not** currently incapacitated
    **5.** ☐ Permanent/long-term condition requiring supervision  **6.** ☐ Multiple treatments (non-chronic condition)
☐ Has a "Serious Health Condition" and requires a family member to take time off from work to provide basic medical, personal or safety needs, transportation, or

psychological comfort.  The probable frequency and duration of this need is _____

☐ Estimated date of Surgery / Procedure / Delivery: _____

☑ Diagnosis (Complete on patient request only): Pregnant  Stress — multiple etiologies _____

**THE ABOVE NAMED PERSON:**

☒ Was seen at this office on: 1/28/02 _____  ☐ Has been given telephone advice on: _____

☐ Has been ill and unable to attend work/school/physical education 1/28/02 _____ through 2/7/02

☑ **States** he/she has been ill and unable to attend work/school/physical education 1/14/02 _____ through 1/28/02

☐ **Can return to full duties with NO RESTRICTIONS on** _____ **OR**

☐ Can participate in a modified work program starting _____ and continuing to _____
  (Please note: If modified work is not available, this patient is then unable to work for this time period.)

☐ Restrictions: _____ hours per day    _____ hours per week

**BASED ON AN 8-HOUR DAY EMPLOYEE CAN:**

  stand/walk _____ minutes per hour    _____ total hours . . . . . . . . . . ☐ no restrictions
  sit _____ minutes per hour    _____ total hours . . . . . . . . . . ☐ no restrictions
  drive _____ minutes per hour    _____ total hours . . . . . . . . . . ☐ no restrictions

**LIFT/CARRY** (Occasionally = up to ⅓ workday.  Frequently = up to ⅔ workday):
  0-10 lbs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions
  11-25 lbs. . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions
  26-40 lbs. . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions

  Can lift/carry up to _____ lbs.

**EMPLOYEE IS ABLE TO:**
  bend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions
  squat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions
  kneel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions
  climb . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions
  reach above shoulders . . . . . . . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions
  perform repetitive hand motions . . . . . . . . . . . . ☐ not at all  ☐ occasionally  ☐ frequently  ☐ no restrictions

**ASSISTIVE DEVICES?** (e.g., cast, brace, crutches) _____

**RESTRICTIONS:** _____

_____

_____

**OTHER:** _____

_____

**TREATMENT PLAN:** _____

_____

☐ Medication effects which could impair performance: _____

☐ Physical therapy required.  Frequency: _____

☐ Re-evaluation on: _____

NOTE: If patient is **industrial**, **physician** signature is **REQUIRED**.

SIGNATURE AND TITLE _____    DATE 1/28/02

NAME (PRINT) _____  LOCATION/ADDRESS _____  PHONE _____

*(Right margin, rotated text:)* I hereby authorize the Kaiser Permanente Medical Care Program to verify to my employer/school, upon request, the information contained on this form.  SIGNATURE OF PATIENT OR RESPONSIBLE PERSON  RELATIONSHIP TO PATIENT

*(Imprint area, handwritten:)* Takashi Kinther Theresa  Identification  # 0378 4143  IMPRINT AREA

| To: | Alexander, Christopher, M.D.; Park Shadelands Medical Office; Medicine; TST | | MR#: | 03784143 |
|---|---|---|---|---|
| From: | AACC Vallejo Call Center | | Ref#: | V004558957 |
| Agent: | Friedman,Sandy, RN, AACC Vallejo Call Center | | Time Sent: | 03/15/2002, 01:40 pm |
| Med/Ped Provider: | Alexander, Christopher; Park Shadelands Medical Office; Medicine | | Priority: | Urgent Clinical |
| | | | Reply By: | 03/15/2002, 05:39 pm |

| Patient: | **TOKASHIKI, THERESA A** | Gender: | F | Contact: | TOKASHIKI, THERESA A; Patient | Pregnant? Yes |
|---|---|---|---|---|---|---|
| MR#: | 03784143 | Age: | 39:00 | Day: | (925) 295-4000 W | LMP: 11/20/2001 |
| Alert: | No | DOB: | 03/10/1963 | Eve: | (925) 691-4950 H | EDC: 08/27/2002 |
| | | | | Within 4 Hrs: 925-691-4950 | | Gestation: 16 |
| | | | | Language: English | | Past Prenatal? Yes |
| OK to leave message. | | | | | | Future Prenatal? Unknown |
| Address: 2169 DALIS DR, CONCORD, CA, 94520 | | | | | | |

**Message from AACC:**

Phone member/contact at 925-691-4950 Within 4 Hrs.

Other: Ob\Gyn, DEPRESSION/ SUICIDE/ POSTPARTUM DEP
Reason(s): f/u from previous call/msg
What Does the Member Want?: FYI.
Comments: Member discussed her declining emotional state, and incompetence to return to work at this time. Per assessment she was warm transfered to "Debbie" from Mtz. Mental Health, where she is being followed.
                    Thank you, Sandy

Schedule checked. Provider in today.

**Response/Amend:**
**Teresa Galan 03/15/2002 01:51 pm **
Chart ordered
** esa Galan 03/15/2002 01:51 pm **
M ge closed by TST
**Teresa Galan 03/15/2002 01:51 pm **
Message delivered to provider.
**Teresa Galan 03/15/2002 01:51 pm **
MESSAGE TO PCP AS FYI

☐ TST called member    ☐ I called member    ☐ TST should call member    ☐ File in chart    ☑ Message closed

**ication:**    Verification: Agent unable to confirm meds
STATIN 100,000U/GM TOPICAL POWDER / HYDROCODONE/ACETAMINOPHEN 5/500 TABS / FLOVENT 220MCG ORAL INHALER / DROCODONE W/HOMATROPINE SYRUP / AMOXICILLIN 250MG CAPSULES

**Allergies:**    Verification: Agent unable to confirm allergies
NO KNOWN ALLERGY

| **Prescription:** | Pharmacy: | Park Shadelands Medical Office, Yosemite | |
|---|---|---|---|
| Medication: | | | Refills: |

☐ generic unless checked    ☐ nearest std size unless checked    ☐ unless checked, include Rx in all approved refill programs    ☐ covering MD

Signature:    Cal Lic#:    DEA#:

3-15-02

TST : refer to mental Health
— 295-4141

**Exhibit 13(d)**

theresa tokashiki                                                    **Exhibit 15**

**From:**     "theresa tokashiki" <territokashiki@msn.com>
**T··**       "Amy Shaw" <amy.shaw@kp.org>
**.t:**       Monday, March 08, 2004 2:28 PM
**Attach:**   Lettter to Amy on 3.8.2004.doc
**Subject:**  Letter

Amy:

Please review the attached letter I wrote to you.

Thank you,

Terri Tokashiki

2169 Dalis Drive
Concord, California 94520


Exhibit 15

## *PERSONAL AND CONFIDENTIAL*

March 8, 2004

Amy Shaw, Manger
Communications Division
Kaiser Foundation Hospital
1425 South Main Street
Walnut Creek, CA 94596

Dear Amy:

I am writing to you for a few reasons. The first reason is I am disappointed with your decision of "Suspending me with Pay" on March 2, 2004 based on the contents of the letter I slipped under your office door on January 24, 2004/Dr. Levy 2-7-2002 letter. And the second reason is that I am upset with you sharing my personal information with others at Kaiser. I gave you that note to keep "Professionally, Medically and Personally Confidential"; I put my trust in you to keep it confidential. You breached the confidentiality that you promised me, Amy. I told you that I was going through counseling on a personal level and that I am working on issues personally with my counselor.

Never did I once give you the right or the permission to share what I discussed with you pertaining to my Mental Health nor did I give you the right or the permission to share any of the contents of the conversations I've had with you, or give you the right or the permission to share with anyone the contents of the envelope with a very personal document inside, that I slid under your office door on January 24, 2004.

However, you felt the need to discuss everything pertaining to my "Mental Health, Counseling, Personal Mental Health Issues" as I requested you to keep all of this information "Confidential". Then on March 1, 2004, you announced to me during a phone call to my home, that you discussed all of this with Kaiser Legal Representative Cliff Gates at Kaiser Regional Offices and Human Resources Generalist Kristin Heiman at Kaiser Human Resources Regional Division. You also mentioned to me you scheduled a meeting on March 1, 2004 at 4:00pm with Mr. Gates and Ms. Heiman, specifically to discuss my "Mental Health Issues".

*Page 1 of 2*

*Listed below is what you told to me over the telephone on March 1, 2004 at 12:49pm:*

◆ "'Terri, I spoke with Cliff Gates and Kristin Heiman about the note you gave me from your doctor. And they both agreed with me to keep you off work tomorrow, Tuesday March 2, 2004-with pay until we figure out what to do with you. Cliff, Kristin and I are concerned for Patient Safety at Kaiser Hospital and we all are worried about your memory loss problem. We feel that you might forget how to do your job as an Operator here. And, we might need you to get something from your doctor regarding your memory loss."'

*Listed below is what you told me in person on March 3, 2004 at approximately 2:30pm:*

◆ "'What if you forget how to use the overhead paging system? What if you forget where the overhead page button is on the phone? What if you forget what to do when you get a Code Blue or a Team Alert? I couldn't take that risk, Terri and neither can Kaiser Hospital."'

I also want to appreciate my days off and do not appreciate receiving telephone calls on my days off as I am resting. Contacting me on those days off by emailing me a note is all right. Nevertheless, please I request you not call me at home on those days.

Regards,

Theresa A. Tokashiki
Employee, Kaiser Walnut Creek

KAISER PERMANENTE

**VISIT VERIFICATION/FAMILY LEAVE Health Care Provider Certification** Exhibit

(This section must be completed and determined by treating provider only)

**Patient Name**

**THE ABOVE NAMED PERSON:**

☐ **NO,** does not have a "Serious Health Condition" (see reverse for further information) **OR**

☐ **YES,** has a "Serious Health Condition", as defined below (check one):

**Identification**

3784173

IMPRINT

**Exhibit 15.a**

1. ☐ Hospital care    4. ☐ Chronic condition requiring treatment
2. ☐ Absence plus treatment    ☐ Is currently incapacitated
3. ☐ Pregnancy    ☐ Is not currently incapacitated

5. ☐ Permanent/long-term condition requiring supervision    6. ☐ Multiple treatments (non-chronic condition)

☐ Has a "Serious Health Condition" and requires a family member to take time off from work to provide basic medical, personal or safety needs, transportation, or

psychological comfort. The probable frequency and duration of this need is _____

☐ Estimated date of Surgery / Procedure / Delivery: _____

☑ Diagnosis (Complete on patient request only): BACK / SPINAL PAIN

**THE ABOVE NAMED PERSON:**

☑ Was seen at this office on: 3/10/07    ☐ Has been given telephone advice on: _____

☐ Has been ill and unable to attend work/school/physical education _____ through _____

☐ States he/she has been ill and unable to attend work/school/physical education _____ through _____

☑ Can return to full duties with NO RESTRICTIONS on _____ 5/16/07 _____ **OR**

☑ Can participate in a modified work program starting 3/15/07 and continuing to 5/15/07

(Please note: If modified work is not available, this patient is then unable to work for this time period.)

☐ Restrictions: _____ hours per day _____ hours per week

**BASED ON AN 8-HOUR DAY EMPLOYEE CAN:**

stand/walk _____ minutes per hour _____ total hours .......... ☐ no restrictions

sit _____ minutes per hour _____ total hours .......... ☐ no restrictions

drive _____ minutes per hour _____ total hours .......... ☐ no restrictions

**LIFT/CARRY** (Occasionally = up to ⅓ workday. Frequently = up to ⅔ workday):

0-10 lbs. .......................... ☐ not at all ☐ occasionally ☐ frequently ☑ no restrictions

11-25 lbs. .......................... ☐ not at all ☐ occasionally ☐ frequently ☐ no restrictions

26-40 lbs. .......................... ☐ not at all ☐ occasionally ☐ frequently ☐ no restrictions

Can lift/carry up to _____ lbs.

**EMPLOYEE IS ABLE TO:**

bend .......................... ☐ not at all ☐ occasionally ☐ frequently ☐ no restrictions

squat .......................... ☐ not at all ☐ occasionally ☐ frequently ☐ no restrictions

kneel .......................... ☐ not at all ☐ occasionally ☐ frequently ☐ no restrictions

climb .......................... ☐ not at all ☐ occasionally ☐ frequently ☐ no restrictions

reach above shoulders .......................... ☐ not at all ☐ occasionally ☐ frequently ☐ no restrictions

perform repetitive hand motions .......... ☐ not at all ☐ occasionally ☐ frequently ☐ no restrictions

**ASSISTIVE DEVICES?** (e.g., cast, brace, crutches) _____

**RESTRICTIONS:** _____

**OTHER:** GIVE BACK PAIN 2° TO DISC + LIGAMENTOUS STRAIN PATIENT NEEDS 5-10 MIN BREAK EVERY

**TREATMENT PLAN:** HOUR AS NEEDED - MEN WILL RE-ASSESS NEED FOR MODIFICATION IN 2 MONTHS

☐ Medication effects which could impair performance: _____

☐ Physical therapy required. Frequency: _____

☐ Re-evaluation on: _____

I hereby authorize the Kaiser Permanente Medical Care Program to verify to my employer/school, upon request, the information contained on this form. RELATIONSHIP TO PATIENT

SIGNATURE OF PATIENT OR RESPONSIBLE PERSON

**NOTE: If patient is Industrial, physician signature is REQUIRED.**

SIGNATURE AND TITLE _____    DATE 3/15/07

NAME (PRINT) _____    LOCATION/ADDRESS _____    PHONE _____

# SETTLEMENT AGREEMENT, COMPROMISE
# AND GENERAL RELEASE

1.  This Settlement Agreement, Compromise and General Release (hereinafter "Settlement Agreement") is made and entered into between Theresa Tokashiki    (hereinafter "Grievant"), Hospital & Health Care Workers' Union, Local 250, SEIU, AFL-CIO (hereinafter "Local 250"), and Kaiser Foundation Hospitals (hereinafter "Employer") for the consideration and mutual promises set forth in the following paragraphs.

2.  Grievant was employed by Employer as a Communications Operator from May 30, 2000 until March 27, 2002 when her employment was involuntarily terminated. At the time of termination, the Grievant was employed in a 32-hour per week regular position at the Employer's Walnut Creek Medical Center. Pursuant to the Collective Bargaining Agreement between Employer and Local 250, a grievance was filed protesting the termination of Grievant's employment. The matter was set for hearing before an arbitration panel chaired by Arbitrator Gerald R. McKay on September 24, 2003.

3.  Grievant, Local 250, and Employer desire to completely and finally resolve and settle any and all claims, rights and actions, of any kind or nature, which Grievant has or may have against Employer arising out of her employment relationship with it, including but not limited to those arising from, or relating to, the Grievant's involuntary termination.

4.  It is understood and agreed that in exchange for Employer's performance of the acts described in Paragraphs 7 and 8, Grievant and Local 250 release Employer and any affiliated or related companies, including the component entities which comprise the Kaiser Permanente Medical Care Program (Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals and The Permanente Medical Group, Inc.) and their respective officers, directors, agents, and employees, (collectively, "the releasees") from any and all claims of any kind, known or unknown, which Grievant now has or has ever had against the releasees which arise from or are in connection with, Grievant's employment relationship with Employer or any of the releasees. This includes, but is not limited to, any and all claims arising out of or in connection with any alleged violations of the Collective Bargaining Agreement between Employer and Local 250, tort, express or implied contract, any covenant of good faith and fair dealing, any personal injury, wage claim, or any federal, state or municipal statute, regulation or ordinance, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Fair Employment and Housing Act, except as specifically enumerated in this Settlement Agreement. At no time subsequent to the execution of this Settlement Agreement will Grievant file any claim or action of any kind against the releasees which is based in whole or in part on any matter referred to in this paragraph relating to or arising from events which occurred prior to the execution of this Settlement Agreement.

/ / /

1

5.    It is understood and agreed that this is a full and final Settlement Agreement, which also covers all unknown, undisclosed and unanticipated grievances, losses, wrongs, injuries, debts, claims or damages which may have arisen, or may arise from any act or omission prior to the date of execution of this Settlement Agreement, as well as those alleged losses, wrongs, injuries, debts, claims or damages now known. Grievant hereby expressly waives any right or benefit available to him in any capacity under the provisions of Section 1542 of the California Civil Code, which provides as follows:

> **A general release does not extend to all claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

Grievant understands this waiver and expressly agrees that this Settlement Agreement extends to all claims of whatever nature and kind, known or unknown, suspected or unsuspected, vested or contingent, past, present or future, arising from or attributable to any incident or event, occurring, in whole or in part, on or before the date of Grievant's execution of this Settlement Agreement, and that any and all rights granted herein under any state or federal law or regulation limiting the effect of this Release are hereby waived.

6.    Local 250 agrees to immediately withdraw all outstanding grievances filed on behalf of Grievant, including, but not necessarily limited to, the grievance styled "Theresa Tokashiki Termination." ~ in the amount of $50,000 ↗ WAP

7.    In exchange for Grievant's and Local 250's agreements and releases herein, Employer shall pay to Grievant back wages ~~calculated from March 27, 2002 through the date of this Agreement~~, less legally required and customary deductions for the Federal Income Contribution Act and federal and state income taxes. Employer will rescind Grievant's termination, and the accessible documents in Grievant's personnel file will be modified to so reflect. Employer shall place all documents regarding the Grievant's March 27, 2002 discharge in a sealed envelope in the Grievant's personnel file. Such documents shall be retained for legal and regulatory purposes only, and shall be accessed or used only in connection with such activities.

WAP

8.    Employer agrees that ~~within___days of execution of this Settlement Agreement,~~ it shall (immediately) reinstate Grievant to a Regular position as a Communications Operator ~~at the Martinez Medical Center, or~~ at another facility, as mutually agreed to by Employer, Union and Grievant. Grievant shall be reinstated without loss of seniority or tenure credit for benefit calculation purposes. ↗ WAP   WAP

/// 

other than Martinez and/or Walnut Creek

↗ WAS

Grievant shall be placed on a personal leave of absence ~~not to be~~ until Jan 4, 2004, and during said leave, may apply for other positions. If she secures no other position, she shall return to work as described above on January 4, 2004.

9.   Grievant acknowledges that she: (a) has read this Settlement Agreement, is fully aware of its contents and legal effect, and is freely and voluntarily executing it; and (b) has been given the opportunity to consult with an attorney and has exercised that right.

10.  This Settlement Agreement (a) shall not be construed as an admission of fault or wrongdoing by either party; (b) shall not be used or referred to by either party to support a claim of such fault or wrongdoing; and, (c) has no effect on any vested rights to any moneys in any employee benefit plans in which Grievant has participated or any claim which he may have in the future because of events which may occur after the effective date.

11.  It is understood and agreed by both parties that this is the entire settlement of this dispute and no other grievance shall arise out of or in the course of the settlement of this dispute. The settlement of this grievance shall not constitute precedent for any party nor shall any party use any portion of this grievance or settlement in any pending or future case of a similar or dissimilar nature.

12.  This Settlement Agreement shall become effective on the last date of signature by Grievant or Local 250. Upon receipt of the signed Settlement Agreement, Grievant and Union shall promptly submit to Employer's designated representative documentation requested by Employer necessary to determine Grievant's interim earnings from March 27, 2002 through the date of execution of this Settlement Agreement. Upon receipt of such information Employer shall calculate the amount of back pay due Grievant pursuant to Paragraph 7 of this Settlement Agreement, and shall notify Union of this amount. If Union and Grievant agree with Employer's calculations, Employer shall prepare and transmit a check to Grievant in the agreed-upon amount. If Union, Grievant and Employer fail to agree to the amount of back pay due Grievant, Union may submit the dispute to binding arbitration pursuant to Paragraph 17, below.

13.  This Settlement Agreement shall be construed and governed by the laws of the State of California. Should any provision of this Settlement Agreement be determined by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remainder of this Settlement Agreement shall remain fully valid and enforceable. The usual presumptions against the drafter of the document shall not apply to any dispute regarding interpretation of this Agreement.

14.  This is the complete agreement between the parties regarding Grievant's employment, the release of any claims against Employer, and the payment by Employer for that release. Any modifications must be in writing and signed by the parties.

/ / /

/ / /

/ / /

3

15.    Any disputes concerning the implementation, interpretation or application of this Settlement Agreement shall be subject to binding arbitration pursuant to the terms and conditions of the Collective Bargaining Agreement between the Employer and Local 250.


Dated: _September 24_, 2003          By: _____
                                          Theresa Tokashiki


Dated: _September 24_, 2003          By: _William Sokol_____
                                          For Hospital & Health Care Workers'
                                          Union, Local 250, SEIU, AFL-CIO


Dated: _September 24_, 2003          By: _____
                                          For Kaiser Foundation Hospitals


4

**Exhibit 30**

May 3, 2005

Kaiser Permanente Executive Management
1425 South Main Street
Walnut Creek CA, 94596

To Whom It May Concern:

On or around March 17, 2005, I was handed what looked like a small fortune cookie paper, that had scotch paper over it that was typed in black ink written " medical use contains cannabis", it was found in position three by Elizabeth DePietro. When Elizabeth handed the small label she was laughing and I took it as a joke ( I did not know what it meant). I ask Elizabeth DePietro what is this, she said Terri Tokashiki was sitting in the position number 3 and Elizabeth DePietro thought I was left by Terri Tokashiki and I said ok. I than ask Elizabeth DePietro if she wanted it back or can I throw it away? Elizabeth DePietro said throw it away she did not want it. I toss it in my recycling bin.

On March 21, 2005, Diane Thurin asked me to meet with her to discus the incident mention above. I told exactly what happen and I also said I did not take it serious.

On March 24, 2005, Elizabeth DePietro and I were working the evening shift together and Elizabeth DePietro brought up about the above incident and I told Elizabeth DePietro that the note was in my recycling bin never gets changed so the note would still be there, I retrieved the "note" from my recycling bin and gave it to Elizabeth DePietro to give to Diane Thurin.

Sincerely,

Cindy Munoz-Romo

**Exhibit 30.1**

### INVESTIGATION STATEMENTS

| | |
|---|---|
| **EMPLOYEE NAME:** | **TERESA TOKASHIKI** |
| **EMPLOYEE ID:** | **000110383** |
| **HIRE DATE:** | **05/30/00 (REHIRE)** |
| **POSITION:** | **COMMUNICATIONS OPERATOR** |
| **DEPARTMENT:** | **COMMUNICATIONS, WALNUT CREEK** |
| **MANAGER:** | **DIANNA THURIN** |
| **INVESTIGATOR:** | **KRISTIN HEIMAN, HR GENERALIST** |

### David Langkiet, Communications Operator, Walnut Creek

On Friday, 4/15/05, I met with David Langkiet to discuss the recent incident on 4/3/05 with Teresa Tokashki. Mr. Langkiet stated that on 4/3/05 around 12:45 pm he got up from his desk and walked over to co-worker Dean Horn's desk to ask him if he wanted anything for lunch. Mr. Horn was seated at the middle desk against the wall with the windows; Ms. Tokashki was using the desk to the left of Mr. Horn in the corner. Ms. Tokashki was at lunch. Mr. Langkiet noticed a half eaten cookie on Ms. Tokashki's desk and walked over to look at it more closely. It was a half eaten homemade chocolate chip cookie partially wrapped in plastic wrap. On the plastic wrap was a label stating, "For Medical Use Contains Cannabis".

Mr. Langkiet called co-workers Mr. Horn and Elizabeth DePietro over to look at the cookie and the label. Both co-workers confirmed the label stating, "For Medical Use Contains Cannabis". Mr. Langkiet called security and his manager, Dianne Thurin. Officer Ryan White came over to the Communications Department to take a picture of the cookie, but was unable to do so because the camera was not working. Officer White tried to get a digital camera to take a picture but was unable to do so before Ms. Tokashki returned back to work. Officer White escorted Ms. Tokashki off the premise.

Mr. Langkiet stated that Ms. Tokashki is always talking about drugs and pills she is taking and has shown coworkers her license to carry cannabis. ⟵——————— "Shown coworkers license to carry Cannabis"

Mr. Langkiet took a picture of the cookie and label with his cell phone and will provide it to Jan Austin and Dianne Thurin. Mr. Lankgkiet has also provided Ms. Thurin with report from another company who was able to terminate an employee for having drugs on the work premise for a medical condition.

### Dean Horn, Communications Operator, Walnut Creek

On Friday, 4/15/05, I met with Dean Horn to discuss the recent incident on 4/3/05 with Teresa Tokashki. Mr. Horn confirmed Mr. Langkiet's statement about him approaching his desk to ask about lunch and then noticing the half eaten cookie on Ms. Tokashki's desk. Mr. Horn stated the cookie had been eaten and was rewrapped in the plastic wrap with a label indicating the cookie had cannabis in it. Mr. Horn stated when Officer Ryan came into the office to escort her out she

Exhibit 30.1

explained to the officer that she had brownies in the refrigerator with the same label. Mr. Horn has never heard Ms. Tokashki state that she has a license to carry cannabis for medical purpose.

### Officer Ryan White, Security Shift Supervisor, Walnut Creek

On Friday, 4/15/05, I met with Officer Ryan White to discuss the recent incident on 4/3/05 with Teresa Tokashki. Officer White stated he received a phone call from Mr. Lankgiet reporting a chocolate chip cookie on a coworkers desk with a label indicating the cookie contain cannabis. Officer White went over to the Communications Department to take a picture of the cookie but was unable to do so because the camera was not working. Officer White witnessed and verified the label on Ms. Tokashki's desk stating cookie contains cannabis. Officer White called his Supervisor, Steven Fernandez. Mr. Fernandez advised Officer White to wait for Managers request to send employee home. Officer White was contacted by Ms. Thurin and advised to escort Ms. Tokashki off the premise. Before leaving the premise peacefully, Ms. Tokashki advised and showed Officer White her brownies in the refrigerator with a label stating contains cannabis.

On Friday, 4/15/05, I sent an email to Steven Frenandez requesting a copy of Officer White's report.

**HOW** was clmt terminated? ☒ In Person ☐ By Phone ☐ Other _____

**WHY** was clmt terminated? What reason(s) were given to the clmt? Include **FINAL INCIDENT** and date. **AB**
Claimant Information: **CLMT/S WAS TERMINATED FOR ALLEGED, POSSESSION AND CONSUMING OF
MARIJUANA WHILE AT WORK.**
 **FINAL INCIDENT ON 040305; ER ALLEGES, THAT CLMT POSSESSED AND CONSUMED OF MARIJUANA
WHILE AT WORK AND WAS PLACED ON PAID LOA PENDING AN INVESTIGATION. UPON INVESTIGATION,
IT WAS CONFIRMED AS ER STATED, THAT CLMT POSSESSED AND CONSUMED OF DRUG WHILE AT WORK.**

 **CLMT'S RESPONSE- CLMT DENIES CONSUMING MARIJUANA AT WORK. CLMT/S POSSES A LICENSE THAT
ALLOWS HER TO POSSESS THE MARIJUANA.**

 **CLMT/S STORED THE MEDICATION IN THE REFRIGERATE AT WORK PLACE, BUT HAD NOT USED IT AT
WORK.**

**CLMT/S ER NEVER TOLD CLMT WAY THEY FOUND OUT; NO INVESTIGATION COPY WAS EVER PROVIDED TO
CLMT.**

 **CLMT WAS SUSPENDED FROM 040305-062005.**

**CLMT/S WAS ON MEDICAL LOA FOR AROUND ONE YEAR, AND OBTAINED DR'S RECOMMENDATION/ LICENSE
FOR POSSESSION OF MARIJUANA ON 070604. CLTM WENT TO WORK WHILE ON LOA, TO REPORT THE
ISSUE TO ER, AND SINCE HER SUPERVISOR JOE SMITH, AND AMI SHAW WERE ABSENT, CLTM TOLD
ALICIA BLINKS, ACTING SUPERVISOR. THERE WAS ANOTHER EE, MORENDA GUTIERREZ PRESENT TOO,
WHO IN FACT WROTE AN LETTER REGARDING THE INCIDENT ON 070604- PLEASE SEE ATTACHED COPY.
 CLMT/S DOES NOT HAVE IRRESISTIBLE COMPULSION FOR DRUG USE, BUT FOR HER MS PAIN, IS
REQUIRED TO TAKE THE PRESCRIPTION DRUG.
 DR'S ASSED PRESCRIBED THE DRUG ON 070604 FOR PERIOD OF ONE YR- TILL 070605.**

**WAS** clmt aware his/her actions could result in termination? ☐ Yes ☒ No **EXPLAIN (i.e., Warnings, Policy, Suspension)**
**NO WARNINGS REGARDING THE ISSUE.**

## 12. INFORMATION/VERIFICATION FROM OTHER SOURCES (witnesses etc.)

Name _____ Title _____ Phone No. _____
Date _____ Time _____ Additional Information

## 13. REBUTTAL ☐ Clm ☐ ER Name and Title _____ Date _____ Time _____

**14. SUMMARY OF MATERIAL FACTS:** ER HAD TERMINATED CLMT FOR ALLEGED, POSSESSION AND CONSUMING
OF DRUGS WHILE AT WORK. FINAL INCIDENT; CLMT WAS SUSPENDED, AND LATER TERMINATED UPON
INVESTIGATION. CLMT DENIES CONSUMING OF DRUGS AT WORK, BUT PROVIDED DR'S RECOMMENDATION
FOR DRUG USE AS PRESCRIPTION MEDICATION; PLEASE SEE ATTACHED EX.1. ER FAILED TO PROVIDE
ANY EVIDENCE SUPPORTING MISCONDUCT. CLMT HAD REPORTED HER PRESCRIPT MEDICATION TO ERRAND
NEVER RECEIVED ANY WARNINGS REGARDING THE ISSUE.

Termination was ☐ For MC ☒ Not For MC **REASON FOR DECISION: BASED ON AVIL INFO, DEPT DETERMINES,
THAT CLMT WAS NOT TERMINATED FOR MISCONDUCT. DUE TO THE FACT, THAT ER FAILED TO PROVIDE
ALL EVIDENCE SUPPORTING MISCONDUCT, DETP FINDS CLMT ELIG UNDER 1256 UI CODE.**

**LEGAL RESULTS** Under Section 1256 of the UI Code clmt is ☒ MC Eligible ☐ MC Disqualified RD **MC 270 CC**
ER/Agent Address **1425 S MAIN ST**                          **WALNUT CREEK    CA 94596 5318_____**
                                                                                            ER Acct. No. _____

                                                                         **DANUTA L.** _____
                                                                         Department Representative

**DE 2403 MC (8-00) macro (10-22-02)**                 SSN: 550 63 2479

**8. Claimant Information (continued):**

Is the claimant currently receiving, or received in the past, treatment for the addiction?   ☐ Yes   ☒ No   If yes, from whom?

_____

Reason for discharge that was caused by <u>inability to abstain</u>: (If one of the following reasons, the issue is 1256.)

   ☐ Chronic absenteeism due to intoxication      ☐ Reporting to work while intoxicated

   ☐ Using intoxicants on the job           ☐ Gross neglect of duty while intoxicated

**9. Employer Information:**

Er name: _____   Agent name: _____

Person spoken to: _____   Phone No.: _____

Time called: (1) _____   (2) _____   L/M to return call by: Date _____   Time _____

Reason for Separation:

**10. Information From Other Sources:**

Name: _____   Phone No.: _____

**11. ☐ Claimant ☐ Employer Rebuttal to Conflicting Information:**

**12. Department Information:**

Reason for ☒ eligible   ☐ disqualifying decision. Summary of material facts:

CLMT DOES NOT ADMIT INTO IRRESISTIBLE COMPULSION FOR ALCOHOL USE, AND IS FOUND ELIG
UNDER 1256.5 UI CODE. RD MC 270 MM

**TOX**

<u>DANUTA L.</u>
                (Department Representative)

DE_2403TOX_Rev_2_(3-98)_InTRAnet      SSN: 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



**Employment
Development
Department**

State of California
**TOX**

## RECORD OF CLAIM STATUS INTERVIEW

Date of Interview: 06-28-05

1. **SSN:** 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      2. **Claimant Last Name:** TOKASHIKI
3. **BYB:** 06-12-05      4. **Affected Week(s):** 061805
5. **Potentially Disqualifying Facts:** MEDICAL LICENCE TO USE DRUG
6. **Check if Applicable:**   ☐ Information Only    ☐ Appeal    ☐ Claimant Does Not Need More Time
7. **Documents Made Part of Record:**   ☐ Er Pro   ☐ 4934H   ☒ Other: 1173:062705

8. **Claimant Information:** Phone No.: 925 691 4011      call time: 1:59P     Rslt: R.CLMT

L/M to return call by: Date _____ Time _____ call time: _____ Rslt: _____

Why did the claimant leave work? POSSESSION AND USE OF DRUGS

Was the leaving caused by claimant's use or consumption of intoxicants?   ☐ Yes   ☒ No

Did the claimant have the ability to abstain from the use or consumption of intoxicants?   ☒ Yes   ☐ No
(If yes, resolve issue using 1256 guidelines.)

**VOLUNTARY QUIT**

If quit to enter treatment program or facility:

- Was claimant advised by competent professional to leave work to enter treatment program or facility?   ☐ Yes   ☐ No

  Name and title: _____ Phone: _____

- Type of facility or program (I.e., in-patient or out-patient hospital, county rehabilitation program, A.A., etc.):

  _____

- Could treatment have been accomplished without leaving work?   ☐ Yes   ☐ No   Explain:

If quit because work was a factor in the addiction, how was it a factor?

N/A

If claimant quit because work posed an undue risk of injury or illness related to the addiction, describe the risk:

Did claimant have prior LOA from this employer for same reason?   ☐ Yes   ☐ No   If yes, did claimant request LOA for current treatment?   ☐ Yes   ☐ No   Explain:

**DISCHARGE:**

Does claimant admit to an irresistible compulsion to use intoxicants (an inability to abstain)?   ☐ Yes   ☒ No

Has claimant exhibited an ability to control the addiction before or after the discharge?   ☐ Yes   ☒ No   If yes, what prevented control at the time of the discharge?

N/A

DE_2403TOX_Rev_2_(3-98)_InTRAnet      SSN: 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

**10. ATTEMPTS TO REACH EMPLOYER/AGENT**   Date _____   Time Called _____

Company Name **KAISER HOSPITAL** _____ Phone No. _____

Agent Name _____ Phone No. _____

**Results of Final Call** ☐ Reached ER/Agent ☐ Busy ☐ Disconnected/Wrong No. ☐ No Answer

Left Message ☐ Answering Machine or ☐ with Name _____ Title: _____

for ER/Agent to return call by   Date _____ Time _____

☐ ER/Agent did not return call   Date _____ Time _____ ☐ DE 4463 Suspense Date _____

**11. EMPLOYER/AGENT INFORMATION**

Spoke with ☐ ER ☐ Agent Name _____ Title _____ Date _____ Time _____

**WHAT** is the clmt's restriction/limitation? _____

**WHEN** did clmt's restriction/limitation start/end? (Document dates.) _____
**HOW** did ER become aware of clmt's restriction/limitation? _____

**12. INFORMATION/VERIFICATION FROM OTHER SOURCES** (Doctor, Care Provider, Alternate Transportation, and Labor Market, etc.)
Name _____ Title _____ Phone No. _____

Date _____ Time _____ Facts

Document Labor Market Source _____

**13. REBUTTAL** ☐ Clmt ☐ ER   Name and Title _____ Date _____ Time _____

**14. DEPARTMENT ANALYSIS OF RESTRICTION**

☒ Restriction is compelling. **Explain CLMT IS NOT AA TO WORK DUE TO HEALTH ISSUE. UNDER MEDICAL CARE EFFECTIVE 062105 TILL RELEASED TO WORK.**

Does a substantial field of employment remain? ☐ Yes ☒ No **Explain CLTM HAS REMOVED HERSELF FROM LM.**

☐ Restriction is non-compelling. **Explain**

Describe how the restriction impacts the clmt's chances for re-employment. _____

SUMMARY OF MATERIAL FACTS **CLMT IS NOT AA TO WORK DUE TO HEALTH ISSUE. UNDER MEDICAL CARE TILL RELEASED TO WORK. CLTM HAS REMOVED HERSELF FROM LM.**

Is clmt available for work ? ☐ Yes ☒ No **REASON FOR DECISION BASED ON AVIAL INFO, DEPT DETERMINES, THAT CLMT IS NOT AVIAL FOR WORK. DUE TO THE FACT, THAT CLMT HAS REMOVED HERSELF FROM LM, DEPT FINDS CLMT DISQ UNDER 1253.5 UI CODE W/E 062505 5BR RD AA 235 A.**

LEGAL RESULTS Under Section 1253c of the UI Code, clmt is ☐ AA Eligible ☒ AA Disqualified RD **AA 235 C**

         **DANUTA L.**
         (Department Representative)

DE 2403 AA (11-00) macro (10-22-02)     SSN: 550 63 2479



**Employment Development Department**

State of California

**AA**

## RECORD OF CLAIM STATUS FOR ABLE AND AVAILABLE (AA)

Date of Interview **06-28-05**

1. SSA No. **550 63 2479**
2. Claimant's Last Name **TOKASHIKI**
3. BYB **06 12 05**
4. Affected Week(s) **061805**

5. Potentially Disqualifying Facts AA Reason **HEALTH ISSUE**

6. Check if Applicable ☐ Unscheduled Issue/Verbal Due Process Provided ☐ Information Only ☐ Pre-Appeal ☐ Re-Det

7. Documents Made Part of Record ☐ ER Pro Dated _____ ☒ 1173 Dated **062705** ☐ Other _____

8. **ATTEMPTS TO REACH CLAIMANT**

Phone No. **925 691 4011**   Time Called **1:54P** , _____ ☐ Will Call   Time Clmt Called _____

**Results of Final Call** ☒ Reached Clmt   ☐ Busy   ☐ Disconnected/Wrong No.   ☐ No Answer

Left Message ☐ Answering Machine or ☐ with Name _____ Relationship _____

☐ for clmt to refer to DE 4800 regarding appointment.

☐ for clmt to return call by Date _____ Time _____ or decision will be made on available information.

Did clmt return call? ☐ Yes ☐ No Date _____ Time _____ ☐ DE 4365 Suspense Date _____

9. **CLAIMANT INFORMATION**

Primary occupation **TELEPHONE OPER** Length of Exp. **10YRS** Days/Hrs Wkd **8A-4PM,M-F** Pay Rate **$17.0073/**

Dept. Info Customary Days/Hours for Occupation _____ Prevailing Wage $_____

**WHAT** is the restriction/limitation? **NOT AA TO WORK** _____

**WHEN** did the restriction/limitation begin and end? Document date(s). **062105 AND CONTINUE**

**WHY** is there a restriction/limitation? Document reason(s). **CLMT/S IS UNDER MEDICAL CARE, AND WILL BE ON DI EFFECTIVE 062105.**

**NATURE OF MEDICAL CONDITION- CLMT/S WILL HOLD HER INFORMATION REGARDING MEDICAL CONDITION; MS IN THE SPINE.**

INSTRUCTION: Advise clmt that his/her restriction may lead to his/her ineligibility for UI benefits.

Having been so advised, will the clmt modify or eliminate the restriction? ☒ Yes ☐ No ☐ Preference only

If yes, what steps has the clmt taken or will clmt take to modify or eliminate the restriction? Include effective date of modification

**CLMT WAS AA TO WORK TILL 062105, WHEN WENT UNDER MEDICAL CARE AND FILED FOR DI**

Assigned Seek Work Plan **AB**_____   ESW Required? ☒ Yes ☐ No

Did the clmt seek work or conduct other job search activities during period in question?

☐ Yes (List ESW below.) ☒ No (If AA/ESW still exists, continue on reverse. If issue is ESW only, DE 2403ESW is required.)

| Date | ER Name | City | Phone/Fax # | Contact Person | Type of Work | Results |
|------|---------|------|-------------|----------------|--------------|---------|
|      |         |      |             |                |              |         |
|      |         |      |             |                |              |         |

Other job search activities _____

Dept. Verification (if applicable) Date _____ Time _____ , Name _____ Title _____

Results _____

DE 2403 AA (11-00) macro (10-22-02)   SSN: 550 63 2479



**Employment
Development
Department**

State of California
MC

## RECORD OF CLAIM STATUS INTERVIEW MISCONDUCT (MC)

Date of Interview **06-28-05**

1. SSN **550 63 2479**      2. Claimant's Last Name **TOKASHIKI, THERESA**

3. BYB **06-12-05**      4. Affected Week(s) **061805**

5. Potentially Disqualifying Facts   MC Reason **USE OF INTOXICANTS WHILE AT WORK**

6. Check if Applicable ☐ Unscheduled Issue/Verbal Due Process Provided ☐ Information Only ☐ Pre-Appeal ☐ Re-Det

7. Documents Made Part of Record ☐ ER Pro Dated _____ ☒ 1173 Dated **062005**    ☒ Other **XX.1.**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8. ATTEMPTS TO REACH EMPLOYER/AGENT     Date **062805**    Time Called **8a** _____

Company **KAISER HOSPITAL**                         Phone No. _____

Agent Name **ER'S UNITY**                          Phone No. **800-525-8232**

Results of Final Call ☐ Reached ER/Agent ☐ Busy ☐ Disconnected/Wrong No. ☐ No Answer

Left Message ☒ Answering Machine or ☐ with Name **CANDY JAMES** _____ Title **CLAIM REP**

for ER/Agent to return call by     Date **063005** _____ Time **9A** _____

☒ ER/Agent did not return call Date **063005** _____ Time **9A** _____ ☐ DE 4463 Suspense Date _____

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9. EMPLOYER/AGENT INFORMATION

Spoke with ☐ ER ☐ Agent Name _____ Title _____ Date _____ Time _____

Clmt's. Job Title _____ Duration _____ Rate of Pay $ _____ Per _____

WHEN was clmt terminated? Date _____ LDW _____

WHO terminated the clmt? Name _____ Title _____

HOW was clmt terminated? ☐ In Person ☐ By Phone ☐ Other _____

WHY was clmt terminated? Document specific dates and facts of FINAL INCIDENT. Include dates of and reasons for warnings.

WHAT reason was given to the clmt for the discharge?

If none, WHY NOT? _____

If delay between the final incident and discharge, explain:

10. ATTEMPTS TO REACH CLAIMANT

Phone No. **925 691 1011** _____ Time Called **8:07A** _____ ☐ Will Call Time Clmt Called _____

Results of Final Call ☐ Reached Clmt    ☐ Busy    ☐ Disconnected/Wrong No.    ☐ No Answer

Left Message ☒ Answering Machine or ☐ with Name _____ Relationship _____

☒ for clmt to refer to DE 4800 regarding appointment.

☐ for clmt to return call by Date _____ Time _____ or decision will be made on available information.

Did clmt return call? ☐ Yes ☐ No Date _____ Time _____ ☐ DE 4365 Suspense Date _____

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11. CLAIMANT INFORMATION

☒ Verified last employer – Name **KAISER HOSPITAL** _____ LDW **040305**

Job Title **TELEPHONE OPERATOR** _____ Duration **5YRS** _____ Rate of Pay $ **17.0073** Per **HR**

WHEN was clmt terminated? Date **062005** _____

WHO terminated the clmt? Name **DIANE THURIN** _____ Title **EXEC CONSULTANT**

DE 2403 MC (8-00) macro (10-22-02)          SSN: 550 63 2479

**theresa tokashiki**

**⌐ ·m:** "Greg Tegenkamp" <gtegenkamp@seiu-uhw.org>
<territokashiki@msn.com>
**Cc:** <Sammie.Garrett@kp.org>; <rcornejo@seiu-uhw.org>
**Sent:** Tuesday, May 03, 2005 12:07 PM
**Subject:** Grievance Request

Terri,

I am in receipt of your fax sent to me yesterday afternoon. You have
requested that the Union file a grievance on your behalf regarding being
placed on investigatory suspension on April 3, 2005 and for having that
investigatory suspension continue after you met with the Employer and shop
stewards on April 8. As you know, investigatory suspensions at Kaiser are
paid, so you are not suffering any loss of income while Kaiser is conducting
its investigation. To my knowledge, Kaiser did inform you of the reason you
were being placed on investigatory suspension was the fact that you brought
canabis to work with you on Sunday April 3. You claimed the canabis was
used by you for medical reasons and Kaiser asked you to provide
documentation of that, which you provided on April 8. Based on the findings
of their investigation, Kaiser will make a determination of what action to
t. .. This action could be return you to work without discipline, to
terminate you or to return you to work with some other form of discipline.
Until Kaiser takes some action which is adverse, such as warning,
disciplinary suspension or termination, the Union has no basis for a
grievance. In short, Kaiser has not violated the CBA by placing you on
investigatory suspension with pay. You raise issues that your Weingarten
rights may have been violated and if that is indeed the case, we can use
that as an affirmative defense should Kaiser take adverse disciplinary
action.

Also, please note that I was not at the April 8, 2005 meeting as you state
in the third paragraph of your faxed letter to me. I have talked to Tee
Grice and Sammie Garrett regarding their involvement with your case.

Once again, no grievance is being filed at this time over your
investigatory suspension with pay, since this does not violate our CBA. We
currently have several other employees at Kaiser Walnut Creek on
i estigatory suspension with pay, for various reasons, and each of them
understands the process and none have asked to have a grievance filed over
their suspension.

If you have questions, please follow up with me.

Yours truly,

Greg Tegenkamp
UHW Field Representative/Organizer

**theresa tokashiki**                                                    **Exhibit 69**

**From:**     <Amy.Shaw@kp.org>
              <territokashiki@msn.com>
**Sent:**     Wednesday, October 22, 2003 9:29 AM
**Subject:**  Re: I do need some help with this Amy...

Terri.

To date we have fully complied with the terms of the settlement agreement.  You have received the settlement amount due ($50,0000.00 gross).  You have been placed on a personal Leave Of Absence.  You will begin to accrue vacation upon your return to work.  That accrual will reflect your unbroken seniority.

As far as accessing the "Corporate" Kaiser Permanente site from you home.  I don't believe you can.  You are welcome to use a computer here in the Walnut Creek Operator area during business hours 8:00 a.m. - 5:00 p.m. Monday - Friday.  You need to contact me to set up a time so I can have a station available for you to use.  Please call me at 295-6255.

Amy

## CERTIFICATE OF SERVICE BY MAIL

*U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA*

TOKASHIKI vs. KAISER FOUNDATION HOSPITALS

Case #: C 08-0357 BZ

July 17, 2008

I am over the age of 18 and not a party to the action as noted above.  I am a resident in the County of Contra Costa, in the State of California.  My address is:  2034 Spring Lake Drive, Martinez, California 94553.

On July 17, 2008, I served the following document:

## NOTICE OF MOTION for [PROPOSED] SECOND (2ND) AMENDED COMPLAINT

By placing a true and correct copy thereof in a sealed envelope addressed as follows:

Chris Baker and Deborah J. Broyles, Attorneys for Defendants
THELEN, REID, BROWN, RAYSMAN & STEINER, LLP
101 SECOND STREET
Suite 1800
San Francisco, CA 94105

Today, July 17, 2008, I placed said document above in a pre-paid envelope at the Concord, California United States Post Office.

I declare this under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 17, 2008, at Martinez, California.

Date:  July 17, 2008

Barbara McCauley

-1-